# MALONE v. LOCKHEED MARTIN CORPORATION, ET AL.

# 07-65-T

# PLAINTIFF'S MEMORANDUM OF LAW SUPPORTING MOTION FOR SANCTIONS

# EXHIBIT E

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * *
AZELL MALONE *
* Civil Action
-vs- *
* No. 07-65-T
LOCKHEED MARTIN CORPORATION *
and CARL SUPANCIC *
*
* * * * * * * * * * * * *

APPEARANCES: Michael F. Drywa, Junior, Esquire
53 Arlington Street
Post Office Box 7367
Brockton, Massachusetts 02303;
Representing the Plaintiff.

Tamika R. Nordstrom, Esquire
LAW OFFICES OF MILLER & MARTIN, PLLC
1170 Peachtree Street NE - Suite 800
Atlanta, Georgia 30309;
Representing the Defendants.

DEPOSITION of RICHARD JAMES GOULART, a witness of lawful age, taken on behalf of the Plaintiff in the above-entitled cause wherein Azell Malone is the Plaintiff and Lockheed Martin Corporation et al are the Defendants, pending before the United States District

* * * * * *

Parisi Court Reporting
270 Hixville Road
North Dartmouth, Massachusetts 02747
(508) 984-5502

Court for the District of Rhode Island, pursuant to notice and agreement of parties before Barbara St. Jean, CSR, RPR, commissioned in the State of Rhode Island, at the offices of Jamison Chase, Esquire, 2477 East Main Road, Portsmouth, Rhode Island, on Wednesday, the 24th day of October, 2007, at 10:00 o'clock a.m.

# I N D E X

Page

RICHARD JAMES GOULART

Direct Examination By Mr. Drywa 4

(October 24, 2007
Wednesday, 9:54 a.m.)

RICHARD JAMES GOULART, identified to me by a Lockheed Martin Identification Card No. 22476, a witness called on behalf of the Plaintiff, having been duly sworn on oath, deposes and says as follows:

DIRECT EXAMINATION

Q (By Mr. Drywa) Could you please state your full name and spell your last name.
A Richard James Goulart, G-O-U-L-A-R-T.
MR. DRYWA: Thank you, Mr. Goulart. By way of introduction, my name is Michael Drywa. And I am an attorney; and I represent Al Malone in a lawsuit against Lockheed Martin and Carl Supancic. And the reason you're here today is -- I don't expect it's going to take us very long; but you may have information that may be relevant to the action that Mr. Malone has brought. And so I want to ask you a series of questions about what you may or may not know.
The nature of the lawsuit is one for discrimination and whistle blower. So I'm going to try to keep those two actions compartmentalized so

that we don't cross over; although some certainly cross over.
Q Have you ever given a deposition before?
A No, sir.
MR. DRYWA: Okay. Basically it's what -- what you see is what you get here, that I'm going to ask you a series of questions. The stenographer at the end of the table here will take down everything that is said in the room. As a result of that, if you answer a question audibly -- and I'll ask that you answer all questions audibly if you could. She's gonna take down what you say. So it's important to just take your time and think about the answers before you say something.
And if you have any need to have a break for the bathroom or what have you --
THE WITNESS: Sure.
MR. DRYWA: -- by all means, let me know. And, again, I don't anticipate it'll take that long. Do you have any questions of me before we get started?
THE WITNESS: No, sir.
Q Okay. Before you got here today, were you aware of a lawsuit -- the lawsuit that Mr. Malone has against

Lockheed Martin and Mr. Supancic?
A Not till I was -- you know, by the company telling me just recently.
Q When?
THE WITNESS: When did we -- was it last week?
Q Okay. Who told you?
A Keith Cobb and I were called over to the office. And they informed us of there was a lawsuit going on.
Q Who told you that?
A Carl Supancic.
Q Okay. So you, Carl, and Keith Cobb were in a meeting. And Carl told you that there was a lawsuit against him and Lockheed Martin that Mr. Malone had brought?
A Yes.
Q Where did that meeting take place?
A Over at the main office in Middletown. I guess that was Middletown.
Q You can't look to him for an answer. I mean, you can look to him if you want, but --
A No. I was just trying to think. Dan Ferguson, I guess one of the managers, was there.

Q So you, Dan, Keith, and Carl?
A Well, let me get this right.
Q That's okay. Take your time. I'm not trying to trick you.
A I went over last week. It was just me to stop by. And I was informed about the case. And then Keith and I went over there -- that's why I was looking -- I believe it was a couple of days ago.
Q He can't answer.
A Oh. I'm sorry.
Q You -- you gotta pretend he's not here.
A And I was told last week. And then where Keith and I was yesterday. We went over; and they informed us in detail, the lawyer.

MS. NORDSTROM: You can't talk about anything we talked about.

THE WITNESS: Right.

MR. DRYWA: Well, actually, you can.

A Well, I was informed about the case.
Q Okay. Who informed -- what I was interested in is who talked to you about your deposition today, about what you may or may not say today.
A Yesterday --
Q Yes.

A -- was just from the lawyer about this case.

MS. NORDSTROM: I'm his attorney; and I object to any questions that are listed as attorney/client information.

Q Did you hire Ms. Nordstrom as your attorney?

A No.

Q So you don't have an attorney representing you today?

MS. NORDSTROM: I am representing him today. And I have represented that to you as well. That's why he's appearing without Subpoena today.

MR. DRYWA: Let's go off the record.

(Discussion off the record)

MR. DRYWA: Let's go back on the record.

Q When did you first meet with Ms. Nordstrom?

A Yesterday at the end of work.

Q Okay. And where did you meet her?

A In Middletown. Lockheed office, Main Road.

Q Okay.

A East Main. East Main Road.

Q Okay. And at whose request did you meet her?

MS. NORDSTROM: I'm going to object as attorney/client privilege and direct that you not

answer that question.
Q Did Ms. Nordstrom contact you directly in the request that you meet with her?
MS. NORDSTROM: I'm going to object again. Same basis.
Q Did Ms. Nordstrom tell you how you should prepare your answers for today's deposition?
MS. NORDSTROM: Object again. Same basis. I'm his counsel sitting here. You can shake your head; but --
Q Did you ever talk about this case with Mr. Supancic?
A Yes. When we were over at the office about the case coming up.
Q Did he ever tell you what he thought the case was about?
A I asked him.
Q And what did he tell you?
A What the suit was about. He said it was a -- a suit against Lockheed and against him for racism and persecution of a whistle blower. Those two things.
Q Okay.
A And that's all that was stated material.
Q And when was that?
A When I asked him last week when I was informed of

the case.
Q Okay.
A And I asked what it was about, just like --
Q Yeah. And so then did you talk about it after that?
A We ended the meeting. It was more to inform me that this questioning was coming up.
Q Oh, he told you that?
A Well, about the case that we're gonna have a date that we have to meet, which is here. I wasn't sure at the time of the exact, you know, place. It could be in Providence. Things like that.
Q Did you and he discuss the facts of the case at all?
A I'm not sure what to say on that.
Q Just answer truthfully.
A I plan -- I didn't know I was -- you know, I thought it was just come in and questions; and I answer 'em truthfully --
Q Right.
A -- and go from there. I didn't know about this representation. I don't fully understand. But I understand what she's saying. I didn't know fully.
Q Do you believe that Ms. Nordstrom represents you in

a legal capacity?
A I thought she's representing the company, Lockheed Martin. And I thought it was for Mr. Supancic and that I was just a witness coming in.
Q Are you aware that you could have had your own attorney present today?
A No, not -- no.
Q Did Mr. Supancic tell you you had a right to have an attorney with you today?
A No.
Q Did Ms. Nordstrom say that to you?
A No, sir.
Q Okay. So let's go back.
MS. NORDSTROM: Just for the record, I'd like to state that I told him I was his attorney for today. So he understood that he was represented.
THE WITNESS: Oh, I did as far as a point with Lockheed. I didn't know this -- I was being protected.
Q So let's go back to the conversation you had with Mr. Supancic. When you said you talked about the case and you said you weren't sure how to answer that, Mr. Supancic's not your lawyer, is he?

A No, sir.
Q Okay. So why don't you tell me what you and he talked about when you talked about this lawsuit. Let me ask a more pointed question.
Did he tell you what he thought about the lawsuit?
A Well, he basically -- first thing he told me was that Al had the right -- he was filing a suit, but he had the right to do it. Because, you know, he didn't say it harshly or anything. That's an individual's right, which I understood. And then he explained to me about that it was for racism and persecution of a whistle blower.
Q Right. Did he offer his opinion about what he thought about the lawsuit?
A Other than that, that was probably the major thing.
Q How long did the meeting take place for?
A Yesterday?
Q Not yesterday. Your initial meeting with Mr. --
A Initial?
Q -- Supancic.
A Forty-five minutes maybe to an hour.
Q All right. Forty-five minutes. That's a long time. So I'm interested in what you guys talked about for

that 45-minute period rather than him just telling you that Mr. Malone had a right to bring a lawsuit. I mean, did he talk to you about what you might say if you were questioned?
A No. He didn't tell me anything in detail, not to say anything.
Q Right.
A He told me -- he did tell me, "Tell the truth."
Q Right.
A He says, "Don't say anything, you know, secondhand." You know, in other words, direct facts of anything I know and just tell the truth. Basically he told me that. Mr. Ferguson was there --
Q Yeah.
A -- when I was there. And he basically told me that from -- I -- to put on record, also, I am the original whistle blower. From a lot of things that happened, and within two days, people knew it was me. That much I can tell you. I haven't been happy with the situation from what's happened. All the witnesses, they weren't even spoken to.
Q Well, we'll get to that in a few minutes. I'll ask you a lot of questions about that.

A Well, I did. I explained that. You know. Because he said to me -- he never explained to me about what had happened, what -- you know, what he controlled. And that some day, he was gonna tell me; and that because they're in charge are not allowed to explain why. I'm just baffled that this whole system, that it doesn't work. That much I know. It's almost like --
Q The system at Lockheed Martin, you mean?
A Well, with this HR thing. It's almost like they take control; and they're not -- I was never even told anything.
Q You're referring to the complaints that you filed in September of 2004 --
A Right.
Q -- with Al Malone who then forwarded it on to Mr. Supancic about the allegations of harassment --
A (Witness Nodding)
Q -- about the allegations of --
A Oh, there was a lot of illegal activities going on, I mean, with our guys. There were favors being done. Tools were being bought for certain people. There was government people.
Q Yeah. We'll talk about that. I don't want to

interrupt you.
A I know.
Q But I want to stay on a train of questioning here.
A Well, that's what I'm tryna say is that's what I explained to Carl. I said, you know, the witnesses weren't spoken to. And I got put in a corner; and that's all I know.
Q Okay.
A You know. And --
Q All right.
A That's why I was sayin' I didn't believe in the system.
Q Are you afraid by coming here today and giving testimony that you may suffer some form of retaliation by Mr. Supancic?
A I'm intimidated by the whole thing. Because I don't know what to expect --
Q I understand that.
A -- from everything that's happened. I don't know what to expect.
Q Well, let me just ask you again. Do you believe that you're at risk for some form of retaliation if you come here and testify today?
A I did think that may be a possibility --

Q Okay.
A -- you know, from maybe both parties. I don't know; but I just want to tell the truth.
Q Okay.
A I didn't know it was this detailed.
Q Well, it's -- it's gonna be a little bit detailed. So I'm gonna ask you for patience. Okay?
A Oh, I made it this far.
Q All right. That a boy. So in the 45 minutes that you met with Mr. Supancic and talked about this case, did he at any point ever tell you about what he thought about Mr. Malone's allegations of racial discrimination?
A Not at that time. Yesterday, he explained it.

MS. NORDSTROM: I'll object to anything that went on yesterday. That was a meeting with me.

MR. DRYWA: Well, if he was there and he said something to him, that's not privileged.

MS. NORDSTROM: Well, as long as he can differentiate between what we talked about and what he talked about with Carl.

THE WITNESS: There was a -- from something that had happened there at work, during

that time -- I'm tryna be brief. I had explained about the racism as far as the driving Miss Daisy, which I was told that -- you know, I'll never be friends with these guys again where I work. And I had a explain finally that they aren't my friends. They're working associates. And I get the right in life to at least choose my friends, who I would call my friends, people -- I mean, I can work with anybody. And how I didn't agree with this -- they're colleagues, that they were gonna show the company that they weren't gonna travel. They wanted to stay there. And field engineers, we always travel wherever the work is when needed. And, again, how I wasn't happy with that.

And it went from there to -- you know, these guys were gonna show the company and not use their vehicles. And they were -- I didn't like the idea that Al was forced to -- it seemed like -- I don't know for sure; but he was the one that ended up driving the employee over there and over to Raytheon, I don't know, probably a few times that one week and brought him back. And the guy sat in the back of the car.

After Al left to go home and we do

the shift turnover, they're all jokin' in there about this drivin' Miss Daisy. And I didn't agree with that. That's why I stopped sitting in there. And I ended up sittin' in the back shop in the building just to be away from that. I didn't agree with that.
Q Did you feel it was racially motivated?
A That's -- well, from the things they were sayin' and they were jokin'. And the government official that sits in the next room over when he heard about it that week, he said it right in front of me, he says, "Well, it's about time they got things right now."
Q Who was that?
A His name is Olimpia Pavao. P-A-V-A-O, I believe.
Q Okay. You knew him from --
A Yeah.
Q -- working over there?
A Day one that I arrived there.
Q Eighty-one you said?
A No. From the first day I --
Q Oh. Day one.
A He was there at least a couple of years. I was asked for by another company to work in that contract. And as soon as I got over there, I was

being attacked from day one personally. From then on, it just would never stop. And there was -- there's a collusion there that -- you know, and plus the things that happened, I didn't agree with that. Driving Miss Daisy, that was the individuals there. And --

Q Who said that?

A His name is Joe -- Joseph Pires.

Q Joe Pires?

A Pires.

Q Yeah.

A And the other individuals there, there's a John Lastowski and another John -- I can't think of his last name. He worked second shift. And the guys that were there, they were just constantly jokin' about it, how they showed the company.

And then Joe would come out and joke about, yeah, just like driving Miss Daisy in the movie. And that -- and that's not me --

Q I understand.

A -- what they were sayin'. And the retaliation of other individuals, yes. I do feel intimidated going back. I got moved back over to the other building where I can't do any wrong. Or anywhere else I've

gone. I've always tried. And I applied the same approach at that building. And, again, I'll state, I am the original whistle blower.

Q Yeah. We'll talk about that for sure. I want to get into that a little bit.

A I don't know all the legalities to this. This is all new to me.

MR. DRYWA: Okay. Can we go off the record for a minute, please?

(Discussion Off the Record)

MR. DRYWA: Okay. Let's go back on the record.

Q As we sit here today, do you understand that?

A I --

Q Go ahead.

A I got a picture now.

Q Okay. Do you understand the attorney/client privilege?

A If you hire someone, I thought that's what -- you know, your personal, like a doctor or --

Q And as you sit here today, do you believe that Ms. Nordstrom is your attorney?

A If I -- if I'm here for Lockheed and she says she's representing Lockheed, I -- in my mind, I thought

she was representing Carl. Because, you know, the lawsuit against him. I didn't know I was on -- I thought I was just a witness comin' in from the outside.
Q You are a witness.
A Oh, right. I mean, from the outside not attached to anyone.
Q Well, the reason I ask is because Ms. Nordstrom is going to continue to assert the privilege. And as --
MR. DRYWA: And correct me if I'm wrong, Tamika, but as you indicated, that you don't believe that he understands what the privilege means.
MS. NORDSTROM: Despite my attempts to educate him, it appears not.
MR. DRYWA: All right.
Q And that you hold the privilege, meaning it's up to you to decide whether you want to disclose the communication between your lawyer and yourself. It's not up to your lawyer. Do you understand that?
A Oh. Right.
Q Okay. So if your lawyer directs you not to answer a question put before you on the basis of

privilege --

A Right.

Q -- you -- you understand that it's up to you to decide whether to respond to the question, not up to your lawyer. You hold the privilege. Do you understand that?

A I understand that. But I thought it was if I hired a lawyer, that somebody would be directing me. I didn't know --

Q That's correct.

A -- I was being controlled. I thought I was just gonna be asked questions and answer freely.

Q I think that that is a proper understanding of your role here today.

MS. NORDSTROM: For the record, I'm not sitting here as your lawyer to control you.

THE WITNESS: Oh, I understand. I understand. I didn't know it fully.

Q Then let me just submit to you this, that if you are inclined to answer a question I put forth to you, then feel free to do so regardless of what Ms. Nordstrom may tell you. Do you understand?

A I do. I understand that.

Q Okay.

A But that's --

MS. NORDSTROM: You also understand that I may direct you not to answer. It's your choice to decide to answer --

THE WITNESS: Right.

MS. NORDSTROM: -- over my recommendation; but that I will be giving you those recommendations if he asks you questions that I believe are protected by attorney/client privilege.

MR. DRYWA: Are you okay, Mr. Goulart? I hate to put you in a situation like this; but I didn't anticipate this coming up. Are you all right?

THE WITNESS: Yeah. I'm --

MR. DRYWA: You want to take a minute and collect your thoughts?

THE WITNESS: I don't know what to think. I didn't know it was so lined up. Like I said, I thought I was just a witness coming in to answer.

MR. DRYWA: Right.

THE WITNESS: I had never got an attorney. I believed in the system. I always thought it would work. It's sad it's all come to

this.

MR. DRYWA: Yeah.

THE WITNESS: Because, you know, when you say you nip something in the bud early --

MR. DRYWA: Yeah.

THE WITNESS: -- it was never done. I don't know if I need legal representation now. I don't know.

MR. DRYWA: Well, you certainly have that option.

THE WITNESS: I'm intimidated to say anything now. I mean --

MR. DRYWA: I understand. And I'm not going to force you to do so. I'm simply -- I've asked you to come here today to provide testimony about what you may know about a lawsuit that Mr. Malone has brought against Lockheed Martin and Mr. Supancic.

MS. NORDSTROM: And I'm inviting you to ask questions about that and not about what he did to prepare for the deposition.

MR. DRYWA: But that's relevant.

MS. NORDSTROM: Well, not really. But that's what you should focus on.

MR. DRYWA: Well, I'm going to get to the rest of this. But I'm interested in actually how he was prepared for this. If he wasn't prepared by his own attorney, then I certainly have a right to endeavor as to who told him about the case, what may be asked, the questions that -- and how if at all to respond to certain questions. I understand your position perfectly well, Tamika. I disagree with it vehemently. And, therefore, I don't want to waste your time and my time going forward on this if I can't get the questions answered that I am entitled to ask.

I'm gonna ask all the rest of my questions. But if you have any reservations, Mr. Goulart, that's up to you. I mean, you know you're under oath. And I want to continue to ask you questions --

THE WITNESS: Oh, yeah.

MR. DRYWA: -- so I will.

Q When were you hired by Lockheed Martin?

A It's through corporate changes. We were merging from -- I've been with the company since 1986.

Q Was it Sperry?

A Sperry Corporation.

Q So you were originally hired by Sperry. Is that right?
A Yes, sir.
Q What was your job when you were originally hired?
A As a technician. But they didn't have any openings at the time at the base. And they asked me if I would mind working in the shipbuilding contract. And I did cable fabrication. And I did that for about five years. We built Coast Guard cutters for the government.
Q And what's -- what education level have you achieved? What's your highest education?
A I have some college. I have a lot of military schooling. I was in the Army. I worked civil service. I have much trade school.
Q Sure. The Army, how long were you in the Army for?
A Four years four months.
Q Okay.
A It was a regular time. They extended me for Beirut Lebanon for back in '83.
Q Sure. Then you got out; and you went to work for Sperry?
A No. I got out. I worked civil service in the government. I was stationed out in Oklahoma. And I

lived there for several years. And then I came here in '86, moved back. I was married then, two children. And I got hired by Sperry --
Q Okay.
A -- that year.
Q And you still live here in Rhode Island. Is that right?
A Yes.
Q Okay. And at some point after you began working for Lockheed Martin -- well, let me ask it this way. When Sperry was taken over by Lockheed Martin, did your job change?
A Well, I wouldn't say changed that much. Because as a technician, I would do more.
Q I'm not looking for any big changes.
A No. Different things. There was more technician work now. Now, you know, with Lockheed taking over, I figured there would be more expansion. But there was actually cuts where we went from three shifts down, which is budget. That's not anybody's fault other than the government saying we only got so much money.
Q Yeah.
A So we've kind of trimmed down a lot.

Q Okay. Let's back it up a little bit. Have you basically held the same job from 1986 to now? Or has it changed over the course of let's say about 20 years or so?

A Well, when I got sent over to the other building, I was, you know, doing technician work, plus fiber optic building. I do cable fabrication. And I was allowed to do all these all at once.

And then after that, with the whistle blower thing, I got moved out. I know I lost a lot of work because, you know, they want me out.

Q Yup.

A And --

Q We'll get to that in a few minutes. What -- at any point in your employment with Lockheed Martin, did Carl Supancic ever become your supervisor?

A Yes. There was a change some years back when Mr. Hoffius who worked there for years -- I had never met him. It was funny, you never meet someone.

Q He was Carl's predecessor. Is that correct?

A Yes. And then I heard there was first two people, Mr. Supancic and Mr. Higson I believe, who I didn't meet until later on. And then within a few months,

say several months, I'm not sure, we were told there was one person now, which was Carl Supancic. And he took over as the head one there.
Q Okay. And did he ever make -- you know, did he -- did you ever meet with him to talk about that, you know, he was gonna be in charge or anything like that?
A Not till after, you know, it had happened.
Q Did he ever act as your direct supervisor?
A No. Because he came from software. I'm in hardware.
Q Sure.
A And then hardware just seemed to change after that. We all had -- I don't know all the management thing. But after all them years there, we always had someone -- a chain of command in charge going.
Q Right. Who was your direct supervisor at the time that Mr. Supancic took over the organization?
A That would be Keith Cobb.
Q Keith Cobb. Okay. And how long had you worked for Keith Cobb at that point?
A Since I got laid off for two years. I was laid off.
Q Yup.
A And I came back. This was in I'm gonna say around

'93, '94, I believe, when I came back.
Q Yup.
A And Keith was now sitting there. I had another supervisor when I left. And when I got laid off, Keith was now moving down taking that supervisor's position. And that guy got moved down. Then that's when I had Keith.
Q Okay.
A And then he was -- you know, we had been there all that time.
Q Yup.
A And then this other contract next door, the Global, I was asked by another company for my services there. Because I cover a lot of different things. I enjoy the work. And like I said, from day one I went over there, I was just attacked. It didn't matter.
Q Okay. We'll talk about that in a second. Did you ever work directly for Al Malone?
A When I went over, he was my supervisor when I worked there.
Q That was for the CCSL. Is that --
A CCSL.
Q -- Combat Control Systems Laboratory? Did I say

that right?
A Yes, sir. And I was under Al's direction.
Q Okay. Do you remember about when that started?
A When I went over?
Q Yeah. When Al became your supervisor.
A I'm tryna think. This was --
Q Take your time.
A -- a five-year contract. I wanna say around -- was it -- I don't know -- 2002, I believe.
Q Okay. I'm not looking to hold you down to a specific date.
A Yeah. They're five-year contracts. And I'm not sure of the exact date. But I went over there when they won the contract. Well, that's a couple ago.
Q Who's your supervisor right now?
A I believe Keith Cobb. I mean, things have changed. A little while, probably a few months ago, I remember askin' him, you know, last six months; and he had told me that he wasn't the same anymore, that he's like an EIC, Engineer in Charge, that he really wasn't in charge now. He was more of a worker.
Q Keith was telling you this?
A Right. But I still -- you know, he still handles the things there, that I have to answer to somebody.

Q And that's who you answer to?
A Right. And I've been with him.
Q All right. Before we get into the details of this -- this matter, I just want to ask you some general questions about working at Lockheed Martin.
When Lockheed Martin took over Sperry, did anyone from Lockheed Martin communicate to you that there was a specific policy on absenteeism?
A Could you say that again, please.
Q Sure. Yup. When Lockheed took over Sperry, did anyone from Lockheed Martin communicate to you that there was a specific absenteeism policy? In other words, were you trained in some sort of absentee policy or anything like that?
A If you were gonna be out, you know, sick or for some reason you wanted to use vacation or sick leave or if you didn't feel well or -- that -- you know, just to -- so they would know what to put down on your -- you know, your timecard.
Q Well, did anybody train you --
A I would get that -- that was more or less from the EIC that, you know, this is the policy of how --
Q Okay.

A -- you know, to do things.
Q And --
A Ethical.
Q -- do you believe that the policy during your time there was uniformly enforced?
A Well, up to a point. I mean, I never had heard of any major problems. If somebody was out, they were usually pretty sick or something was -- you know, other than that, I had never really heard of anything until Mr. Malone -- when I went back over to the 12 -- Building 1258. And I was in Building 1259. When I got there, Al was already assigned there to work from next door where he was my supervisor. And now he was a worker like me there --
Q Yeah.
A -- as a technician.
Q Yup.
A And because of the area we sit in, little cubes, and we were all right next to each other.
Q Sure.
A And after a while, there were times that, you know, you could hear him on the phone, him complaining. I'm not sure who he was talking to; but -- it wasn't