that I was listening. I mean, you could --
Q I understand you can't help but hear; right?
A And that's how it is there in the cubes.
Q Sure.
A And how I heard bits and pieces of how he wasn't happy that he had a get I believe a Doctor's note if he had an appointment, as far as he couldn't be late. He had a window. He didn't think it was right. And he -- after a while, he was gettin' up -- you know, you could tell he was upset at different times that he'd talk about it.
Q And he'd talk about it with you; right?
A No. This was on the phone, whoever he was talking to.
Q Did he ever discuss with you the application of the absentee policy to him?
A He did ask me if, you know, I had a go through something like that. And I said, "No." I said, "I never heard of that." That's something new that -- I didn't even know of anyone that had a ago through that. I didn't know what reasons they were or why.
Q I understand.
A I didn't question it. But that was something new that I just know he was pretty upset from, you know,

the situation.

Q Have you ever been -- had you ever taken time out of work by calling in on the day you weren't gonna be there?

A At this time, because of my travel, I mean, I'm in all kinds of weather.

Q Sure.

A I gotta lug my tools sometimes a mile just through the snow to get to a boat, to a submarine. And there's days I've woken up that I was sorry I woke up. I mean, a cold. And I'd just call in. I am sick. You want me to come in give it to somebody else if I have to be there?

Q You never had a problem with calling in sick though when you were sick on a given day?

A No, sir. There were times that I put over 70 hours of work in. You know. I was workin' seven days a week coverin' different contracts. And I didn't complain. I enjoyed the work. The pay was good. I mean, you work for what you get. But --

Q Sure.

A -- I mean, it's tough. But, I mean, I did it. And it was a necessity.

Q Did Mr. Supancic ever discipline you for failing to

call in on a day you were going to be out absent?
A Oh, no, sir.
Q Did Mr. Cobb ever discipline you for failing to call in -- excuse me -- for calling in on the day in which you were going to be absent?
A Oh, no, sir.
Q Did anyone in your organization ever tell you, whether it be Mr. Cobb, Mr. Supancic, or otherwise that your absences because of illness or whatever affected your performance?
A Oh, no, sir.
Q How do you think Mr. Malone was treated by Mr. Supancic?
A Well, to this day, I -- there's a lot of -- I've never been explained why things were done. I was shocked when I saw he was removed and as an EIC and that the people I had turned in on the whistle-blower thing, one of 'em even got promoted. The other guy had threatened me a couple of times. He was kind a held in check. I felt bad for him, too. But he was just a very harsh individual.
Q Yeah.
A And if anything, like I said, I was shocked at what happened. And the HR lady I believe was

Mrs. Thompson. And after about a week, I was removed. Gone. I didn't know what was goin' on.

Q When is this that you're talking? What time frame, approximately?

A This was the actual from the whistle-blower time.

Q Okay. So shortly after the report?

A Yeah. It wasn't long after that that he was removed. And they were supposedly doing an investigation, which I believe they did. I don't -- like I said, they didn't talk to --

Q Nobody ever talked to you about the result of any investigation?

A No, sir.

Q Okay. We'll talk about that in a second. We're getting close to it. Are you aware of any incident -- what was the building, by the way, that you worked in? Is there a name for it when you worked with Al?

A They go by numbers. Building 1259.

Q Twelve fifty-nine?

A He had been there since I started. I got there around 1990 --

Q Yeah.

A -- '91. And he was in charge of that building. But

I worked at 1258 next door for a lot of years before I was assigned there.
Q Did you ever have any problems with Al as your supervisor?
A No. I always respect my chain or my -- I try to -- my fellow employees. And, you know, you give me direction; and I do the job the best I can. Or I ask for my own ideas and how to do things. Because it was kind of a new trade that he was dealing with what I do, other things besides.
Q Did you ever have any problems with any of your co-workers?
A You mean at that time?
Q During -- under Al's supervision.
A Well, there were, you know, incidents that were building up for the time that I was there up to when I did the whistle blower that I knew after day one. I didn't know for sure why. I thought it was because, well, they don't know me or haven't worked with me. But it got pretty harsh with the individuals there. They -- it was like cut-throat egos, everybody positioning.
Q Do you believe that Mr. Malone adequately addressed any issues you may have had if you brought any

issues to him about the work environment?
A Oh, I -- I took quite a bit. I didn't -- you know, I didn't wanna make any noise. I'm new in that building. I'm just tryna lay low.
Q Yeah.
A And then later on, I did bring up, you know, different things with the individuals --
Q Sure.
A -- that -- but it was -- it was close to the time like when I did the whistle blowing.
Q Okay. Not counting the whistle-blower complaints, were there any issues that you brought up to Mr. Malone's attention relative to your work environment, whether it be people or equipment or tools or whatever, that he did not address adequately?
A Oh, no. Anything I did bring up, he did address. Like I went -- that one individual that was pretty harsh towards me, he was there with the individual. And I explained to him, I asked the guy to please stop it.
Q Yeah.
A You know. But for his part, he -- I would assume he thought everything was under control. Everything

was --
Q Is it fair to say in your opinion then that Al was as good supervisor for you?
A Oh, I have no complaints there.
Q Okay. And do you think he was a good supervisor for the rest of the group?
A I -- I just knew I didn't wanna be in management, seeing what he had a handle. Because it was a 24/7 responsibility --
Q Sure.
A -- of three shifts. That's quite a lot. I was amazed.
Q Yeah.
A And he had -- there was a system already set in place there that, I mean, had been going for years. I wasn't gonna question. And I worked in according to their system.
Q And Building 1259, is that also where Olimpio Pavao worked as well --
A Yes.
Q -- and John Lastowski and Joe Pires?
A Yes, sir.
Q And are you aware of an incident that occurred -- I think it was in that building, but maybe you can

correct me -- where Mr. Pavao either objected to or removed diversity posters? Are you aware of that incident?

A I remember when that was -- that came up that Al was puttin' up the pictures. And, you know, I thought it was a good thing, the company doing it. You know, very more open --

Q Sure.

A -- varied and --

Q Yup.

A And then I guess it was within a few days, the next thing you know, they were taken down. People didn't like it.

Q Who didn't like it? Do you know? Did anyone ever say anything about that to you?

A Yeah. It was like -- I was in the room when it was being -- sayin' like from Joe Pires and John Lastowski and even the government, Olimpio Pavao -- I believe that's how you pronounce his name.

Q Yeah. Sure.

A And they didn't like the idea.

Q They didn't like the idea of having diversity posters up or diversity in the workplace?

A Well, from what I gather, they didn't like the

pictures or the posters and that it came down from I believe with the lady running the contract, Sandy --
Q Rosario?
A Yes.
Q Yup.
A They came down and had to be removed. I felt bad for Al. He was involved in it.
Q Sure.
A And it sounded good. And, boom, that was gone. And that's the political part I saw.
Q Is that all you know about that incident?
A Yes, sir. That I can think of right now.
Q All right. And I already talked about the comments you heard about the gentleman, the driving Miss Daisy comments. We already talked about that.
A Oh, yeah.
Q So we're not gonna return to that.
A That was totally uncalled for.
Q Any other incident that you recall while working with Mr. Malone that would indicate he may have been treated unfairly by anybody because of his race?
A Well, after that driving Miss Daisy, that kind a set in my mind the type of people. And I served -- and,

I mean, race, creed, color, religion --
Q Yeah.
A -- from the service, I don't care who it was, they were covering my back. And it was the same here, that these people, some of them, you know, being prior military, I was just surprised, you know, at the way they acted. That around Al, they wouldn't say anything. But when he wasn't there, they -- you know; I could see this wasn't a happy family with the crew there. And --
Q Do you think that they -- that Al was sort of targeted where the other non-African American workers were not?
A Well, I -- you know, I'm not sure about that --
Q Yeah.
A -- that part; that it was more of -- I thought it was just a -- you know, cause you hear guys, oh, that's the boss. Look out. You know.
Q Sure.
A I thought it was more of a thing like that situation. But, again, after the driving Miss Daisy, that's when I -- I didn't wanna be associated.
Q You kind of believe that maybe these guys are

racist?
A Well, that statement as far as I'm concerned is racial. I'm not a judge. That's just common sense. That's not the people in my life.
Q I understand.
A And that's why I say they were working associates; and I keep it like that. And I learned to keep 'em working associates. You know. And --
Q Sure. Okay. Now, let's -- let's talk about this whistle-blower aspect of Mr. Malone's lawsuit.
In September -- was -- do you recall -- was it September of '04 that you brought your concerns to Mr. Malone? Does that sound about right to you?
A I believe so.
Q I'm not tryna --
A Yes.
Q And what did you do? What did you do? You would call him up? Did you go to see him in his office? What had happened to spur you to go see him about this?
A It was at work. And I reached a point I -- I couldn't go on anymore like that where I -- you know, the working conditions were -- it was pretty

bad --
Q Yeah.
A -- the individuals. It's a tough crew. It's just a tough crew that -- and from those things that had happened up to that point that -- and then with the government. I mean, this guy constantly attacking me. And you turn your head -- you know, you don't wanna -- you feel intimated if you did say anything or do anything. These guys walked around with like power. It's my place; and that's it.
And not that I was even testing them or contesting them. I was keeping my mouth shut doing the work. And then it got to the point, an incident happened. This job came down that they knew about, the government. It was these two special cables I had a build.
Q You were assigned to do that?
A Yes. And the parts didn't come in till just maybe one in the afternoon. And I had already started, since we start 7:00, 7:30 in the morning.
Q Yeah.
A And I had already started. And the government, Mr. Pavao and Mike Theriault, told me, says, "We have to have this built. We need it out tonight."

And I told 'em, I said, "That's impossible." These are 155 pin connectors, 90 degrees, custom made. And they're tryna tell me how to do my job. As far as I didn't argue with them when they said, "Well, we want you to pin 'em now while we wait for the parts."

I'm tryna explain to them, "You can't; because they're custom made. You don't know -- because the length of a 90-degree, these are short. These are long. There's 155 in a little area. I can't pin 'em. I'll never get 'em together."

Q And they didn't understand that?

A Well, I tried to explain to them. And they said, "Well, just continue on with it." Al says, "Well, do the best you can." Another government guy, Chris Plezia, decided to call me every hour all the way up to -- he wanted me and gave me a number to call this other government official after he stopped calling me to give him an update every hour. I'm like -- I said, you know, this was -- it would take a day to two days to build this.

Q At best?

A I sat there until seven the next morning. I walked

out of there, I didn't know my name.
Q You worked the night through. Is that what you're saying?
A Yes, to try and get that done. And like I said, I left there; I didn't even know my name. That's when I reached a point, I said, you know --
Q Who were the people that were badgering you?
A At that time, mainly the government.
Q Who was?
A Limp Pavao.
Q Yeah.
A And he was right in that first morning. And he couldn't believe that I had it done, you know, to that point. But like I said, I didn't know my name. And I can't work like that.
Q Sure.
A You know. And I was intimidated. You know. And I hadn't -- I have nobody to call to help.
Q Did you -- did you discuss that with Mr. Malone? Well, he was your supervisor at the time.
A Well, there was one other guy that said he could do it; but he wouldn't help. Al was left alone to do that job.
Q Who was the other guy?

A A John Lastowski. He claimed he could do cable. And he was on the other contract with me some years back. And like I said, it's cut-throat over there. Somebody's gotta go down for somebody else, I guess, to feel their levels movin' up or to make advancement or whatever.

Q So at some point -- maybe around or shortly after that time, you went to Mr. Malone. And you told him that you had some issues, three issues in particular. One was that there was this issue of harassment.

A Oh, yes. And that was like I've been living through that all that time. I couldn't do it anymore.

Q The other thing was this issue about people getting tools for certain favors.

A Yeah. The government guy, Pavao, came right out and right in front of me to the other two guys, Joe Pires and John Lastowski, "Order whatever you want. I got plenty of money." He had just come back from a government fleet call up to Hawaii.

Q Yeah.

A And he got back. He said, "I got plenty of money from the contract. You guys order whatever you want." Just to John and Joe. I couldn't --

Q And the last --
A He didn't say nothing to me.
Q And the last thing was that you also --
A I know that's wrong. Because we're only allowed a certain small amount.
Q Let's talk about that while we're on the topic.
A This was hundreds of dollars that --
Q So at some point -- is it fair to say that Mr. Pavao didn't like you; and you didn't like him?
A That's -- that's the impression I got. I mean, he made sure I knew.
Q And you believe that he was treating these other -- your co-workers, Mr. Lastowski, Mr. Pires with certain favors?
A Oh, yeah. They were all --
Q They were his buddies?
A Yes. There was a line crossed there that shouldn't happen. Not in corporate, in other businesses, and the -- it happened to be the government to the customer.
Q Right. So this guy, Mr. Pavao, offered these co-workers of yours to buy whatever they wanted on the government. Is that what your impression was?
A Yes, they did. Yes.

Q And then you felt that that was -- that was unacceptable?
A Well, I knew that was illegal. I mean, the toolbox -- they each got a toolbox probably three, $400 apiece. That's way out of the spectrum. And they ordered -- they filled 'em up, all special tools that they ordered.
Q That was not offered to you or anybody else?
A No.
Q But it was offered right in front of you; right?
A Oh, yeah. Yeah. He made sure he rubbed that in. Because I asked for a fiber optic checker. It was probably the cheapest thing they make so you can test a fiber to see where the break is. No way. Didn't wanna hear it.
Q Okay.
A So I never asked again.
Q All right. So you brought that complaint to Mr. Malone.
A Yes.
Q You brought the complaint about being harassed.
A Yes.
Q And was there a complaint about -- was it Joe Pires talking about your family?

A Well, yeah. I can't say in the words he said it.
Q Well, you can speak freely here. It's all right.
A It came out of nowhere. I was just in the office at my desk gettin' a manual, I believe. And he walked in. He turned around, looked at me -- and as far as I'm concerned, it's a threat. He just looked at me and said, "I don't give a damn about you or your family." And I'm a single parent with two children.
Q So how did you take that?
A I mean, and then he gave me -- as far as I'm concerned, it's another threat. He's a very, very harsh person, very deep voice; let's you know, you know, that -- whether it's a power thing or whatever, which I never intimidated the guy in any way. And he just went off on me. As far as I'm concerned, that's a threat.
Q Okay. So there was that complaint. There was the complaint about the toolboxes. And you also learned that Mr. Pavao was selling scrap aluminum for money; right?
A Oh, yeah. The guys were actually loadin' it on his truck. This was equipment we were strippin' right from the labs. That is government NSN stuff, you know, with serial numbers on 'em. And we strip it

down. And this guy had been doin' this for years. And other people there know it, even know of him doin' it. And he'd go to Mid City Scrap Yard. That's where he had been taking it for years.
Q In Westport?
A Yeah. And, you know, he ran the show there. It was his place. He did what he wanted. There were times -- cause I ended up sittin' towards the back. I had my own workshop for cable fabrication. And supply was right there. And I went in to get parts from supply, whatever I was building at the time. And the lady that sat in there would allow me to go get the parts. I knew where they were.
Q What's her name?
A Excuse me.
Q That's all right. You want some water?
A No. Kelly. I'm fine. Kelly --
Q If you can't remember, that's fine.
A I can't remember her last name.
Q That's all right.
A She's gonna shoot me.
Q That's okay.
A That's all I remember is Kelly.
Q That's fine. Tell your story. I'm sorry.

A And she worked there. And her mother worked there. Her grandfather worked there. It was a family thing. Her grandfather was government; but everybody else was contracted. And I was in there gettin' parts.

And he came into supply; and he opened up the file cabinet. And he had his arms like this, everything you could think of; dry goods as far as pads, pencils, pens, markers. Anything you could think of. And he had his arms full. And he walked up to her desk -- because I was walkin' out with the tools, with the parts there. And he stated to her, he says, "Is that my pencil sharpener?" She said, "No. That's mine. I bought that. I brought it from home." "Oh, I thought you took that off my desk." She says, "What are you doin' with all that stuff?" He said, "My kid's startin' college."

Okay. Right there -- I mean, I didn't say a word. I walked out with my parts. And I'm like -- this is ridiculous. Hey. I'm sorry. That's taxpayer money. People will say what they want. They can call me what they want; but I'm sorry. That's wrong.

Q So you told Mr. Malone about all these things, the harassment, the selling of metal?
A That's all towards -- I mean, at that time when I told him everything, I said, "That is what's been goin' on." And I was intimidated to say anything; because this guy's walking around with -- you know, he's a power monger.
Q And you're talking about Mr. --
A Limp Pavao. Yes.
Q Yeah. Okay. Now let me -- let me ask you a question about the whole issue of the tools, if I can for a second. If Mr. Lastowski -- is it Lastowski or Latowski?
A I think it's Latowski. T-O-W -- Latowski.
Q Okay. He and Mr. Pires were the two gentlemen who Mr. Pavao offered these tools to --
A Yes.
Q -- and so forth. If Mr. Pires and Mr. Lastowski wanted to keep that hidden from Mr. Malone, would it have been easy for them to do that?
A They did. They each had their own key to it. It wasn't for us.
Q It would not have been easy?
A He didn't know. He did not know. I was watching

what was goin' on right in front of him. And like I say, at that time, I was intimidated to say anything.

Q And they were keeping this from Mr. Malone?

A Oh, yeah. It was their toolboxes. And they were laughing about it. And even John Lastowski gave me a few of his tools and said, "Here. I don't need these anymore. These were mine. Because I got all these other tools." They replaced everything new with these others.

Q If you, for instance, needed a tool to do a particular job -- and you do a lot of hands-on work; right?

A Yeah. Yeah. I have a lot of tools that I brought with me that they're custom tools from years ago because of what I do. But, I mean, the few tools that I needed, you know, I was always -- I would tell Al. And they'd get 'em for me. It wasn't many for what I needed.

As far as a technician in the back shop where I worked in the cable shop, which is right near our office where we sit in that building, there was like seven roll-a-ways of toolboxes there. I mean, these are the big --

Q Sure.
A I mean, they had every tool. Then in the filing cabinets, they had every kind of drill, left-handed, right-handed, whatever you could think of.
Q But there was never a problem if you needed to get one?
A No. And then in our shop, we had a few more roll-a-ways. I never saw so many tools. I was in heaven. I love tools. Wow. I saw tools I never saw. I mean, it was great, all that stuff. But, again, those tools -- those guys, it was for them.
Q Yeah. Personally?
A Right.
Q Okay.
A Right.
Q All right. So you tell Al all this stuff.
A Yeah.
Q And do you know what he does with the information?
A He told me he was gonna report it.
Q And do you know if he did that?
A Doin' his job. Well, yeah. I guess. Because it wasn't long before, you know, I had this -- I could a -- I didn't have to put the sign on my back, whittle blower. Here I am.

Q Okay. We'll talk about that in a second. You tell Al the stuff. He reports it. What happens next?
A Well, I figure, well, this is the system.
Q Well, let me ask you --
A If I didn't say anything, I'm gonna live in hell. It looked like my time is limited. And I didn't have nothing to lose. And if the system's gonna work, that will take care of it. The truth will come out. To this day, I don't know.
Q Well, did anyone ever interview you? There was an interview that you gave. Didn't somebody from --
A Oh, yeah.
Q -- Minnesota come and ask you --
A Yes. I even called -- I did it twice. I made them come back again to try to explain to them.
Q Who did you speak to?
A I don't remember the names.
Q That's all right.
A I know one was the lady from our company, Mary -- I can't think of her last name. Brain dead here.
Q That's all right.
A She was in one of the meetings. And I explained to her the threats I got. And they had me stay home for a week after that, after they started their -- I

go --
Q They had you stay home? Or you wanted to stay home?
A Well, right after that -- by that Monday -- I reported like a Thursday. By Monday, I was gettin' phone calls.
Q Yeah.
A And they were harassing, intimidating. Well, I couldn't tell who the voice was. It was blocked calls. And basically it came out is you'll get yours.
Q Really. You started receiving harassing phone calls, huh?
A Yes. And there were calls where nobody would say anything. I'd just hang up.
Q Were you involved in anything else in your life that could have reasonably been related to these harassing phone calls?
A I got divorced 20 years ago. And that's long gone. And I won my children. And I raised 'em. That's --
Q Did you ever tell anybody about these harassing phone calls?
A I mentioned it to Al right after it happened.
Q Yeah.

A I said, "I don't know where this is goin'." I said, "I can only imagine what you're dealing with, high-profile people." They make a lot of money. You know. Read the newspapers.
Q Yeah.
A The stories are -- I didn't know what to think.
Q Okay.
A But I did tell him my concern. Not that I expected anybody to do anything. I mean, if I gotta defend myself, I gotta. And plus I was threatened by this guy in work twice.
Q Which guy?
A Pires. Joe Pires. And I told him there wouldn't be a third time after he did this. I said, "This ain't gonna happen a third time. I'm not taking no more threats."
Q And sitting here today, as far as you know, there is no outcome from the investigation that they did into these allegations?
A I have no clue.
Q Well, did you suffer some --
A No. The outcome was -- I didn't know at the time. It was like a week after the investigation started. That was a Thursday. By Monday, I was already under

the gun. They already knew it was me.
Q Yeah.
A And from what Al -- you know, I guess they were pretty hectic there. And the company asked me to stay home for that week. Cause I was -- I was concerned about my --
Q When you say the company, who -- you know, I know you want to speak in broad terms; but -- was it Al? Did he say, look, why don't you take a week off and let this thing settle? Did Carl come to you? Was it --
A No. It wasn't said like that. It was -- you know, I reported my concern. And I don't know if it was from Carl or Keith Cobb or -- no. It wasn't Keith. It wasn't Keith. I don't remember. I can't remember who it was.
Q That's all right.
A But they had me stay home a week.
Q That's all right.
A And I was at home all that week intimidated. I didn't know what to think. And I came back. I believe there's a Mrs. Thompson. They called a meeting in the office. And I was asked to come in there. I stood in there in Building 1259.

Q Who was present?
A All the workers. I believe Carl was there, Joe Pires, and everybody else. And when I walked in, there was Joe Pires talkin' in there to Ms. Thompson. "Oh, you gotta get him outta here. He's bad. He's bad." Which I guess is me. And this is Mrs. Thompson from the company. And my eyes are like, oh, boy.
Q The HR woman, you mean?
A Yeah. And then she came out and made the statement that -- we didn't -- Al was gonna be removed. We were gonna be workin' -- they didn't have anybody. They were gonna advertise for someone for that position; and that this is the way things are gonna be, that you guys work together now. Joe or John, you know, whoever they were gonna just relate back to the office, I guess, keep the contract goin' till they could find someone to put in.
And I'm just standin' there. Al's gone. And then within a couple of days after that, the other individual, John Lastowski, was put in charge.
Q Okay. So shortly -- at some point after this report was made, so I'm clear on the time line --

A Right.
Q -- Mr. Malone was removed from his job as a supervisor from Building 1259?
A Right. And I didn't know until that meeting -- I knew he was gone. I didn't know why. No one said anything till days later when they had that meeting; and then they informed us what was goin' on.
Q And then shortly after that point, you were reassigned. Is that fair?
A Well, they -- they were leavin' me there.
Q Oh. They were leaving you there?
A "You can't leave me under a guy that I turned in. And you're gonna leave him as my boss?" And I was gettin' some nasty -- intimidating things were already comin' my way from, you know, the way they were actin' towards me.
Q Like what?
A They were looking for a fight to get back at me. They'd brush into me. I -- even if I was driving off the base -- I reported that -- Joe Pires, he cut over in my lane, stayed in the middle so I couldn't go to my lane to go out to hold me up, you know, and play this. Everything was a joke to him. You know.

Q So what --
A Anything to intimidate me, I guess.
Q So what ultimately happened with that situation? Did you eventually get out from underneath Joe's control?
A Well, I had a ask. I believe it was Carl I called. I said, "Carl, you can't leave me like this. These guys are all drooling at me." I mean, the government guys and all. I cannot believe I was left in that position. I had a ask. I said, "You gotta get me outta here." And then they sent me next door.
Q Okay. Were you satisfied with that move?
A Well, they wanted me outta there. They were goin' around saying they wanted me outta there.
Q Do you think they were trying to get you to quit?
A Well, to embarrass you to the point -- it didn't cross my mind. I had other job offers --
Q Sure.
A -- I was sorry I didn't take earlier.
Q Right.
A I didn't know what to think.
Q Okay.
A I really didn't know what to think. I was livin'

in it. That's all I know. It was a nightmare.
Q Yeah.
A And with the system.
Q And when you were reassigned or moved to the other building, did things get better for you?
A Well, I was kind a scared gettin' over there, too. Because those guys, there's three or four individuals that were there at the time. And they brought one guy over to my -- to work over where I was workin'.
Q Uh-huh.
A He didn't do what I did; but they sent him over. And that went over I guess to fill in that position.
Q Yeah.
A And those guys were already intimidated. Because they kind a just got in trouble by the customer. Because the customer had been tryna get a hold a them for about a couple of weeks that when I got over there. And I was told straight out that I was -- they blamed me for them gettin' in trouble.
Q Who told you that?
A One of the workers there. Rod Gerjets.
Q Okay.
A Is he an LM employee?

A Yes. He works there with me now. He's a great individual. Don't get me wrong.
Q No. I'm just trying to get to the facts here.
A And they believed they got in trouble because of me, which I had nothing to do with. They couldn't be contacted. I worked in a whole different thing. And I came right out; and I told them, I said, "Rod, I said, I'm gonna tell you how much I respect your knowledge, your abilities. I never -- I never did anything to you guys. I never got you in trouble. It had nothing to do with me."
Q Sure.
A I said, "Everybody knew about it from the other company." Because I believe the government official talked to Carl over there. And these guys, now I'm walkin' into another hot spot. And I'm bein' blamed for them gettin' in trouble. And I know this for a fact. Because I heard one of the individuals on the phone. And Al had already been there that, yeah, now I'm gonna get stabbed in the back -- from the front and the back.
And I'm sittin' back. And I hear this. And I says, "Well, I guess that means me and Al." I don't know who was in the front and who was

in the back. But that's -- So I felt intimidated just goin' there. I said, "I'm just gonna work." I was dying to take anything just to get my mind off the things. I was just tryna work. I wasn't tryna get anybody in trouble. And how things go off. It's crazy.
Q Were you aware that there was some kind of celebration or party after you and Al were removed?
A Yeah. I was told Al Landel went and picked up a cake to celebrate me gettin' out of there.
Q He went to pick up a cake, huh?
A Yeah. You have your cake and eat it, too, I guess.
Q So they were having a little cake on the fact that you and Al, or at least you anyway, were no longer involved in their operation?
A Well, the girl from supply, Kelly, had walked in there when they were doin' it. And she came out and told me, she goes -- she even asked them, "Why are you having that cake?" And they told her not to say anything. You know. I'm, again, yeah. I believe it. That's what I'm dealing with, some cold-cut people there. And I pushed the wrong button. And, again, I -- I don't know what to think in the system. It's not a system.

Q Right. And do you think that Al Malone was also -- as you suffered retaliation, do you believe he was also the victim of retaliation for reporting these issues?

A Well, to see him removed like that and not know anything, what else could it be? I mean, as far as I'm concerned, he got downgraded. He was now a technician. He wasn't -- he was my boss that I had been working for. And he explained to me he's a technician like me now, in his position, what he's doin' there for work. And he was. He was workin' on the computer, whatever we had for the jobs. I don't wish anybody would live through this. You know.

Q That, I understand. And I feel bad for you.

A Well, I'm still standing. Like the movie, Last Man Standing. That's what it seems like.

MR. DRYWA: Bear with me for a second, Mr. Goulart. I just want to review my notes and check on some things. And --

Q In the organization, not counting Carl, have you ever discussed Al's lawsuit? Or have you ever heard anybody discuss it in the organization? Is it talked about?

A Up to -- I was -- it was probably a few months ago, three or four months ago --
Q Yup.
A -- and I had a go over to the office for something, to get something. And then I'm tryna think. No. Cause the only time -- you said other than what, Carl?
Q Yes.
A No.
Q Okay.
A No.
Q Are you afraid that if you don't follow Ms. Nordstrom's direction today that you may be retaliated against?
A This whole thing, I have -- I have no clue to -- I don't know what to think.
MR. DRYWA: Okay. Why don't we take a few-minutes break. Okay? I'm gonna have a few follow-up questions. Why don't we take a few-minutes break. We'll go off the record, take a break for a couple minutes. And we can go off the record for a minute; and I'll be back with a few follow-up questions.
THE WITNESS: Okay.

(Off the Record)

MR. DRYWA: Okay. This won't take long. I just have one or two more follow-up questions.

Q Mr. Goulart, did Mr. Supancic tell you leading up to today that you would suffer some sort of negative action at work if you didn't answer these questions in a certain way?

A He -- all he stated to me was to tell the truth --

Q Yup.

A -- and not to -- you know, secondhand statements or, you know, anything -- just the facts, tell the truth. And that's what I intended on doing.

Q Okay. He didn't say anything else then?

A I can't recall everything that -- this is kind of overwhelming at the moment.

MR. DRYWA: Sure. It's all right. Then what I'd like to do is to go on the record and say that although I'm done asking questions, I'd like to at least suspend the deposition pending any motions. And, otherwise, I'm done asking questions.

MS. NORDSTROM: You can make the request. We would object to that; but you can make

the request.

MR. DRYWA: All right. Looks like we're done.

THE WITNESS: I am done?

MR. DRYWA: You are done.

MS. NORDSTROM: You're done.

MR. DRYWA: Thank you for your time, Mr. Goulart.

THE WITNESS: Thank you.

(Time Noted at 11:12 a.m.)

* * * * *

C E R T I F I C A T E

I, Barbara St. Jean, CSR, RPR, commissioned in the State of Rhode Island and authorized to administer oaths and to take and certify depositions, do hereby certify that heretofore, to wit, on the 24th day of October, 2007, personally appeared before me Richard J. Goulart at the law offices of Jamison Chase, 2477 East Main Road, Portsmouth, Rhode Island, in the afore-captioned cause now pending before the United States District Court for the District of Rhode Island; that the witness was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth; that thereupon and while said witness was under oath, the within deposition was taken down by me in shorthand at the time and place herein named and was thereafter reduced to typewriting under my supervision.

I further certify that I am not interested in the event of the action.

IN WITNESS WHEREOF, I have hereunto subscribed my hand and affixed my seal of office this 26th day of October, 2007.

Barbara St. Jean

Notary Public

My commission expires April 28, 2008