UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

---

Azell Malone,

Plaintiff,

C.A. No: 07-65-T

v.

Lockheed Martin Corporation
and Carl Supancic,

Defendants.

---

## DEFENDANTS' STATEMENT OF UNDISPUTED FACTS SUPPORTING MOTION FOR SUMMARY JUDGMENT

1. Azell Malone ("Malone") began his employment with Sperry Corporation (which was later acquired by Lockheed Martin Corp ("Lockheed")) on or about March 7, 1977. (Malone Resume).

2. He was hired as a Field Engineer and progressed to Engineer-In-Charge (EIC) in March 1983. (Malone Resume).

3. In August 1997, he was promoted to Field Engineering Manager. (Malone Resume).

4. The only substantial change in job responsibilities between the EIC and Field Engineering Manager positions was that the Field Engineering Managers were responsible for finalizing performance reviews for their subordinate staff, while EIC's simply contributed to the ratings for those same subordinates. (Cobb Dep. at 9-10, 36; Malone Dep. at 20-21).

5. Sometime in 2000, Malone and his subordinate team of approximately six other Field Engineers, began working on the CCSL contract, in which Purvis Systems was the prime contractor and the Government was the client/customer. (Malone Dep. at 44, 76-77).

6. Purvis had approximately 40 employees working on the CCSL contract and the Government had approximately six employees jointly working with the two contractors.

(Malone Dep. at 76-77).

7. Malone was the only Manager that Lockheed had representing its daily interests on the CCSL contract at that time. (Malone Dep. at 77).

8. Malone began reporting directly to Supancic in November 2000, when Supancic became Site Manager for Newport Operations. (Malone Dep. at 21; Supancic Dep. at 27).

9. Supancic had no performance or attendance issues with Malone early in the reporting relationship and continued to give Malone good performance reviews and raises. (6/02 to 6/03 Performance Review; Malone payroll documentation).

10. Despite Malone's managerial position on the CCSL contract and reporting requirements to Purvis, Supancic was ultimately responsible for Lockheed's performance on the CCSL contract as a whole. (Org. Charts; Malone Dep. at 77).

11. In early 2002, Malone began what became a pattern of unexcused and/or unplanned absences. (Supancic Dep. at 38, 65-66; 1/24/02 Email).

12. On January 24, 2002, after Malone asked to take a second unscheduled vacation day on the same day he planned to be absent, in the same week, Supancic sent him an email regarding his inappropriate use of vacation time and absenteeism. (1/24/02 Email).

13. Despite this reprimand, in June 2003, Malone had another episode of requesting vacation time twice in the same week on the day he planned to take vacation. As a result, Supancic issued another email dated June 11, 2003 regarding this continued problem. (6/11/03 Email, in part).

14. This situation occurred again in December 2003, prompting Supancic to notify Lynda Thomson, a Lockheed Human Resources Manager, of the problems he was having with Malone's attendance. (12/9/03 Email).

15. In addition to these attendance issues, Malone admittedly had a problem managing his team on the CCSL contract and stated that they were "resistant to direction". (Malone Dep. at 33-34; 93-94).

16. As a result of these issues, Malone's performance review for the latter half of 2003 stated, in part: "Performance was spotty. Disruptive staff behavior is problematic. Status is not regularly provided on a timely and complete basis. PRS process is also lacking, as is example-setting behavior for vacation planning and authorization, as well as absences. . . . [C]ustomer criticism of team performance, employee whereabouts and level of cooperation was disappointing. Getting to the root of it and rectify negative perceptions is a priority." (6/2/03 to 12/31/03 Performance Review).

17. Despite Supancic's admonitions and performance review comments, Malone called in requesting to take vacation days on the same day of his request again in June 2004 and August 2004. (Voice Mail Transcriptions).

18. As a result, Supancic noted these performance concerns to Ms. Thomson yet again in August 2004, stating in part: "[M]y concerns over Al's performance have deepened. . . . [H]is behavior, accountability and performance is falling well short of what it needs to be. Al is certainly not setting the example that is required of management." (8/29/04 Email).

19. Further, Malone failed to report to work on October 4-7, 2004. (Supancic Dep. at 113-115; 10/6/04 & 10/7/04 Letters).

20. Due to this repeated and serious misconduct, on October 13, 2004, Malone was given a formal written warning, which required that Malone speak with Supancic directly at least 24 hours prior to any request for vacation time. (10/13/04 Memo).

21. Malone's performance review for 2004 likewise reflected that: "Al did not adequately address some of the weaknesses that had been called out in his assessment from the prior year, with problems in attendance and accountability being most significant. These problems set him very much apart from his management peers for the period, and set a very poor and visible example." (2004 Performance Review).

22. These problems led to the issuance of a formal performance improvement plan on January 7, 2005, requiring Malone to speak with Supancic and Keith Cobb (his EIC) directly for approval or notification of any absences. (1/7/05 Memo).

23. In March 2005, Jim Higson ("Higson") took over as Manager of Malone's group, removing Malone from Supancic's direct supervision. (Supancic Dep. at 100-101; Org. Charts).

24. For clarity and continuity, Higson sent Malone an updated copy of the performance improvement plan requirements while Malone was under his supervision. (Supancic Dep. at 169; 8/16/05 Memo-Updated Final Warning).

25. Even after Higson became Malone's Manager, unexcused and unplanned absences continued in direct violation of Malone's performance improvement plan requirements. (4/11/05 Email; 7/18/05 Email).

26. Additionally, Government employees and prime contractor, Purvis employees who were teaming with Lockheed on the CCSL project, likewise reported problems with Malone's absenteeism, stating "Malone's problem was a lot of time we would be looking for him and he wasn't available." (Pavao Dep. at 15, 18-19; Rosario Dep. at 26-31; McCauley Dep. at 9-11, 29-30).

27. Lockheed's Absence From Work policy states that "regular and reliable attendance on scheduled work days" is an essential function of all positions. (Absence From Work Policy).

28. When Malone was asked during his deposition what he understood he was required to do under Lockheed's attendance policy, Malone stated "I'm required to show up for work," indicating that he clearly understood Lockheed's expectations. (Malone Dep. at 41).

29. Newport Operations went through a period of reorganization of its management level employees in 2004, beginning in April 2004. (Supancic Dep. at 51-60).

30. The concerns that led to this reorganization were the decreasing number of employees reporting to what seemed to be an overabundance of Managers. (Supancic Dep. at 51-60).

31. All Lockheed employees are given "Level" ratings and there were both Level 4 and Level 5 Managers prior to April 2004. (Supancic Dep. at 54, 64-65). Lockheed's goal was

to reclassify all Level 4 Managers as non-management employees and leave only Level 5 Managers with that particular title. (Supancic Dep. at 54, 61, 64-65).

32. Malone was a Level 4 Manager. (Supancic Dep. at 54, 61, 64-65).

33. In April 2004, during the initial stages of this reorganization, Keith Cobb and Don Rhodes, two Caucasian Level 4 Managers, were reclassified as non-management employees and given the title of Engineer-in-Charge (EIC). (Org. Charts).

34. In October 2004, as a result of the continual shifting of management and staff, Keith Cobb was placed under the management of Malone who had previously been a peer level Manager. (Org. Charts).

35. In accordance with the stated reorganization goals of eliminating Level 4 Managers, and in light of Malone's ongoing performance and attendance issues, Malone was reassigned as an Engineer-in-Charge on November 15, 2004. (Supancic Dep. at 65-71; 8/29/06 Email).

36. Malone's job duties, pay and benefits remained the same and he was still going to be responsible for front line management of Lockheed's CCSL team. (8/29/06 Email; Salary Chart).

37. Malone admitted that "[t]here was no change with respect to responsibilities between Manager and EIC." (Malone Dep. at 20-21; Cobb Dep. at 36).

38. However, Malone failed to report to work for the following two days after being informed of his reclassification to EIC status. (8/29/06 Email; 9/8/06 Email & attachments).

39. Given the customer complaints, prior warnings and continued absenteeism problems, on November 18, 2004, Supancic recommended and Lockheed's Director of Lifetime Support, Janet Christopherson, approved removal of Malone as EIC of the CCSL team and transitioned him to another contract with the Trident DPS team as a Field Engineer. (8/29/06 Email; 9/8/06 Email & attachments; Org. Charts).

40. Keith Cobb had been repositioned as the EIC on the Trident DPS team, so therefore, Malone was now reporting to Cobb. (Org. Charts).

41. Despite the change in title, Malone remained a Level 4 employee and had no change in his pay or benefits. (Salary Chart).

42. Malone admitted that, during his tenure with Lockheed, his job titles and duties would change depending on the contract and/or program he was assigned to work. (Malone Dep. at 11-12).

43. The Trident DPS team was in a different building from the CCSL team, minimizing the contact between himself and his former subordinates, whom Malone believed to be "harassing" him. (Malone Dep. at 82-83, 102-103; Cobb Dep. at 31).

44. Malone worked onsite with the Trident DPS team for approximately a year (2005-2006) and then began working in a systems engineering position on the CSRR program, with a four hour round trip drive to the location site. (Malone Dep. at 101-103, 187).

45. It is common for Field Engineers to travel to customer worksites. (Malone Dep. at 16).

46. Malone admitted that he has had to travel and work in the field at various points in his career with Lockheed. (Malone Dep. at 15). Malone perceived this position to provide career progression opportunities. (Malone Dep. at 101-103, 187). As Site Manager, Supancic approved Malone's request to work in this capacity. (*Id.*) Malone worked in this position until the customer funding was depleted in May or June 2007. (Malone Dep. at 106).

47. After the systems engineering position ended in 2007, Malone agreed to work a contract for a customer based in Wisconsin where the client funding is sufficient. (Malone Dep. at 107-108). Malone's Manager is currently Gary Hessler. (Malone Dep. at 197). Malone continues working in this position to date. (Malone Dep. at 107-108).

48. Malone received a pay raise in 2007. (Malone Dep. at 211).

49. On September 23, 2004, while Malone was still a Field Engineering Manager working the CCSL program, Richard Goulart ("Goulart"), one of Malone's subordinates, reported to Malone that two of his other subordinates had been accepting tools as gifts from a key government employee. (9/23/04 Letter).

50. Malone, in accordance with his managerial duties, relayed Goulart's report to Supancic, who likewise forwarded it to his supervisor, Janet Christopherson and Lockheed's Human Resources department. (Malone Dep. at 46-48; Supancic Dep. at 106-107).

51. Malone admitted that he had no idea of his subordinates' misconduct and that he later learned that such conduct had been going on for at least a year. (Malone Dep. at 75).

52. Ultimately, an investigation was conducted by Lockheed's Ethics department that resulted in a finding that the tools were being improperly gifted to Malone's subordinates and reprimands were given as appropriate. (Supancic Dep. at 113; Investigative Report).

53. Malone was among the employees who received a written warning, not for his transmission of the information, but rather for his "lack of effective and/or active management practices," "lack of a clearly communicated tool process," "overall poor supervisory practices, and [his] own personal attendance." (10/18/04 Memo).

54. Malone alleges Supancic made the following comments to him early in his reporting relationship: (a) Malone made too much money and had to "earn his keep"; (b) told him not to worry because he could "probably find a job anywhere"; (c) said that Malone did not like to get his hands dirty; and (d) said that Malone talked down to people. (Malone Dep. at 21-23, 30-31).

55. Malone further alleges that in 2003 or 2004, that he believed Supancic "attacked" his family by recommending that Malone's wife "do more" in the household so Malone would not have to leave work for such things like picking up his daughter after her car broke down or staying home to wait for the furnace repairman. (Malone Dep. at 36-38).

56. While Supancic denies these allegations, Malone admitted that Supancic has not made any of the alleged comments since approximately 2004 or 2005. (Malone Dep. at 23-24).

57. Malone was asked on several occasions whether he believed that Supancic was treating him this way because of his race, and Malone continuously stated that he did not believe so, specifically stating on one occasion, "[n]o, I don't know. All I know is he had a problem

with me." (Malone Dep. at 32, 78-81, 135, 188). However, Malone admitted that he did not know how Supancic treated his other subordinates. (Malone Dep. at 31).

58. There is only one specific allegation Malone asserts against other Lockheed employees relating to his claims of race discrimination. (Complaint at ¶39). Malone alleged that Joe Pires ("Pires"), one of his subordinate employees on the CCSL program, disagreed with Lockheed's travel reimbursement policy and refused to drive his own vehicle to travel to an after hours worksite. (Malone Dep. at 113). Given Pires refusal, Supancic asked Malone to drive him to the worksite and return and pick him up after Pires had completed his work. (Malone Dep. at 113-114). Malone alleges that the following day, Pires and others were laughing and joking saying he was "Driving Miss Daisy." (Malone Dep. at 114-119). This is the only incident or statement that Malone proactively states that he believed to be race based. (Malone Dep. at 119).

59. However, Malone admitted that he believed Supancic's only reason for asking him to perform the task was because Pires reported to Malone and he needed to get the work done. (Malone Dep. at 115).

60. Malone alleges that this incident occurred in July 2005. (Complaint at ¶39). However, the undisputed facts show that Malone was no longer working with Pires or the CCSL team after November 18, 2004, so this approximated date is questionable at best. (Org. Charts).

61. Malone alleged that he reported the "Driving Miss Daisy" incident to Supancic and Lockheed's Human Resources department. (Complaint at ¶39; Malone Dep. at 118).

62. Supancic recalls Malone alleging that "someone" had used the term "Driving Miss Daisy" in relation to his transporting Pires, but Supancic recalled Malone stating that he had heard about the incident second or third hand and that he could not directly identify any party making the statement. (Supancic Dep. at 189). In any event, Supancic stated that in response he gave an admonition to the entire team to refrain from using any type of derogatory comments in the workplace and that such conduct would not be tolerated. (Supancic Dep. at 189-190). Supancic also notified Human Resources of the allegations and his response. (*Id.*).

63. Malone understood that Lockheed had policies prohibiting discrimination and harassment and understood that he had a duty to report any such claims to the company. (Malone Dep. at 190-192). Malone asserted that he would only make such a claim or report if the discrimination or harassment was "obvious." (Malone Dep. at 192).

64. Malone never reported claims of race discrimination to Lockheed prior to hiring a lawyer. (Malone Dep. at 121).

65. Malone admits that he made only one report of alleged "harassment" by Supancic to Lockheed's Human Resources department in August 2005. (Malone Dep. at 89, 97). Malone did not report any of the alleged conduct stated above regarding his perceived discriminatory treatment, but simply told them that Supancic was "harassing" him and to "get him off my back. Get him off now. This has got to end." (*Id.*).No specific allegations of race discrimination or retaliation were ever reported to Lockheed's Human Resources department by Malone with regard to Supancic. (*Id.*).

66. Malone admitted that he has not had any complaints of discrimination or retaliation against anyone since he began working offsite in the systems engineering position in 2005 through the present. (Malone Dep. at 107).

67. Specifically, Malone stated that any perceived discrimination or retaliation ended on December 2, 2005, when his attorney sent a letter to Lockheed requesting a copy of his personnel file. (Malone Dep. at 198, 204-205).

LOCKHEED MARTIN CORPORATION
AND CARL SUPANCIC
By their Attorney,

MILLER & MARTIN PLLC

/s/ Tamika R. Nordstrom
Tamika R. Nordstrom MN#275463
1170 Peachtree Street, N.E., Suite 800
Atlanta, Georgia 30309-7706
Telephone: 404.962.6413
Facsimile: 404.962.6315
Email: tnordstrom@millermartin.com

and

/s/ Mark T. Reynolds
Mark T. Reynolds, Esq. #4764
REYNOLDS, DeMARCO
& BOLAND LTD.
170 Westminster Street, Suite 200
Providence, Rhode Island 02903
Telephone: 401.861.5522
Facsimile: 401.331.4861
Email: mtreynolds@conversent.net

CERTIFICATION

I hereby certify that on January 7, 2008 I served a copy of the within electronically upon:

Michael F. Drywa, Jr., Esquire
michael@simsandsimsllp.com

/s/ Tamika R. Nordstrom