**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **AZELL MALONE,** **Plaintiff** | : | |
| **v.** | : | **C.A. No. 07-65-T** |
| **LOCKHEED MARTIN CORPORATION and CARL SUPANCIC,** **Defendants** | : | |

**PLAINTIFF'S STATEMENT OF GENUINELY DISPUTED FACTS SUPPORTING OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Now comes the Plaintiff, Azell Malone, in the above-captioned matter, and pursuant to Local Rule 12.1 and this Court's Pre-Trial Order, hereby submits this statement and genuinely disputes the following material facts as set forth by Defendants in their Statement of Undisputed Facts:

> 4. The only substantial change in job responsibilities between the EIC and Field Engineering Manager positions was that the Field Engineering Managers were responsible for finalizing performance reviews for their subordinate staff, while EIC's simply contributed to the ratings form those same subordinates. (Def.'s Stmt. Undisputed Facts ¶4).

The Plaintiff disputes this fact and asserts that his demotion from Field Engineering Manager did involve a substantial change in job responsibilities. It is a distortion of the facts for Defendants to imply that the Plaintiff did not suffer a significant change when the was stripped of his manager's title and the summarily demoted less than one week later to field engineer, a position that was two levels below his position as Engineering Manager.

This fact is disputed by the Plaintiff's deposition testimony, which reads in relevant part as follows:

Q. Okay. So you were removed from the contract, moved to a different building on or around December of 2004. And at that point were you still reporting to Carl or had you begun reporting to Jim Higson?

A. No, I was still reporting to Carl
Q. At this new location that I was on?
A. Right.
Q. At this new location that I was on?
A. I was working on the - what they call the DPS program.
Q. Was that any different from the job that you had been doping before?
A. Skill level wise, yes.
Q. How so?
A. Lower.

* * *

Q. But your pay was still the same even though you went from a field engineering manager to a staff field?

A. The pay was the same and responsibilities were different. Basically I had none.

Q. Describe what you meant to me by that. You said you had no responsibilities. How did you responsibilities change from when you were a field engineer?

A. When I was at CCSL, basically what I did was coordinated the daily tasks of all the field engineers on-site. I interfaced with the program manager on the Purvis contract, which is Rick McCauley. That was part of my everyday functions. In this new position I was now put under a previous subordinate.

Q. Who was that?
A. Keith Cobb.
Q. So you were direct reporting to Keith Cobb?
A. Yes.
Q. Okay. Any other changes?
A. Changes such as?
Q. In your responsibilities.

A. Basically I did not have any supervisory or management responsibilities. I did – I did – how would you call it? I don't want to call it menial tasks, but I was no longer challenged. I was not even put in a position to justify my position, not with any opportunity for progression.

[Pl.'s Dep. at 84-86]

The Plaintiff also disputes the following material facts as set forth by Defendants in their Statement of Undisputed Facts:

> 11. In early 2002, Malone began what became a pattern of unexcused and/or unplanned absences. (Supancic Dep. At 38, 65-66; 1/24/02 Email). (Def.'s Stmt. Undisputed Facts ¶11).

The Plaintiff disputes this fact and asserts that none of his absences at the time they occurred were considered to "unexcused." Defendants have attempted to demonstrate that all of the Plaintiff's absences from work were unexcused when, in fact, the Plaintiff never took more time off than he was allotted and never violated the practice and procedure of employees in his department.

Q. Okay. That e-mail is dated, I believe, 2002. During that time period what were you required to do to get time off?

A. Let me ask you. I'm not sure I quite understand that question. Because let me go back to what I'm thinking that I had said before when you were asking about policies and what have you. I'm not sure we ever adhered to 30 days prior approval or anything like that. Because if I cover a shift shortage or whatever, there's no 30 days notification for that either. It's an emergent situation. In the past I would call, and I would ask for time off, and I would be granted time off. Just like if there was a shortage, and they required my supporting that, sometimes on my own time, I would do that. So as far as was there a clear cut policy or something like that? I would say no. No. It was just as I stated. In the past, if I needed time off, I would usually call in, usually on a Monday or Tuesday. I never took time off at the end of the week. And I would ask for it.

* * *

Q. Okay. So in 2002 when you asked for that Thursday off on that Thursday, you believe as long as your job duties were covered, then it shouldn't have been a problem?

A. That's right. That's what I believe.

* * *

Q. So when you had employees reporting to you, what Absence From Work policy did you enforce?

A. Common sense. What I mean by that, if you had a guy who was always – and I had certain individuals who was always willing to stay later because someone was going to be late in showing up, I mean, who always went above and beyond. You try to accommodate him. One hand washes the other. That's the way. It was no set, well, you know, I need three hours before you can do that, because a lot of time when I asked him to stay over, I may have given him five minutes notice.

Q. So as a manager of several employees over the course of time, you never referred to the Absence From Work policy when deciding whether your employees could take off from work or what the - what the process they were supposed to go through to take off?

A. We always followed if the site could afford it. Especially under the Purvis contract, if the site could afford it, we allowed the person time off from the contract. It saved money.

* * *

Q. The question was did you ever refer to it? Did you ever look at it to see what it required?

A. I may have. I can't say emphatically that I did. And the only reason I say that – I mean, during the course of the last 20 years I'm sure I've looked at a lot of policies. And if I had to use that to make a decision, I would have remembered it. I don't recall having to use a policy like that to make a decision as to whether to allow someone to take time off.

[Pl's. Dep. at 143-153]

The Plaintiff also disputes the following material facts as set forth by Defendants in their Statement of Undisputed Facts:

> 15. In addition to these attendance issues, Malone admittedly had a problem managing his team on the CCSL contract and stated that they were "resistant to direction." (Malone Dep. At 33-34; 93-94) (Def.'s Stmt. Undisputed Facts ¶15).

The Plaintiff dispute of this fact is supported by his deposition testimony as follows:

Q. In or around that 2000 time period, approximately how many subordinates did you have reporting to you?

A. In 2000 I would say maybe 15.

Q. And of those 15, how many of those would you characterize as problem subordinates.

A. Well, what are you calling problem subordinates?

Q. I'm not calling them anything. You just defined to us what you believed problem subordinates to be. I'm just trying to figure out how many people in your staff did you consider to be a problem subordinate?

A. Possibly three, maybe four.

Q. So the bulk of the direct reports that you had you didn't have problems – you didn't have the kind of problems you just described with he bulk of them; just three or four?

A. Right, or that I knew of.

* * *

Q. You're talking about these six people who were reporting to you during that tiem period?

A. Yes.

Q. What were they – how were they behaving badly?

A. Being resistant to direction. First of all, they didn't want to be supervised. And it's even harder to supervise someone when you're not even allowed to supervised them anyway

Q. What do you mean by that?

A. Some of the individuals didn't have – had no use for any type of supervision on-site. So when I said – and the reason I made this statement, I'm trying to supervise guys who don't want to be supervised, and I'm getting micromanaged by Carl. That only added to the problem.

Q. But these are guys under your management. They have to do what you say, correct?

A. And pretty much they did. And when I say pretty much, I don't know what they did behind the scenes. Obviously, the things with the tools and the metals, that was going on behind the scene.

[Pl.'s Dep. at 33-34; 94]

The Plaintiff also disputes the following material facts as set forth by Defendants in their Statement of Undisputed Facts:

> 19. Further, Malone failed to report to work on October 4-7, 2004. (Supancic Dep. at 113-115; 10/6/04 & 10/7/04 Letters). (Def.'s Stmt. Undisputed Facts ¶19).

The Plaintiff disputes this fact and its characterization that he "failed" to report to work. The Plaintiff simply took vacation days that he was entitled to take in accordance with the company policy. [Pl.'s Aff. ¶¶10, 13-14]

The Plaintiff also disputes the following material facts as set forth by Defendants in their Statement of Undisputed Facts:

> 26. Additionally, Government employees and prime contractor, Purvis employees who were teaming with Lockheed on the CCSL project, likewise reported problems with Malone's absenteeism, stating "Malone's problem was a lot of time we would be looking for him and he wasn't available." (Pavao Dep. at 15, 18-19; Rosario Dep. at 26-31; McCauley Dep. at 9-11, 29-30). (Def.'s Stmt. Undisputed Facts ¶26).

The Plaintiff dispute of this fact is supported by his deposition testimony of Sandy Rosario and Richard McCauley as follows:

Q. But I'm talking about you said performance not whether he was there or not. And I want to be clear on who complained about his performance and his job.

A. Performance? I thought I said that he did the work he was given to do when I was asked about his performance.

Q. I'm sorry. Could you say that again?

A. I though I said that when I was asked about performance my answer was he did the work we gave him to do.

Q. Okay. So his performance the actual execution of the job wasn't an issue it was the amount of time he spent?

A. When he was – yes, he did the work he was given to do. There wasn't a lot of it at that point but what he was given to do, I never had anyone tell me he didn't do it correctly or the technical work that we asked him to do was done.

[Rosario Dep. at 33-34]

Q. Did Al do a good job for you?

MR. REYNOLDS: Objection.

A. Yes.

* * *

Q. And I guess what I'm asking, and I'm not trying to corner you or trick you or anything, I just want to know in you regular dealings with Al if you found that these allegations were founded. Did you believe the government when they said that Al's spending too much time in the office?

A. Yeah.

Q. Did you find that in some way or in any way affected his performance?

A. No. The job got done. What I assigned him to do he did the job.

Q. And that was your primary concern anyway, right?

A. That's all I wanted him to do was do the job.

* * *

Q. Did you ever complain to Mr. Supancic to anyone at Lockheed Martin that Mr. Malone was taking too much time out of work?

A. No.

[McCauley Dep. At 11; 17]

The Plaintiff disputes

> 53. Malone was among the employees who received a written warning, not for his transmission of the information, but rather for his "lack of effective and/or active management practices," "lack of a clearly communicated tool process," "overall poor supervisory practices, and [his] own personal attendance." (10/18/04 Memo). (Def.'s Stmt. Undisputed Facts ¶53).

The Plaintiff disputes this fact as contrived in an effort to remove him from his management position for the purposes of replacing him with a white employee and in retaliation for making the report. [Pl.'s Af. ¶23]

The Plaintiff also disputes the following material facts as set forth by Defendants in their Statement of Undisputed Facts:

> 57. Malone was asked on several occasions whether he believed that Supancic was treating him this way because of his race, and Malone continuously stated that he did not believe so, specifically stating on one occasion, "[n]o, I don't know. All I know is he had a problem with me." (Malone Dep. at 32, 78-81, 135, 188). However, Malone admitted that he did not know how Supancic treated other subordinates. (Malone Dep. at 31). (Def.'s Stmt. Undisputed Facts ¶57).

The Plaintiff disputes the characterization of this assertion a supported by his deposition testimony:

Q. Did you perceive that he was treating you that way because of your race?

A. I didn't draw any inferences at the time. I was trying to figure out – I was trying to figure out why, after having such a great relationship with everyone in this company, I'm having all the problems with this guy.

* * *

Q. Did you believe that was because of your race?

A. Remember I said I didn't necessarily put race forefront. I tried to look beyond that. Can't get anything done doing that. But that might have been his situation. I don't know.

Q. I'm asking for your perception though at the time.

A. At the time or now?

Q. At the time.

A. I don't know how to answer that, Mrs. Nordstrom. And I'll tell you why I say it that way. I did not know why this guy was bothering me the way he was. I didn't know if he just didn't like me, if there was a personality problem, or whatever. You know, it was – I just felt that I was continually ridden, continually sought out. There was really nothing I could do other than breath free air without his permission.

Q. And you didn't witness him treating other people that way.

A. No.

[Pl.'s Dep. At 32; 78-79]

The Plaintiff further asserts that the following additional facts preclude summary judgment in Defendants favor:

1. Prior to Defendant Supancic becoming the Plaintiff's supervisor, the Plaintiff enjoyed an impeccable record of high performance and above average performance appraisals, with regular promotions and increasing amounts of responsibility. [Pl's. Aff. ¶3]

2. After Defendant Supancic began to supervise the Plaintiff, the Plaintiff began to suffer from heightened scrutiny regarding his attendance that no other white employees were subjected to. [Pl.'s Aff. ¶¶4, 18, 19]

3. Since being transferred to Wisconsin, the Plaintiff has received the same high regard he had prior to working under Mr. Supancic and was quickly promoted and given greater responsibilities. [Pl.'s Aff. ¶24]

4. With the exception of Defendant Supancic, no other Lockheed Martin employee or manager ever complained to Human Resources or other company management that the Plaintiff had an attendance or performance problem. [Pl.'s Aff. ¶12]

5. The Plaintiff suffered immediately and swift retaliation for his reporting of the unethical and/or illegal activities of Lockheed Martin employees and a government employee insofar as he suffered from two demotions in less than one month's time. [Pl.'s Dep. ¶¶20-22]

PLAINTIFF
By his attorneys,
SIMS & SIMS LLP

January 24, 2008

/s/

Michael F. Drywa, Jr. (#5999)
53 Arlington Street
P.O. Box 7367
Brockton, MA 02303
(508) 588-6900
(508) 586-3320 (fax)

## CERTIFICATE OF SERVICE

I, Michael F. Drywa, Jr., hereby certify that the within Motion was served upon the below-named counsels of record via email and first class mail at the addresses listed and that same has been electronically filed and is available for viewing and downloading from the court's ECF system.

**Tamika R. Nordstrom, Esq.**
Miller & Martin PLLC
1170 Peachtree Street NE
Suite 800
Atlanta, GA 30309
tnordstrom@millermartin.com

**Mark T. Reynolds, Esq.**
REYNOLDS, DeMARCO & BOLAND, LTD.
146 Westminster Street, Suite 400
Providence, RI 02903
mtreynolds@conversent.net

/s/

Michael F. Drywa, Jr., Esq. (#5999)
SIMS & SIMS LLP
53 Arlington Street
Brockton, MA 02303
508-588-6900