**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **AZELL MALONE,**<br>**Plaintiff**<br><br>**v.**<br><br>**LOCKHEED MARTIN CORPORATION**<br>**and CARL SUPANCIC,**<br>**Defendants** | **C.A. No. 07-65-T** |

## AFFIDAVIT OF AZELL MALONE

Now comes the Plaintiff, Azell "Al" Malone, in the above-captioned matter, and upon oath does hereby depose and state that:

1. I am the Plaintiff in the above captioned matter and have personal knowledge of the matters set forth in this Affidavit.

2. I am an African-American male and was hired by Defendant Lockheed-Martin's predecessor (Sperry) in March, 1977, and have been continuously employed by Lockheed Martin since it took over Sperry in 1983.

3. During my years with Sperry/Lockheed Martin, and up until the time I began to report to Carl Supancic in around 2000, I received excellent performance reviews and was regularly promoted and given greater amounts of responsibility.

4. Shortly after Mr. Supancic began to supervise me I began to be subjected to an extraordinary degree of scrutiny by him, specifically regarding my attendance.

5. For all the years I had worked at Lockheed Martin, and prior to Mr. Supancic becoming my supervisor, it was common practice to allow all employees to request a vacation day on the same day they sought to take one, so long as the work was being performed.

6. As a Lockheed Martin employee, I had always made certain that my work responsibilities were covered prior to requesting any vacation time from work and this continues to the present day.

7. I have never taken a vacation day or sick day from work without calling in and notifying someone at Lockheed Martin.

8. Prior to Mr. Supancic becoming my supervisor, I was never disciplined for any reason at any time by Lockheed Martin and never received any warnings for attendance problems.

9. All vacation time and/or sick time I have ever taken as an employee of Lockheed Martin was time that I had earned and was properly credited to me and I never took more time than I had earned.

10. To the extent that Lockheed Martin may have had a formal attendance policy in place prior to Mr. Supancic becoming my supervisor, it was not rigidly enforced and it was and is the common and accepted practice that an employee who desired to have time off from work could call into work on the same day and be granted the time off, whether it be for a vacation day or a sick day. This was especially true of management personnel, such as myself, who would often work many hours without compensation.

11. While working on the Purvis Contract at the CCSL 2000-2004, no Lockheed Martin Employees, government employees, or Purvis employees ever expressed to me that my attendance at the job site was a problem nor did they report any such problem to anyone at Lockheed Martin.

12. Except for Mr. Supancic, no other employee or manager at Lockheed Martin ever complained to Human Resources about my having an alleged absenteeism problem or reported any such alleged problem.

13. On October 4, 2004, I did not go to work because I had a problem with my heat at my house and I needed to wait for a repair person to arrive so that it could be repaired and this was communicated to my supervisor at the time, via a telephone message. I did not simply fail to show up for work without calling.

14. In addition, I took vacation days for October 5-6, 2004, that week and had called ahead of time to informed Mr. Supancic that I would be taking vacation days for those days as was the common practice at that time.

15. It was often favorable to take vacation time when it was possible and did not impair performance so that the amount of costs charged to a given contract would be reduced.

16. During my entire tenure as a direct report to Mr. Supancic, he continually made derogatory comments to me regarding the manner in which I walked, talked, and dressed. No white employees were subjected to similar comments.

17. The vacation time I took in 2004 did not have any effect on the performance of my job.

18. The discipline I received for attendance problems alleged by Mr. Supancic was not given to any other white employee, despite that fact that all employees used the same method for taking vacation and sick time, which continues to the present day.

19. Not other white employees were required by Mr. Supancic to obtain doctor's notes to substantiate every doctor's visit/sick day and no other white employees were required by Mr. Supancic to personally speak with two supervisors to obtain approval on the days they wished to take for vacation or sick time.

20. Within days after I reported the wrongful and illegal conduct of some Lockheed Martin employees and one government employee to Mr. Supancic, I was removed from my position as Engineering Manger in retaliation for the report.

21. Although my removal was described as a "re-organization" and I was denominated as "Engineer-in-Charge," other ~~with~~ white managers retained the same basic level of authority.

22. Approximately one month later (November, 2004), I was removed from my position as EIC (under the guise of another re-organization) and I was informed I could re-apply to the position. After I applied for the position, I learned that Mr. Supancic gave the position to John Lastwoski, who was white and who had previously reported to me and was one of the Lockheed Martin employees I had reported for engaging in unethical behavior. I was never interviewed for the position and believe that Mr. Lastowski was simply appointed and was not required to go through a formal interviewing process. I was never interviewed for the position, despite having had years of experience doing the job.

23. The allegations that I was responsible for the wrongdoing of the employees who I had reported was completely untrue and was fabricated to remove me from my management position and replace me with a white employee and was also done in retaliation for the report.

24. Since begin transferred to Wisconsin in or about September, 2007, to work on a Lockheed Martin project in that state, I have been recognized as an exemplary employee and was almost immediately asked to assume the position of Project Engineer. I continue to regarded by Lockheed Martin's Wisconsin personnel as an essential and important part of the management team. In addition, I have had no problems whatsoever with any alleged attendance issues since begin removed from Mr. Supancic's direct supervision.

Signed this 22nd day of January, 2008, under the pains and penalties of perjury

[signature]
AZELL MALONE

33

A -- you know, to do things.
Q And --
A Ethical.
Q -- do you believe that the policy during your time there was uniformly enforced?
A Well, up to a point. I mean, I never had heard of any major problems. If somebody was out, they were usually pretty sick or something was -- you know, other than that, I had never really heard of anything until Mr. Malone -- when I went back over to the 12 -- Building 1258. And I was in Building 1259. When I got there, Al was already assigned there to work from next door where he was my supervisor. And now he was a worker like me there --
Q Yeah.
A -- as a technician.
Q Yup.
A And because of the area we sit in, little cubes, and we were all right next to each other.
Q Sure.
A And after a while, there were times that, you know, you could hear him on the phone, him complaining. I'm not sure who he was talking to; but -- it wasn't





34

that I was listening. I mean, you could --
Q I understand you can't help but hear; right?
A And that's how it is there in the cubes.
Q Sure.
A And how I heard bits and pieces of how he wasn't happy that he had a get I believe a Doctor's note if he had an appointment, as far as he couldn't be late. He had a window. He didn't think it was right. And he -- after a while, he was gettin' up -- you know, you could tell he was upset at different times that he'd talk about it.
Q And he'd talk about it with you; right?
A No. This was on the phone, whoever he was talking to.
Q Did he ever discuss with you the application of the absentee policy to him?
A He did ask me if, you know, I had a go through something like that. And I said, "No." I said, "I never heard of that." That's something new that -- I didn't even know of anyone that had a go through that. I didn't know what reasons they were or why.
Q I understand.
A I didn't question it. But that was something new that I just know he was pretty upset from, you know,





35

the situation.
Q Have you ever been -- had you ever taken time out of work by calling in on the day you weren't gonna be there?
A At this time, because of my travel, I mean, I'm in all kinds of weather.
Q Sure.
A I gotta lug my tools sometimes a mile just through the snow to get to a boat, to a submarine. And there's days I've woken up that I was sorry I woke up. I mean, a cold. And I'd just call in. I am sick. You want me to come in give it to somebody else if I have to be there?
Q You never had a problem with calling in sick though when you were sick on a given day?
A No, sir. There were times that I put over 70 hours of work in. You know. I was workin' seven days a week coverin' different contracts. And I didn't complain. I enjoyed the work. The pay was good. I mean, you work for what you get. But --
Q Sure.
A -- I mean, it's tough. But, I mean, I did it. And it was a necessity.
Q Did Mr. Supancic ever discipline you for failing to





36

call in on a day you were going to be out absent?
A Oh, no, sir.
Q Did Mr. Cobb ever discipline you for failing to call in -- excuse me -- for calling in on the day in which you were going to be absent?
A Oh, no, sir.
Q Did anyone in your organization ever tell you, whether it be Mr. Cobb, Mr. Supancic, or otherwise that your absences because of illness or whatever affected your performance?
A Oh, no, sir.
Q How do you think Mr. Malone was treated by Mr. Supancic?
A Well, to this day, I -- there's a lot of -- I've never been explained why things were done. I was shocked when I saw he was removed and as an EIC and that the people I had turned in on the whistle-blower thing, one of 'em even got promoted. The other guy had threatened me a couple of times. He was kind a held in check. I felt bad for him, too. But he was just a very harsh individual.
Q Yeah.
A And if anything, like I said, I was shocked at what happened. And the HR lady I believe was

SHEET 14 PAGE 53

53

A And she worked there. And her mother worked there. Her grandfather worked there. It was a family thing. Her grandfather was government; but everybody else was contracted. And I was in there gettin' parts.
And he came into supply; and he opened up the file cabinet. And he had his arms like this, everything you could think of; dry goods as far as pads, pencils, pens, markers. Anything you could think of. And he had his arms full. And he walked up to her desk -- because I was walkin' out with the tools, with the parts there. And he stated to her, he says, "Is that my pencil sharpener?" She said, "No. That's mine. I bought that. I brought it from home." "Oh, I thought you took that off my desk." She says, "What are you doin' with all that stuff?" He said, "My kid's startin' college."
Okay. Right there -- I mean, I didn't say a word. I walked out with my parts. And I'm like -- this is ridiculous. Hey. I'm sorry. That's taxpayer money. People will say what they want. They can call me what they want; but I'm sorry. That's wrong.



PAGE 54

54

Q So you told Mr. Malone about all these things, the harassment, the selling of metal?
A That's all towards -- I mean, at that time when I told him everything, I said, "That is what's been goin' on." And I was intimidated to say anything; because this guy's walking around with -- you know, he's a power monger.
Q And you're talking about Mr. --
A Limp Pavao. Yes.
Q Yeah. Okay. Now let me -- let me ask you a question about the whole issue of the tools, if I can for a second. If Mr. Lastowski -- is it Lastowski or Latowski?
A I think it's Latowski. T-O-W -- Latowski.
Q Okay. He and Mr. Pires were the two gentlemen who Mr. Pavao offered these tools to --
A Yes.
Q -- and so forth. If Mr. Pires and Mr. Lastowski wanted to keep that hidden from Mr. Malone, would it have been easy for them to do that?
A They did. They each had their own key to it. It wasn't for us.
Q It would not have been easy?
A He didn't know. He did not know. I was watching



PAGE 55

55

what was goin' on right in front of him. And like I say, at that time, I was intimidated to say anything.
Q And they were keeping this from Mr. Malone?
A Oh, yeah. It was their toolboxes. And they were laughing about it. And even John Lastowski gave me a few of his tools and said, "Here. I don't need these anymore. These were mine. Because I got all these other tools." They replaced everything new with these others.
Q If you, for instance, needed a tool to do a particular job -- and you do a lot of hands-on work; right?
A Yeah. Yeah. I have a lot of tools that I brought with me that they're custom tools from years ago because of what I do. But, I mean, the few tools that I needed, you know, I was always -- I would tell Al. And they'd get 'em for me. It wasn't many for what I needed.
As far as a technician in the back shop where I worked in the cable shop, which is right near our office where we sit in that building, there was like seven roll-a-ways of toolboxes there. I mean, these are the big --



PAGE 56

56

Q Sure.
A I mean, they had every tool. Then in the filing cabinets, they had every kind of drill, left-handed, right-handed, whatever you could think of.
Q But there was never a problem if you needed to get one?
A No. And then in our shop, we had a few more roll-a-ways. I never saw so many tools. I was in heaven. I love tools. Wow. I saw tools I never saw. I mean, it was great, all that stuff. But, again, those tools -- those guys, it was for them.
Q Yeah. Personally?
A Right.
Q Okay.
A Right.
Q All right. So you tell Al all this stuff.
A Yeah.
Q And do you know what he does with the information?
A He told me he was gonna report it.
Q And do you know if he did that?
A Doin' his job. Well, yeah. I guess. Because it wasn't long before, you know, I had this -- I could a -- I didn't have to put the sign on my back, whittle blower. Here I am.

A Uh-huh.
Q Notwithstanding anything Ms. Nordstrom may have told you, did Mr. Supancic talk to you about your deposition testimony today?
A No.
Q Never said anything to you about it?
A (Witness Nodding)
Q Never told you how you should answer any of the questions put forth to you?
A No.
Q Did he talk to you about the facts of the case?
A No.
Q Didn't tell you what the nature of the lawsuit was about?
A I didn't hear about it until yesterday.
Q From Ms. Nordstrom only; right?
A Yup.
Q Nobody else; right?
A Yup.
Q Ever get in trouble at work for being absent?
A No.
Q Ever receive any kind of reprimand for taking days off?
A No.





Q Do you take a lot of time off?
A Yes.
Q Why?
A I like to have time off.
Q Are you entitled to time off?
A Yes, I am.
Q Do you earn it?
A Yes, I do.
Q What kind of time off do you get?
A Vacation, I get four -- four weeks a year.
Q Yeah.
A The maximum six, if I carry any over.
Q Vacation. Do you get any sick time?
A Yes, I do.
Q How many days of sick time do you get?
A I believe it's ten days of sick leave.
Q Four weeks of vacation; right?
A Yes.
Q Ten days of sick; right?
A Uh-huh.
Q Any other time off?
A Flex time, if I can work flex time in.
Q Okay. And what's that?
A You put in your 40 hours; and you take what's left





over off. So in other words, if you work four ten-hour days, you get a day off.
Q So four weeks. And ten, sick. That's five. That's six weeks of available time, not counting -- so you get six weeks of time off, not counting flex time or other holidays. Correct?
A Right.
Q Do you try to use all of that in the course of a year?
A No.
Q Do you use it all in the course of a year?
A No.
Q What do you do with the time you don't use?
A Usually it carries over to the following year.
Q Do you have any currently banked time that's beyond the four weeks and the ten days?
A You can't carry over your sick leave; but I do have banked vacation.
Q How much?
A I have a total of 200 I think it's 41 hours.
Q Okay. Is there a policy on absenteeism at Lockheed Martin?
A I'm not sure what your question is.
Q Okay. I'll rephrase it. Is there a protocol that





must be followed for an employee to take time out of work for illness?
A Yes.
Q And what is the protocol?
A Call your supervisor, your manager, let him know you're not gonna be in.
Q Okay. You do that on the day you're not gonna come in?
A Yes.
Q And if somebody calls in on a day that they're ill, do they -- and says they're not gonna be in, do they get -- is there some sort of discipline for that because they called in on a day they're not gonna be there?
A What do you mean by discipline?
Q Well, is it against the absenteeism policy to call in on the day that you're sick to say you can't be in?
A No. As long as you don't abuse it.
Q Okay. Well, what's the policy say about abuse?
A If it's a constant offender, you don't have to grant them the sick time. They have to come in or take vacation.
Q Okay. But they're still granted the time off; and

# PERFORMANCE ASSESSMENT AND DEVELOPMENT REVIEW

LOCKHEED MARTIN

*(Attach back-up documentation as appropriate)*

| Employee Name (Last, First and Initial) | | Job Code: | Business Entity: | Period |
|---|---|---|---|---|
| Malone, Azell | **Employee Number:** 058549 | L1694 | LMTS CSS | **From** 06/02 **To** 06/03 |
| *Field Help Key = F1* | **Other Identifiers:** Org. 6825 | | | |

**Results Related to Objectives**

With respect to business objectives, most were either met or exceeded. The level of Purvis and NUWC customer satisfaction achieved was generally very good on the CCSL contract in this first year of it's successful recompete. Under Al's leadership, the group's responsiveness to requests for remote field support in both the CCSL and LMTS-Eagan Q-70 T&M contracts have been strong as well. While there were some isolated incidents where Al's direct reports posed some problems, Al was generally effective in detecting and resolving them. The engineering supervisory performance was similarly strong. The latest award fee and customer feedback on the CCSL contract dentified some problems with inadequate cross-training and associated documentation/procedures. However, these issues, which reflect on Purvis as well as LM, appear to be entirely manageable and are currently being addressed. Coordination with the other CSS/Newport management team for matrixed support of other existing contracts and pursuit of new opportunities (e.g., COATS support, Q-70 T&M support, etc.) also bears mention and shows promise for the future. The area of new business development, however, is one that lagged a bit behind the other areas of performance. Although Al has had a challenging year and has performed well, the importance of creative thinking, identification and pursuit of new opportunities cannot be overstated and demands our collective dedication.

**Attributes Contributing to Results**

Al remains a consummate professional. He is highly ethical, has great respect for others, is even tempered, and can operate effectively under stress. Consequently, Al continues to be well respected by his customers, peers and direct reports. Al also continues to apply effective leadership attributes, which is becomingly increasingly important in an environment where "better, faster, cheaper" customer expectations persist. He leads effectively by example, asking no more than he would do himself.

**Strengths**

As reflected in the "Attriutes Contributing to Results" section, professionalism and leadership qualities are Al's greatest strengths..

**Areas for Development or Improvement**

Since business development remains such a pressing need, Al's exposure to where subsurface domain technologies are heading, as well as what our own corresponding business unit and corporate strategies and plans are is a priority. An enhancement of the creative thinking process and means of effectively communicating specific opportunities and pursuit approaches for CSS/Newport would also be an area where didivends would be realized.

**OVERALL ASSESSMENT:** The definition which best describes the employee's overall performance:

☐ Exceptional ☒ High Contributor ☐ Successful Contributor ☐ Basic Contributor ☐ Unsatisfactory

**Rating Definition:**

Willing to go the extra mile. Exceeds key objectives and expectations. Leadership qualities surface. A "can-do," self-starter, who continually seeks ways to improve. Is mission-oriented versus job/task oriented. Effectively plans, strategizes and anticipates. May have a special skill set that is of particular value to the organization.

**Employee Comments (optional):**

My supervisor/manager has discussed this review with me.

| | | |
|---|---|---|
| [signature] Employee's Signature | Azell Malone Print Name | 05/21/03 Date |
| [signature] Manager's Signature | Carl M. Supancic Print Name | 05/21/03 Date |
| [signature] Other Management (optional) | Print Name | 5/21/03 Date |

Lockheed Martin is committed to the highest standards of ethical business conduct and to creating an inclusive environment where diversity is valued, managed and leveraged. Employees are expected to act with honesty, integrity, respect, trust, responsibility, and citizenship in dealings with employees, customers, and suppliers

Lockheed Martin Proprietary Information (when completed)

**Thomson, Lynda**

**From:** [redacted] Supancic, Carl
**Sent:** Sunday, August 29, 2004 9:25 AM
**To:** Lynda Thomson (Thomson, Lynda)
**Cc:** Janet L. Christopherson (Christopherson, Janet L)
**Subject:** More Al Malone Concerns

Lynda,

I need to speak to you yet again regarding concerns over Al Malone's behavior. Before I arrived on Thursday, he left me v-mail to say he needed to see a dentist for a cracked tooth. I have asked Al to make it a point to make sure he talks to me directly when he's not going to be in. He has my cell phone number and has been encouraged to use it. As it was, he called before I got in, never called back, and never showed up, even though he knows I'm counting on him to set a good example and to help carry the load. Again on Friday, he left a v-mail before I got in, saying he would be in, but maybe not until the afternoon. His voice sounded a bit odd. I called Al to tell him I was disappointed that he had once again not complied with my expectations, as all other managers do, to talk to me when they are not going to be in so that we can talk about "what's hot & what's not" to ensure nothing falls through the cracks during the absence. Again, he sounded quite odd, and when I asked him about it, he said he was on pain killers. I thought this was odd, but decided not to press him on it, and assumed I would be speaking to him later in the day when he came in. I asked him if he was going to use vacation or sick leave, and he asked me what I wanted him to use. My response was to do what was appropriate. In all of my experience with tooth problems, I wasn't aware of having to take 2 days off sick with a cracked tooth. Most dentists will take patients immediately for urgent pain-inducing problems, and will relieve their discomfort very quickly. I had to call Al a little later with Norm Nunes on the line to try to get a handle on some FE stuff that had and was still going down in Groton. Al was absolutely befuddled on the phone in trying to respond to even the most straightforward questions. It was so frustrating that Norm and I gave up on him and called each other back w/o Al on the line. Well, as it turned out, Al never did show up, didn't call, didn't complete his own timesheet, didn't complete Joe Pires' timesheet, and didn't approve any of his staff's timesheets. Therefore, his and Joe Pires' time will bounce into OH for fiscal August!

065438 Why didn't Carl complete Al's? Isn't Joe OH anyway? Why is Al completing Pires'

I have now completed both Joe's & Al's timesheets and approved them. I put down vacation rather than sick leave for Al's time, and will leave it up to him to submit a correction if that doesn't reflect what the real situation is. More importantly, my concerns over Al's performance have deepened. As both you and Janet have emphasized, I am not in the position to delve into his whatever medical situation Al might have. Nonetheless, his behavior, accountability and performance is falling well short of what it needs to be. Al is certainly not setting the example that is required of management. Al has offered a few comments to me in the past about going for a series of tests, and has mentioned some possible insomnia-related problems. I have never pressed him on it and do not intend to. However, when someone continues to call in to me in a clearly befuddled state, and then doesn't show up when they say they will and don't call, what options do I really have? Do I have to take him at his word regarding 2 days off for a dental problem? I certainly intend to speak to him in a pointed fashion about his PERFORMANCE in terms of not being on the job when he indicated he would be, and not getting his own administrative duties fulfilled, and not coordinating with me about getting any assistance. I am also inclined to document my PERFORMANCE concerns, but will not do so until I have heard from you.

JL

The bottom line is that, given Newport's multiple issues in the FE management area, I need Al to step up, but he is not responding, and if anything, is stepping back in terms of performance, accountability and behavior.

V/r,

Can't continue to approve V and then hold it against him.

How did others get approved?

*Carl M. Supancic*
Lockheed Martin MS2 Tactical Systems - Newport
25 Enterprise Center
Middletown, RI 02842
carl.supancic@lmco.com (work)
cmsupancic@cox.net (home)
(401) 849-3310 Extension 111 (office)
(401) 714-2527 (cell)

**Malone, Azell J**

| | |
|---|---|
| **From:** | Malone, Azell J |
| **Sent:** | Friday, October 01, 2004 1:55 PM |
| **To:** | Markov, Mary A |
| **Cc:** | Supancic, Carl |
| **Subject:** | Rick's Complaint Follow-up |

Hello Mary,
After you left Newport a Purvis employee provided unsolicited information to me about Olimpio Pavao admitting that he had sold scrap metal and used the money to buy tools. Per your instructions I did not discuss anything. I listened. For more information please feel free to call me.

A.Malone
Lockheed Martin Tactical Systems - Newport Operations
25 Enterprise Center
Middletown, RI 02842
(401) 846-1327
Lockheed - azell.j.malone@lmco.com
NUWC - malonea@npt.nuwc.navy.mil
Cell Phone (401) 935-4622

LOCKHEED MARTIN

October 18, 2004

To: Al Malone

From: Carl Supancic

Subject: Record of Written Warning – Negligent Supervisory Responsibilities

You were recently debriefed on Tuesday October 12, 2004, by Sean Thompson, Human Resources, of the findings of an investigation that specifically involved your employees. The investigation uncovered that your lack of effective and / or active management practices contributed to the issues your employees were having. Specifically, lack of a clearly communicated tool process; your overall poor employee / supervisory practices and relations; and your personal attendance issue. Your actions as a supervisor are unacceptable and has negatively impacted the overall performance your work group as well as your own.

This letter serves as written notice and clearly communicates the seriousness of these issues that require your immediate attention. I am confident that you are capable of meeting the challenges to effectively lead and perform your supervisory responsibilities of your group. I will set up a time for us to periodically review your progress. If you can make marked and sustained improvements, we will not need to pursue this matter further, anything less and further disciplinary action will be required up to and including termination of employment. If there are any personal problems affecting your work and or behaviors feel free to contact our Employee Assistance and Counseling Program at 1 888-562-2243.

Read and Acknowledged:

____________________________ ____________________________
Signature Date

CONFIDENTIAL

**From:** Thompson, Sean C
**Sent:** Sunday, October 17, 2004 6:53 PM
**To:** Supancic, Carl
**Cc:** Thomson, Lynda
**Subject:** Rhode Island Letters

**Importance:** High
**Sensitivity:** Private

Carl,

Attached are letters that you will need to Al Malone and Richard Goulart tomorrow. The letter to Al dated October 8, you should explain to him that you planned on doing that irregardless of the outcome of the investigation due to his personal attendance and pervious conversations you had with him (it was just held up by Legal for review) and it was separate from the investigation. The second letter to Al dated October 18 addresses his overall poor management style that was a direct outcome of the investigation. The memo to Rich just is a written follow up to our conversation we had last Tuesday. I have sent the October 18 letters to Legal for review but if you don't hear from me by the time you are ready to give the letters just go ahead, there shouldn't be any issues with them.

Sean

Warning memo.doc (31 KB) | Al Malone memo.doc (32 KB) | Rich Goulart memo.doc (30 KB)

10/20/04

Mr. Sean Thompson,
In response to this letter, I feel it's necessary to point out a few things. The individuals involved in this incident (Joe Pires and John Lastowski) have demonstrated behavior that's not in the best interest of this contract. They have shown disrespect for the prime team member (Purvis) and a disdain for any type of management. This was documented in my notes as instructed in the past by HR. Upon discovering the tool situation, I reported it. It seems the consequences were to shoot the messenger. I accept my management duties and responsibilities and understand that we are held to a higher code of conduct. But the individuals are taught ethics and should be held solely accountable for their actions. No amount of management can deter anyone determined to undermine the system. That's why ethical behavior is expected on their part. I know what they did happened on my watch, however I feel this letter is overly harsh on me. I'm working with difficult individuals and trying to make this team perform in spite of their determination to demonstrate their dislike for Purvis.

I've followed HR's recommendation in documenting incidents. I was told to keep track of incidents without passing them on to the employee. If this situation happened again, I would probably report it the same way I did this time, however I'm asking myself" Will I be blamed for whatever they've done"? Does HR have training for dealing with difficult employees who don't want to be managed? I even asked Carl "How things could have been handled differently", however under the circumstances we're not sure. Every time I report infractions will I be reprimanded for doing my job? I am documenting incidents and passing them up the chain when warranted. What do you suggest I do differently? I feel unnecessary exposure after this incident and am now asking you for more specific directions on how to handle these individuals without intimidating them, disrupting moral and upsetting the customer.

I also take exception to your assertion that I only kept notes on Joe. You only asked me for notes on him. I can and am willing to provide you with copies of my logs, which include notes on daily meetings and incidents involving others. I am not targeting individuals nor do I have favorites.

I am signing this letter only as an acknowledgement that I received it. As previously stated I sincerely disagree with the harshness of it. Since you put so much blame on me for what insubordinate individuals are doing in spite of being coached otherwise, I'm asking for your help to protect myself, LM and to make this contract work.

**From:** **Supancic, Carl**
**Sent:** Friday, July 29, 2005 2:11 PM
**To:** Thompson, Sean C
**Cc:** Weiss, Darlene
**Subject:** RE: Al Malone's Recent Medical Absence

Sean,

I am unclear on some of what was written in the attachment, and consequently, I am not absolutely sure about where you are going with this. I very much want to discuss this situation, preferably before you talk to Al. I had assumed that you might have called by now, but I perhaps shouldn't have done so. In particular, I would like to understand the significance and intent of your writing the following:

> ** All of Al Malone's absences were approved by his manager and were not contested at the time of his request. However, the doctor's notes were provided to management after he returned from his absences and not at the same day they occurred.

Is there an implication in that text that we **should** have challenged the absences and/or not approved them? If that is the case, I regret that we were not advised to do so. If that is not the case, I'm unsure why you would mention it at all. What I did on Friday 07/01/05 was to reinforce to what I felt his final warning said about having medical substantiation of his absence. My recollection of what Janet's and your position/words to me and to Al when we gave the absolute final warning letter to him was that we were not kidding around, and the burden of showing up was all on him, and likewise, the burden of substantiating any absence or tardiness was his. We don't demand that people who claim they are unable to come to is work show up anyways. We also don't typically ask them to provide medical substantiation, and if we did, that information would not typically come to the management. In Al's case, we were very specific about what his obligations were, and I sincerely feel he was not giving much effort to satisfying them. We also were clear on several occasions about making sure that he, and/or his doctor, provide us with a specific request for accommodation if he had any reason to ask for one, and that if no request were made, none would be given. My understanding was that he never did, in fact, ask for an accommodation. At this point, I would absolutely welcome a constructive post-mortem discussion about what has occurred, what actions are ahead, and what we collectively might have done differently. Again, I would also appreciate it if we could have this discussion before you have your own with Al, if it is not already too late.

On a separate subject, we need to also talk ASAP about the Chuck Jarboe situation. Chuck feels that he has satisfied all that has been asked of him by the EAP and CODAC and was anxious to return to work today. We have told him, yet again, that until we have been cleared by HR (who are collaborating with medical) to welcome him back, that he should not report to the facility or the base. Again, it was my understanding that we would have a well-crafted letter waiting for him to sign upon his return that will clearly enumerate the terms and conditions of his continued employment. As we have not discussed this situation since Wednesday, I would greatly appreciate hearing from you regarding what Chuck should now be told, and by whom. I would also like to know what your estimate is to for when the letter will be ready for Chuck to sign. Please feel free to call me at any time this afternoon or evening, or during the weekend.

V/r,

***Carl M. Supancic***
Site Manager - Lockheed Martin MS2 Tactical Systems - Newport

CONFIDENTIAL

**Malone v. Lockheed Martin, et al., 07-65-T**

**Exhibit K**
**Page 1 of 3**

EEOC Form 5 (5/01)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To: ☐ FEPA ☒ EEOC

Agency(ies) Charge No(s): 523-2006-00984

**Rhode Island Commission For Human Rights** and EEOC

*State or local Agency, if any*

| Name *(Indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Mr. Azell Malone** | **(401) 683-5558** | **11-01-1952** |

Street Address / City, State and ZIP Code

**130 Islington Avenue, Portsmouth, RI 02871**

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **LOCKHEED MARTIN TACTICAL** | **500 or More** | **(401) 849-3310** |

Street Address / City, State and ZIP Code

**25 Enterprise Center, Middletown, RI 02842**

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

Street Address / City, State and ZIP Code

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☒ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☐ RETALIATION ☐ AGE ☐ DISABILITY ☐ OTHER *(Specify below.)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: **10-06-2004** Latest: **01-06**

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

SEE ATTACHED

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

8/11/06 [signature]
Date — Charging Party Signature

NOTARY – *When necessary for State and Local Agency Requirements*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT [signature]

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)*

Robert R. MacTaker. Notary Public 8-11-2006

01-AUG-06 11:01am From-EEOC BOSTON AREA OFFICE 617-565-3196 T-556 P.002/002 F-355

## EEOC Discrimination Questionnaire – Question No. 5 – Azell Malone

**Revised August 4, 2006**

I am an African-American male and was hire by Lockheed Martin (Sperry) on March 7, 1977. I held the position of Field Engineer up until March 1983, at which time I was promoted to Engineer-in-Charge. I held this position until April, 2004, at which time I was promoted to Field Engineering Manager.

The history of the discrimination at my company began shortly after Carl Supanic was assigned as my supervisor (in 2004). Prior to that time I had been an exemplary employee and consistently regarded as a top performer. Things started to change for the worse when, on October 6, 2004, and October 8, 2004, Supanic issued letters to me ordering that I report to his office or else I would be subjected to termination. This came as a total shock to me since I was a manager and was being treated like a child for no apparent reason.

At an October 13, 2004, meeting, Supanic indicated that I had developed an attendance problem and issued a memorandum to me which required a very strict set of rules for me to follow when I needed time out of work, and that if I failed to follows those rules I would be subjected to termination. I had never had any problems with absenteeism or attendance and I had never been disciplined for any issues regarding absenteeism prior to working for Supanic.

On October 19, 2004, Supanic issued a memorandum to me that accused me of deficient supervision based on fabricated facts and unfounded allegations that Supanic knew were not true. Once again I was threatened with termination if I did not "improve."

In or about the latter part of 2004, Supanic "re-organized" my group and I was stripped of my authority and the title of Engineering Manager. I was then informed by Supanic that my job would be broken up into two positions and that I could re-bid on the job (a job I had performed successfully for seven years). No other department head (***all of whom were white***) was placed in such a situation and all continued to keep their jobs without any real change in their responsibilities.

Although I did re-apply for the position, I was not rehired to the job. Instead, the position was given to Jim Higson (*a Caucasian*), who had previously been the Software Engineering Manager. I was demoted to a Field Engineer.

The series of performance appraisals I received from Supanic for calendar years 2004 and 2005 purported to demonstrate that I had become progressively incompetent in my position. The March 31, 2005, performance appraisal (for the period January 1, 2004 through December 31, 2004) rated me overall as a "Basic Contributor," a significant downgrade from the previous year.

Next, on December 20, 2005, the date of my most recent performance appraisal (for the period of January 1, 2005, through December 31, 2005) I was once again rated as a "Basic Contributor" and the appraisal purported to show that I had lost all my abilities to perform my job and was a serious

attendance problem, none of which was true or could be in any way substantiated. In addition, I have received progressively smaller and smaller raises until 2005, ***when I received no raise at all.*** I believe that all other white employees in the group received raises. It was in or about December 2005/Janaury, 2006, that I realized I was being targeted by Supanic because of my race.

Since the December, 2005, performance appraisal I have been repeatedly given menial tasks and assignments and continue to be closely scrutinized by Supanic ***on a level that no white employees are subjected to***. I believe the treatment I have received at the hands of my supervisor Supanic is intended to force me to resign because I am an African American. There are ***no other African American employees who work in my group under Supanic in a professional capacity***. There are two African American employees in the group who hold very low-level staff positions (non-degreed non-professional positions). Since my removal as Engineering Manager, all the management positions/authority positions within the group are ***now staffed completely by white men.***

I believe that the December, 2005, performance appraisal and denial of a pay increase represented just one discriminatory action in a series of discriminatory actions undertaken by Supanic from October, 2004, to the present and he will continue to ***treat me differently that white employees*** until I resign or am terminated.

I believe I have been discriminated against due to my race as an African American in violation of Title VII of the Civil Rights Act of 1964, 42 USC §20002 *et seq*., the Rhode Island Fair Employment Practices Act, R.I.G.L. 25-7-1 *et seq*., and the R.I. Civil Rights Act, R.I.G.L. §42-112-1 *et seq*.

**Malone v. Lockheed Martin, et al., 07-65-T**

**Exhibit L**


# Performance Assessment and Development Review

Status: Finalized

LOCKHEED MARTIN

| Employee Name: (Last, First and Initial) | Employee Number: | Job Code: | Business Entity: | Cycle Dates |
|---|---|---|---|---|
| Malone, Azell Jr | 048836 | E1694 | Maritime Systems and Sensors | **From:** 1/1/05 **To:** 12/31/05 |

**Manager:** James Higson **Mgr Emplid:** 048196

**Results** Related to Objectives and Demonstrated Behaviors
Al provided field engineering support for SSN and SSBN equipment on-site at the NUWC DPS Laboratory. He was responsible for installation, preventative maintenance and trouble shooting of Combat Control equipment installed at the NUWC Laboratory. Al demonstrated technical proficiency working with legacy hardware such as the UYK-20. Working with the newer equipment like UYK-43, DPS and Q-70 Al's knowledge and trouble shooting skills were inferior to his peers. Al completed most trouble shooting assignments in an acceptable and timely manner however he was not the engineer of choice for the more demanding assignments on the newer equipments. Al showed a willingness to learn and has improved his knowledge but more is required. Attendance issues identified in last year's performance review and in written correspondence, although somewhat improved, continued and required some discussions during the year. Also this year Al and fellow LM employee had to be advised that their heated and public verbal exchange that took place in our customer's office space was unacceptable behavior.

**Strengths**
Al has excellent written and verbal communication skills. Al has a strong knowledge of legacy equipment and is willing to lean new things.

**Areas for Development or Improvement**
Al should continue to aggressively improve his understanding and trouble shooting skills with the newer UYK-43 and Q-70 equipment. Al should also develop an in depth familiarity with the operation of DPS and the specifics of the DPS interfaces with goal of developing an expertise that would facilitate the investigation of system level issues. Al needs to continue to work attendance and accountability issues.

**OVERALL ASSESSMENT:** The definition which best describes the employee's overall performance:

| ☐ Exceptional Contributor | ☐ High Contributor | ☐ Successful Contributor | ☒ Basic Contributor | ☐ Unsatisfactory |
|---|---|---|---|---|

**Rating Definition:**
Has the necessary ability to handle the current job effectively, with proficiency in most areas. Meets objectives and basic expectations, but may require assistance to perform assignments. May need to build functional and/or interpersonal skills to increase effectiveness. Needs improvement in one or more areas.

**Employee Comments:** (optional)
I disagree with most of this evaluation;discussed the misinformation it was based on with Jim Higson, and documented my response in the form of a rebuttal. However, character restrictions does not allow my rebuttal to fit within the confines of this evaluation. Therefore, I'm hoping anyone reviewing this evaluation ask for the rebuttal that hopefully will accompany this evaluation in my personnel folder.

My supervisor/manager has discussed this review with me.

| Signature | Print Name | Date |
|---|---|---|
| 0488362889751<br>Employee's Electronic Signature | Azell Malone<br>Print Name | 12/20/05<br>Date |
| 0481962849626<br>Manager's Electronic Signature | James Higson<br>Print Name | 12/15/05<br>Date |
| Other Management (Optional) | Print Name | Date |

Lockheed Martin is committed to the highest standards of ethical business conduct and to creating an inclusive environment where diversity is valued, managed and leveraged. Employees are expected to act with honesty, integrity, respect, trust, responsibility, and citizenship in dealings with employees, customers, and suppliers.

Absence includes FL, PB, PI, PL

| Sum of HOURS | YEAR | | | | | | | | | THRU 30 JULY | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NAME | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | Grand Total |
| AURES,ERIN | | | | | | | | 15.6 | 44 | 26 | 85.6 |
| BARRON,DEAN G | 8 | | | | | | | | | | 8 |
| BOTELHO,MICHELE,O | | 8 | 34.3 | 20 | 3.5 | 17.5 | 6 | 16 | 20 | 5.3 | 130.6 |
| BOYD,LOUISE,T | 7 | 24.5 | 10 | 6 | 6 | 7.5 | 32.5 | 8.5 | 26 | 3 | 131 |
| BRADFORD,KENNETH | 10.5 | 21.5 | 26.5 | 36 | 39 | 12.5 | 35 | 11 | 3.5 | | 195.5 |
| BRANNICK,TERRENCE | | | | | | | 16 | 33 | 61 | 16 | 126 |
| COBB,KEITH,B | | 13 | | | | 24 | 17 | | 25 | 6 | 85 |
| COVINGTON,KIT,Q | | | | | | 18 | 58 | 102 | 594 | 156 | 928 |
| DELEHANTY III,JOHN | | | | | | | | | 15.2 | 8 | 23.2 |
| FARINA,CARL | | | | | | 4 | 8 | | | | 12 |
| FERGUSON,DANIEL,J | 20 | | 20 | 38 | 7 | | 16 | | | 8 | 109 |
| FLYNN,MICHAEL,W | 25.5 | 16 | 22.5 | 41.4 | 27.9 | 60.7 | 23 | 27.3 | 18 | | 262.3 |
| FLYNN,SEAN | | | | | 22 | 58.2 | 49.6 | 25 | 40 | 8 | 202.8 |
| FORREST,MARY | | | | | | | | | 396 | 21.5 | 417.5 |
| GALLAGHER,JOHN | | | | | | | | | 3 | 11 | 14 |
| GATEWOOD,PHILIP,S | | 7 | 38 | 25.5 | 27.5 | 12.5 | 23 | 16.9 | 19 | 8 | 177.4 |
| GAUCH,WILLIAM,F | | | | | | 2 | 0.7 | 6.4 | 12.5 | 12 | 33.6 |
| GERJETS,RODNEY,D | 25 | 8 | 60 | 32 | 22 | 23 | 79.5 | 36 | 35 | 3 | 323.5 |
| GILLETTI,DAVID,A | 12 | 16 | | 22 | 204 | 48 | 91 | 60 | 51 | 37 | 541 |
| GOULART,RICHARD,J | | | 0 | 24 | 142.5 | 16 | 8 | | 38.5 | 56 | 285 |
| HERBIG,BARBARA | | | | | | | | | 4.5 | 46 | 50.5 |
| HESSLER,GARY | | | | | | | | | 9 | | 9 |
| HIGSON,JAMES | | | | | 125 | 16 | 17.5 | 96 | 3 | 21 | 278.5 |
| HUNT,RANDY | | | | | | | | | 38 | 16 | 54 |
| JETTE,ANN,T | | 29.5 | | | 16 | 6.3 | | 17.5 | 8 | | 77.3 |
| KENYON,THOMAS,W | | | | | | 4 | 11 | 22.2 | 14 | 16 | 67.2 |
| KRAJEWSKI,LEONARD L | | | | | | | | 1 | | | 1 |
| LALLI,R,CELESTE | 76 | 8 | 50 | 32 | 20 | 21 | 20 | 37 | 12 | 16 | 292 |
| LAMAR,NICHOLAS | | | | | | | | | | 3 | 3 |
| LANDEL,ALLEN,R | 80.5 | | 48 | 53 | 46.5 | 26 | 32 | 59 | 156 | 16 | 517 |
| LASTOWSKI,JOHN P | 8 | 24 | 30 | 28 | 40 | 44 | 65 | 56 | 60.5 | 1 | 356.5 |
| LEWIS,VIRGIL O | 8 | 40 | 39 | 37 | 36 | 38 | | 8 | 2 | | 208 |

Malone v. Lockheed Martin, et al., 07-65-T

Exhibit M
Page 1 of 2

CONFIDENTIAL

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MALONE,AZELL,JR | | 11 | 40 | 40 | 44.5 | 15 | 75 | 27.5 | 66 | 24 | 343 |
| MANCINI,ERIC | | | | | | | | | 13 | 14 | 27 |
| MANSKE,JAMES L | 12 | 12 | 34 | 23 | 32 | 16 | 13.5 | 18 | 32 | 13 | 205.5 |
| MASSEY,RICKEY | | | | | | 8 | 40.5 | 2 | | 11 | 61.5 |
| MENDILLO,JAKE | | | | | | | | | 40 | 58 | 98 |
| MORROW,TRAVIS | | | | | | | | | | 8 | 8 |
| MOTYL,ALFRED,D | | | 24 | 1 | 30 | 31 | 10 | 223 | 33.5 | | 352.5 |
| MOURA,LICINIO | | 0 | | | | | | | | | 0 |
| NEDEAU,MICHAEL,G | 19.5 | 6 | 10 | 27 | 21.8 | 27 | 26 | | 1.5 | 4.5 | 143.3 |
| NEELY,KELVIN | | | | | | | | | | 3 | 3 |
| NUNES,NORMAN,M | 22 | | 6.5 | 40 | 62.5 | 7 | 18 | | | 5.5 | 161.5 |
| PIRES,JOSE,C | 12.5 | 32.5 | 16 | 21.5 | 40 | 22 | 20 | 222.5 | 25 | 3.5 | 415.5 |
| PITZER,GEORGE,W | | | | | | | 4 | | | | 4 |
| PRENDYS,JOHN P | 4 | 92 | 36 | 30 | 19 | 27 | 24 | 11 | 32 | 80 | 355 |
| RHOADS,DONALD,J | | | 0 | | | | | | | 4 | 4 |
| ROSS,DAVID | | | | | | | | | 62 | 21.5 | 83.5 |
| RYBAK,FRANCIS H | | | | | | 5.3 | 17.2 | 24.1 | 50.3 | 26 | 122.9 |
| SALINGER,MARY | | | | | | | | | 13 | 5 | 18 |
| SHERMAN,LEN | | | | | | | | | 60 | | 60 |
| SOULES,WILLIAM,T | 30 | 16 | 12.5 | 15 | 221 | 25.5 | 30 | 8 | 13 | 10 | 381 |
| STROM,GAIL,L | | | | | 30.5 | 64.5 | 84 | 21.5 | 16 | 8 | 224.5 |
| SUPANCIC,CARL,M | 7 | 18.5 | 16 | | | | | | | | 41.5 |
| SVENNINGSEN,JOHN | | 28.5 | 32 | 28 | 16 | 33 | 30 | 19 | 26 | 8 | 220.5 |
| VANSCHALKWYK,JEREMY | | | | | | | | 13 | | 32 | 45 |
| VETRI,MARK,A | 15.5 | | 12 | 5 | 6 | 24.5 | 1 | 1 | 23.5 | | 88.5 |
| WEIGEL,LAWRENCE G | 29 | 39 | 32 | 34 | 32 | 32 | 14 | 42 | 23 | 17 | 294 |
| WOOD,LELAND R JR | 16 | 15 | 37 | 24 | 33 | 13 | 4 | 6 | 5 | 8 | 161 |
| Grand Total | 448 | 486 | 686.3 | 683.4 | 1373.2 | 810 | 1020 | 1293 | 2243.5 | 883.8 | 9927.2 |

Malone v. Lockheed Martin, et al., 07-65-T

Exhibit M
Page 2 of 2

CONFIDENTIAL