MS. NORDSTROM: It's a matter of credibility.
MR. DRYWA: Okay. On credibility grounds, that's fine. On relevance I object.
MS. NORDSTROM: Fine.
Q: You can answer the question.
Why is it that you believe that Carl Supancic drove Phil Smiley out of the company?
A: Because he told me.
Q: What did he tell you?
A: He basically said, "I'm retiring, but I'm being fired."
Q: So he was given a choice whether to be fired or to retire?
A: That's what he told me.
Q: And he said Carl Supancic was the person that made that decision?
A: But it wasn't only him. I knew if I mentioned Phil's name to Carl — and this happened even after that — he got a little incensed. There was something there.
You guys didn't like each other, or you didn't like Phil. There was something there.
Q: Okay. Well, let's get back to your relationship.
A: Yeah, that's why I was wondering why we were going



down — Smiley is gone. He's happy where he's at now.
Q: Well, when you make accusations like that, it's my job to kind of pin down the facts that you have supporting them.
Did Mr. Supancic do anything to you directly that you believed to be discriminatory?
A: Mr. Supancic challenged everything about me.
Q: From the beginning of the reporting relationship?
A: Shortly thereafter. He didn't like the way I dressed. He didn't like the way I talked. He didn't like what I drove. I mean, everything about me came in question. My efforts in volunteerism, that was questioned. A volunteering community, that was questioned by him also.
Q: Why did you think he was questioning these things about you?
A: I don't know. The reason I say I don't know — I can speculate on that, but I don't know if I should do that.
Q: I'm asking for your perception.
A: My perception was that I did not fit the role he had in mind for me. And what I meant by that is, like I say, he didn't like the way I dressed. He said — oh, "You don't like to get your hands



dirty." That had nothing to do with that. I washed my hands. Anything I wore to work, it's work clothes, anything I wore to work. So even when I came in jeans. So what? They're pressed. I mean, we have different standards. He shouldn't have a problem with that.
He said the way I talk. I tried to enunciate my words. I tried to talk like or communicate to other people as if I do have a mind. He said I talked down to people in his interpretation.
And, you know, just kind of went on. There's others. I just kind of got the feeling that — I got the feeling that I was not as welcome as I was with previous management. Previous management I received encouragement and positive feedback. From Carl I got criticism, always criticism, whether it was warranted or not.
Q: Do you think that that was a management style or was that just singling you out for criticism?
I guess the better question is did Carl treat everyone that way or did he just treat you that way?
A: I'm not privy to how Carl treated other people. I'm talking about the way he treated me.



Q: Did you perceive that he was treating you that way because of your race?
A: I didn't draw any inferences at the time. I was trying to figure out — I was trying to figure out why, after having such a great relationship with everyone in this company, I'm having all the problems with this guy.
Q: Were you having any problems with any of your other co-workers at that time, or was it just Carl?
A: Co-workers? Subordinates or peers?
Q: Either.
A: That contract had always been problematic. And if you remember, I said that when I was asked to stay on that contract, it was because I resolved a lot of the problems. I was not part of the "good ole boy" system. I didn't go along with things just, you know, sweep them under the rug. Management felt they needed that. I'm talking about management prior to him. So that's one of the reasons I was there as long as I was. I got things done and resolved problems.
So what I'm getting at there is you were asking about the people. Over the years the contract, because of the size, had the ability



EXHIBIT 1

from time to time to absorb people who were being basically let go from other contracts. In other words, as we had fluctuations and LOE (phonetic) and what have you, we used to always be able to manage to find some type of way to put them into or onto the CCSL contract.

Consequently, a lot of the subordinates that I received from these other contracts were problem subordinates. What I mean by that, when you're downsizing, you don't get rid of your best people. You get rid of your worst. And that's what I got, and I had to work with that.

So as far as problems with some of the other, with some of the subordinates, I would say nothing personal. Professional. I mean, some people wanted to do things that were not allowed, and I would keep management privy to that.

Q: In or around that 2000 time period, approximately how many subordinates did you have reporting to you?

A: In 2000 I would say maybe 15.

Q: And of those 15, how many of those would you characterize as problem subordinates?

A: Well, what are you calling problem subordinates?

Q: I'm not calling them anything. You just defined



to us what you believed problem subordinates to be. I'm just trying to figure out how many people in your staff did you consider to be a problem subordinate?

A: Possibly three, maybe four.

Q: So the bulk of the direct reports that you had you didn't have problems — you didn't have the kind of problems you just described with the bulk of them; just three or four?

A: Right, or that I knew of.

Q: And when you talked about the problem subordinates, were you talking about them in the sense of — because my original question was whether you had positive, or what your relationships were like with the people you worked with. And you started talking about these problem subordinates that you had.

Did you have difficult relationships with them because they were problem?

A: No. I — I don't — no, I wouldn't say I had difficult relationships with them. It's — I mean, people didn't always like decisions; but as far as — if you mean personal relationships, no, I had no personal problems with anyone that I'm aware of.



Q: So generally speaking, you got along well with the people who worked for you?

A: Generally speaking.

Q: And with your peers?

A: Yes.

Q: Let's go back and talk a little more about the relationship that you had with Carl Supancic.

A: Okay.

Q: You told me about some comments that he made to you. And I'm going to put a time frame around it, because you started reporting to him in 2000, correct?

A: Approximately around that time, yes.

Q: And then you say that the last time you believe he made that - any of those statements to you was approximately two years ago, which would have been 2005?

A: Yeah, two, three maybe.

Q: Okay. So 2004 or 2005?

A: Yeah.

Q: So from 2000 to 2004 or 2005 Carl Supancic made these statements that you make too much money, you've got to earn your keep, and you can probably find a job anywhere to you at various times throughout that period?



A: Yes.

Q: Okay. I just wanted to get that clear.

Other than those comments, and you say he challenged your dress, your talk, your car, your volunteerism, did that happen throughout the same 2000 to 2004, 2005 time period?

A: Yes.

Q: Did Mr. Supancic do anything else that you thought was discriminatory or unfair to you in some way?

A: I don't know if you call it discriminatory or unfair, but let me tell you this. He stepped over the line when you attack my family, when you attacked my wife.

Q: When did that happen?

A: That happened when my daughter's car broke down and I had to go up to New York to get her. And you said —

**MR. DRYWA:** Al, you have to address the attorney. You can't address Mr. Supancic at all.

**THE WITNESS:** Okay.

A: He basically said, "Your wife could do more. Maybe if your wife did more." My wife was about to have a nervous breakdown because her father over a year-and-a-half period had three heart attacks.

Page 77

A: Maybe 40.
Q: Okay. How many government workers were working with Lockheed and Purvis at that time?
A: I want to say approximately six.
Q: And who did they report to?
A: They reported to John Montanero, who reports to Sandy Rosario.
Q: Okay. And then how many Lockheed Martin personnel were on the contract?
A: It varied. I think at that time six.
Q: Were you the only manager?
A: Only Lockheed manager?
Q: Yes.
A: Yes, other than Carl. Carl was overall manager.
Q: But you didn't report to Carl on a daily basis during this?
A: Yes. See that's why I said for contract performance, I reported to Rick McCauley. But Rick McCauley, he's another company. That was just part of the team. But as far as Lockheed Martin, I reported to Carl.
Q: Okay. With regard to some of the treatment and conduct that you described from Olimpio, who was one of the government technicians, did you ever report that to anyone outside of Lockheed Martin?

Page 78

Did you make a complaint with the government?
A: No.
Q: And just so I'm clear, the conduct that you said Carl committed in terms of treating you differently after you made the report in 2004, you said he just sacrificed you, that he wanted to save the contract?
A: Yeah, but, you know — yeah, I said that. But you know, in hindsight I look at that, my opinion is Carl had an agenda before that, and I was the means to accomplish that agenda. I was ridden for everything that I was doing, unnecessarily. It was harassment. Unnecessarily. Every little — I mean, I couldn't even supervise.
Carl is a micromanager. That brought about problems itself, trying to micromanage me, supervising my people. He's not there. I'm there. And that just contributed to overall problems.
Q: Did you believe that was because of your race?
A: Remember I said I didn't necessarily put race forefront. I tried to look beyond that. Can't get anything done doing that. But that might have been his situation. I don't know.
Q: I'm asking for your perception though at the time.

Page 79

A: At the time or now?
Q: At the time.
A: I don't know how to answer that, Mrs. Nordstrom. And I'll tell you why I say it that way. I did not know why this guy was bothering me the way he was. I didn't know if he just didn't like me, if there was a personality problem, or whatever. You know, it was — I just felt that I was continually ridden, continually sought out. There was really nothing I could do other than breathe free air without his permission.
Q: And you didn't witness him treating other people that way?
A: No.
Q: Did you witness him treating other people in a different way?
A: I felt that Carl was more comfortable with people he had been around. And this goes back to the old hardware/software. You know, look at his organization now. There's nothing there but software people, with the exception of the new guy. I don't know if that was by design or if that's what he wished. But that's the way it ended up.
Q: And I asked you about your perception then. What

Page 80

is your perception now? You said now you think Carl had an agenda before you made the report in 2004. What is your perception about why you believe Carl was treating you differently after the report and harassing you, as you say, before the report?
A: Could you repeat that?
Q: Sure. I asked you what your perception was about why Carl was treating you the way you said he was treating you at the time, you know, harassing you, micromanaging you, all the things you were just describing. And you said you didn't know at that time if it was because of your race or not.
A: Mm-hmm.
Q: I'm asking you for your present-day impression. You say because you had —
A: Well, when I look back on it, I don't know of anyone else that was being harassed like that. I don't know. And I felt that it was unnecessary to even harass me that way. What his reasons were and why he was doing it — I mean, I just didn't come right out and ask him is this because I'm black. But it was — to me it was apparent that there was something about me that he didn't care for.

Page 81

Q: But you didn't know what that was?
A: No. I wasn't — he had never come out and — he had never used any language to — well, I don't know what he used. No, I don't know. All I know is he had a problem with me.
Q: And that was from the beginning?
A: Which increased, I think. It increased especially when it got to the point of this reporting. It was now he had a way; he had a reason, you know, the customer. It was — in my opinion, it was a coverup. And in order to take care of this coverup, get rid of me, blame it all on me, and take it for the team.
But it didn't stop. That was the problem. Individuals felt empowered then. So even from a distance I would get all these negative comments after that. And then even from Carl, I would get meddling. And a grievance that I had with the current manager, he was meddling in that for no reason. And I'm saying, why is this guy bothering me?
Now, you know, that manager — and I know he can argue that, because he is deceased now, unfortunately — he had enough. He said, "Al, the only problem you have is a Carl problem."

Page 82

Q: Which manager was this?
A: This was Jim Higson. He said, "You do not have an attendance problem. I don't believe you ever had an attendance problem. You have a Carl problem."
And he and I then tried to come up with ways for me to basically quantify what I was doing beyond that. In order for me to have any type of career or make any progress in Newport, Jim needed some quantifiable evidence or examples that he could use, because I wasn't going to get — I wasn't going to get any breaks.
Q: Let me stop you. This is after you stopped reporting to Carl Supancic and you started reporting to Jim Higson?
A: I was still getting it from him.
Q: So are we talking approximately 2005?
A: Yes, August.
Q: And what was Jim Higson trying to get quantifiable proof of?
A: When I was removed out of CCSL, and I was put where I was put.
Q: When were you removed out of CCSL?
A: I can't give you — you probably have that. I was removed in, I think it was — I think it was around December, I think, of 2004.

Page 83

Q: And this is the program, the contract that we're talking about, CCSL?
A: I was physically — yeah, the program, plus I was removed to a different physical location, a different building.
Q: So you were taken off the contract and moved to a different building?
A: Mm-hmm.
Q: Was this the first time you had ever been removed from a contract?
A: Ever.
Q: You are aware of other people who have been removed from contracts though?
A: No.
Q: No, you're not aware of any?
A: I'm thinking. Oh, Rick Goulart. When you said that, I thought you meant prior to that. Rick Goulart was removed also.
Q: Around the same time?
A: Yes.
Q: Any other people outside of this context, even during your work experience with Lockheed Martin and Sperry, are you aware of any other people who have been removed from contracts?
A: For what reason? Any reason?

Page 84

Q: For any reason.
A: No.
Q: You're not aware of any others?
A: No.
Q: Okay. So you were removed from the contract, moved to a different building on or around December of 2004. And at that point were you still reporting to Carl or had you begun reporting to Jim Higson?
A: No, I was still reporting to Carl.
Q: What were you working on at that time?
A: At this new location that I was on?
Q: Right.
A: I was working on the - what they call the DPS program.
Q: Was that any different from the job that you had been doing before?
A: Skill level wise, yes.
Q: How so?
A: Lower.
Q: Did your pay change when you moved from the CCSL contract to the DPS program?
A: No.
Q: Did your title change?
A: Yes.

Page 93

scenes saying, "They're going to take our jobs," and, "You guys are not looking out for us." So —

Q: Who was supposed to be training who?

A: We were supposed to be cross-training each other. The guys felt that there was nothing Purvis knew that they needed to be trained about. They felt that Purvis needed to know what we knew because it was implied we were the technical hitters.

Q: Okay. And so you were talking about this in regard to guys behaving badly being your fault. How does that relate to what we're —

A: Well, that kind of set the tone for people acting up and what have you. They felt that we were forcing them to cross-train, which we weren't. I was doing it solely at the direction of my management.

And like I say, we were trying to minimize it to some extent. In other words, not to go out and teach a guy to do your job, but the customer says cross-train and he wants procedures. Well, maybe he developed some power-up or power-down procedures. It's in compliance with the contract. That really does not threaten anyone's position or anything of that nature.

But that didn't really set that well with

Page 94

the troops either though.

Q: You're talking about these six people who were reporting to you during that time period?

A: Yes.

Q: What were they — how were they behaving badly?

A: Being resistant to direction. First of all, they didn't want to be supervised. And it's even harder to supervise someone when you're not even allowed to supervise them anyway.

Q: What do you mean by that?

A: Some of the individuals didn't have — had no use for any type of supervision on-site. So then when I said — and the reason I made this statement, I'm trying to supervise guys who don't want to be supervised, and I'm getting micromanaged by Carl. That only added to the problem.

Q: But these are guys under your management. They have to do what you say, correct?

A: And pretty much they did. And when I say pretty much, I don't know what they did behind the scenes. Obviously, the things with the tools and the metals, that was going on behind the scene. But you have to realize, I can't be everywhere.

Q: So you felt like it was unfair to blame you for your direct reports' bad behavior?

Page 95

A: Especially when I had no control over it. I was not allowed to supervise those guys. Carl did the supervision. Carl did everything. He told me what to do. Regardless of what I wanted to do, he told me what to do.

Q: Well, everybody is supervised. I'm sure Carl had somebody telling him what to do too, don't you think?

A: I supervised — I ran his contract for 20 years without Carl. I had no problems; didn't have any of these problems. As far as dealing with people and the differences in people and what have you, I dealt with that. It's — I didn't need anyone telling me, you know, what to do and when to do it. But, again, I don't own Lockheed either, so I had to do what I was told.

Q: Sounds like you were a little resistant to the direction that Carl was giving you.

MR. DRYWA: Objection. Is that a question?

MS. NORDSTROM: It is a question.

MR. DRYWA: It doesn't sound like a question.

Q: Were you resistant to the direction that Carl was giving you?

Page 96

MS. NORDSTROM: Better?

MR. DRYWA: Yeah.

A: Is that a question still to me?

Q: Yeah.

MR. DRYWA: Yes.

A: Oh, resistant in a nonsupportive way, no. More in a supportive-type manner. In other words, I felt that Carl thought he knew everything, but he didn't know everything. So when he would give direction, I would try and give him some rationale as to maybe why he should do things different or why things should be different.

So when you say resistant, it was — I was not a "yes" man. But then, again, I did not circumvent anything that he required either.

Q: So you did what you were told, but you sometimes challenged his reasoning or —

A: To him. Not in front of others.

Q: Now, you've given the impression here today there was no point in time where Carl Supancic was ever helpful or supportive of you in a management role. Is that your position as you sit here today?

A: I don't feel he was.

Q: Do you know what became of — well, let me start. You say you reported to HR issues that you had

in that position. They cancelled the req, but the work was still there.

Now, supposedly, they cancelled the req because we — Lockheed took too long in staffing the position. But I continued to work until there was pretty much — not so much the funding was gone, pretty much until I had done the work.

Q: Something that you mentioned earlier that we haven't talked about in detail was the "Driving Miss Daisy" comment. Can you tell me what this situation was?

A: Yeah, I can tell you. Joe Pires was supposed to perform some work at Raytheon after hours, after 4:00 o'clock. And this is not like Carl. He did not like Carl's interpretation of the travel policy, travel reimbursement, I should say, policy. So he refused to use his own vehicle to travel to Raytheon.

Now, this is during a time when I was being tasked to expand any and all opportunities that we may have. So I told Carl about the predicament. And he said, "Well, why don't you just drive him." So I did. After work, I took him. And when he was finished, I left home about 10:00 or 11:00 o'clock at night. I went back and



I picked him up, and I took him back to his car.

Q: Was this a management responsibility or how did you perceive the request?

A: I was told to do it.

Q: Because you were Joe's manager?

A: We wanted to get the work done. And my opinion on how it should have been done: Joe has been insubordinate, as I saw it. But I was not going to be insubordinate because he was insubordinate. He should have given and accomplished the work, and that would have been end of the story.

But I was directed to take him, which I did on my own time. And then when I got back, the next day this was a big joke of, "Driving Miss Daisy." I didn't like it.

Q: My original question to you was why do you believe you were told to drive Joe?

A: Because I was told. Why do I believe I was told?

Q: No. Why do you believe that you were told. I understand that you were told.

A: Because Carl told me to.

Q: I understand Carl told you to. What's the reasoning. Why you? Why didn't someone else have to drive Joe?

A: Because this program that we were trying to gain a



foothold in was for the Newport area. It was in the realm of what I was doing. It was not under me, but it could have been under my responsibilities. So they had no one else, I mean, who was even associated with the program other than Carl doing it himself.

Q: Did you believe when Carl told you to do that, that he asked you because you were - because of your race or because of your management responsibility?

A: I believe Carl told me to do it because Joe reported to me, and he needed to get the work done.

Q: Okay. Go ahead and finish telling me about the "Driving Miss Daisy" comment.

A: So I took him. And the next day, you know, it was sort of a big joke. "I made management give in to my demands. They drove me out there," da, da, da, da. "It was just like 'Driving Miss Daisy' and it's a nice old car." And it was very disrespectful.

Q: Did you hear this comment directly?

A: The "Driving Miss Daisy" comment?

Q: Yes.

A: Yes, I heard somebody.



Q: Who made the statement?

A: Joe. He was one. There were others.

Q: Who did he make the statement to?

A: Oh, he had a cadre of people there. He had other people who were there. Basically the normal day-shift guys.

Q: And you heard —

A: Oh, I'll tell you who else.

Q: I'm sorry, let me ask this question first. You heard Joe say this directly to the day-shift workers?

A: I guess the question is did I hear Joe, or did I hear someone else?

Q: Did you hear Joe?

A: I would say I heard it said. And the only reason I qualify it that way, I can't sit here and say I was looking Joe directly in the mouth.

Q: Did you hear Joe speak the words, "Driving Miss Daisy"?

A: "Driving Miss Daisy," I believe I did.

Q: You believe or you did?

A: I believe I did. I'm saying I was not looking at him, but I heard the words, and I interpreted them as Joe saying it.

Q: You interpreted it as Joe saying it, but you

weren't sure if it was him?
A: In other words — well, you can be saying something. If I'm not looking, I cannot say beyond a shadow of a doubt you said it. It sounded like you. But if you say did you see the person saying it as he said it? No.
Q: Describe for me what was going on. What proximity were you to these people that he was talking to?
A: I don't remember the details of that day, Mrs. Nordstrom. I just remember it happened. I said — oh, I had said I don't remember all the details of that day. I just remember it happening. Who else was there? I believe Rick Goulart was there.
Q: Okay. So you believe you heard Joe make the statement to the day-shift workers that you were "Driving Miss Daisy." You said you thought you heard someone else say that as well. Do you recall who that was?
A: Well, when I say that, when people start repeating things, you know, what have you, I can't say he said and he said. The comment was made. People jumped on that bandwagon; it was funny. You know, it was very denigrating or whatever. And that was my perception of it. I didn't like it.



Q: Was this a one-time kind of incident where they all talked about it, or was this something that went on after?
A: They talked about it again. I'm not — I can't say I was aware of that. I'm sure they probably did. I'm sure they probably did, but I don't know that, no.
Q: So what did you do after hearing this comment?
A: Immediately?
Q: Right.
A: Sometime after that, I mentioned it to Carl.
Q: Do you know approximately how long after that? I mean, are we talking days or are we talking hours?
A: No, it wouldn't have been days.
Q: So in the same day?
A: Possibly, yes.
Q: What did you tell Carl?
A: Basically what had happened.
Q: What was Carl's reaction?
A: I don't remember, now that I think about it. I don't remember.
Q: I want to back up. You said you didn't like the comment. Did you believe the comment to be a race-based one, or did you think they were just talking about you driving somebody?



A: I guess in answer, I'm surprised you would ask me that.
Q: I have to ask you the questions.
A: I understand. Yes, I did believe it to be race based.
Q: Do you know if anything happened to any of those individuals partaking in that conversation as a result of the conversation?
A: No, I do not know.
Q: Have we talked about all of the incidents that you believe were discriminatory that occurred while you were working at Lockheed Martin?
A: I'm not sure. I didn't come here with a list. I didn't know I needed one.
Q: You don't need a list. I just want to know in your mind, your perception sitting here today, have you covered the incidents that you believe led to your complaint?
MR. DRYWA: Can I interject before he answers?
MS. NORDSTROM: You are.
MR. DRYWA: The complaint is grounded in multiple causes of action, one of which is a whistleblower action. It's not exclusively a race or racial discrimination claim. So I just wanted



to clear that up. Because you asked him about the complaint and disclose to you everything about the discriminatory aspect of the allegations, not the whistleblower stuff. So I just want to be clear that we all understand that there's multiple claims here and not just the one claim.
MS. NORDSTROM: That's why I left it broadly.
MR. DRYWA: All right.
Q: I want to know every incident that occurred while you were working at Lockheed Martin that you believe resulted in retaliation or discrimination against you. Just broad-based question; just asking have we talked about all those, or are there others that you would like to tell me about your experience there that you think led to those complaints?
A: Those are pretty broad based, probably not all the details but pretty — as far as I can think of at the moment. I'm sure if I think about this, I may be able to come up with something else.
But like I say, I wasn't prepared for that. I didn't know I needed 20 incidents. I came prepared to talk about things in general, so.
Q: Before your counsel got involved — I don't want

Page 133

is all I have to say to you now and then remember something, you know, at 3:00 o'clock and you say, "Oh, you had your opportunity."

**Q:** So is that — what's the answer to that question?

**MR. DRYWA:** What's the question?

**Q:** The question is, is there anything else about your work at Lockheed Martin that you believe to be discriminatory or retaliatory that we have not yet talked about?

**A:** Discriminatory or retaliatory. Retaliatory, yes. The positions that I'm in. I have not been in key positions since this happened. And if I'm digressing or getting off of course, just let me know.

The type of positions that I've occupied since making the report are basically dead-end positions. There's no opportunity for progression. And I think I had indicated this earlier. The very support, the level that I'm at now — now, prior to this I was always in some key position. I've been in key positions for years, going even back to my military days. If you could look in my personnel records, you would see that.

Now, all of a sudden, we have a guy with my seniority in this company, who is now in a

Page 134

non-key position. I don't know of anyone else that I work with who are in that position. I'm basically scrambling from charge number to charge number doing req work. I felt that I was relegated to that. That was retaliation.

Don't like the way I dress, make me dress down. Make me — you don't like me having clean hands, make me do dirty stuff. It's — hey, we've talked about it.

So as far as career progression, do I have any career left? I don't even know that. In this area I don't feel I do. I don't feel I will be even given an opportunity to do anything. And I think all of this is a direct result of — all — not just the retaliation for the report, but all the other ramifications of that.

And you have a customer here who Newport or Lockheed Newport wants to maintain some type of relationship with. And I think in treating me very fairly or very favorably would not be favorable to them, to that customer either.

**Q:** You're no longer working for that customer, correct?

**A:** I'm a hundred feet away, in her domain, another contract.

Page 135

**Q:** Okay. Anything else that we haven't talked about that you believe may be discriminatory or retaliatory?

**A:** Other than Carl?

**Q:** Just Carl's existence or something specific?

**A:** I would say that Carl — one of these days maybe he'll feel like telling me what his problem is with me. I mean, I know that's just me thinking out loud. But I think that's where the problem is at. I think the majority of the problem is Carl's problem with me, whatever it might be.

**Q:** And you believe that to be based on your race?

**A:** What else could it be based on?

**Q:** I'm asking you. I don't know.

**A:** I don't know.

**Q:** So are you saying that by deductive reasoning, it must be —

**A:** I don't know. I'm saying I don't know.

**Q:** So the question is do you believe it's your race?

**A:** And I said I don't know.

**Q:** Anything else that we have not talked about that you believe may have been discriminatory or retaliatory?

**A:** I'm struggling. It's going in the back of my mind because you pretty much limited me, because you

Page 136

said once we move beyond this —

**MR. DRYWA:** Al, answer the question to the best of your ability.

**A:** Okay. Anything else? Nothing I can think of.

**Q:** Okay.

**MS. NORDSTROM:** Were you going to say something?

**MR. DRYWA:** No.

**Q:** I have a few documents that I wanted to go through with you. And this could go quickly, or it could go slowly, just depending on what you have to say.

I'm going to show you what's been marked as Defendant's Exhibit 1. And this is a packet of what has been transcribed, which were voicemails —

**MR. DRYWA:** Is this what you gave me earlier?

**MS. NORDSTROM:** Yes.

**Q:** — from you to, I believe Carl for the most part.

I wanted you to take a look at these and to let me know if any — if you believe that any of these voicemail transcriptions are in error, or if the date is wrong, or the facts are wrong, or if there's anything more you would like to tell me about these voicemail transcriptions. I would

salutation of the memo regarding the subject line.

**MS. NORDSTROM:** Well, we can go through. The first paragraph is different from that first paragraph.

**MR. DRYWA:** Okay. But I'm saying that's the only difference you pointed out.

**MS. NORDSTROM:** I just said it doesn't match up.

**A:** Jim did not have a problem with me. What this supposedly was was transference of, it said in this letter, that anything I did I was supposed to report to Carl. This letter here was supposed to replace this letter saying that anything I did, as stated here, I now was supposed to report to Jim.

**Q:** Okay. So you did not perceive that Jim Higson had an attendance problem with you?

**A:** Jim did not have an attendance problem with me.

**Q:** I'm going to show you what's been marked as Defendants' Exhibit 14. It says, "Performance Assessment and Development Review" from January 1, 2005, to December 31st, 2005.

Take a look at that.

**A:** This is basically — okay. Now what's your question about this?

**Q:** First I wanted to ask, did Carl Supancic or Jim



Higson give you this performance review?

**A:** Okay. Jim Higson's name is on it. Carl, I think — well, Carl — I can't say who wrote it, but Carl was very instrumental in this performance review, very instrumental.

**Q:** How do you know that?

**A:** Because I was told that. Even Carl had mentioned, "If you didn't like a three" — is that what he said? "If you didn't like it as a three, you're really not going to like being rated as a four."

**Q:** Carl told you that directly?

**A:** Yeah, Carl told me.

**Q:** Do you remember — this was approximately when?

**A:** Evidently, it was around when I got this.

**Q:** So towards the end of 2005?

**A:** When was this dated? This was the 15th of December. So it had to be when knowledge of this rating was evident. So I'm telling you I don't know if it was December. I don't know when it was November. I know wherever I was rated as a four. That's when I knew about this.

**Q:** So did you believe Jim Higson had given you that rating, or did you believe that he was somehow influenced by someone else to give you that rating?



**A:** Jim had to go along with the program. It was the — the system for reversing all of this negativity had not started yet. And what I mean by that, remember I told you we had a discussion about doing something else that's quantifiable so I can use that in my performance review? That hadn't happened yet. That happened right after this.

**Q:** So you hadn't started working on that, what was the program that you said required you to travel for four hours a day?

**A:** I didn't say what it was. It was under the Common Submarine Radio Room, known as the CSRR program.

**Q:** So had you started working on the CSRR program?

**A:** It was after this. Because this was unacceptable, and Jim understood that. There was nothing he really could do because he felt that he didn't have anything to go forward and argue against it.

One, I had not been working for him long enough. I did not have any bullets out there or highlights that he could use to offset any of this. So after this is when we decided that we would start meeting together and getting together once a month.

And somewhere towards the end of that — Jim passed in — he was sick in August. Probably



about three or four months before Jim knew he was sick is when I got involved in this CSRR program, in agreement with him as an investment to get out from under this dark cloud, so to speak.

**Q:** And during this time period where you say you believe that Carl Supancic was influencing that rating, did you believe that to be in direct response to your complaining or your reporting the complaint about the tools situation?

**A:** I believe that was part of it.

**Q:** What was the rest of it?

**A:** Part — the whole thing was Carl and I did not get along. That's what I'm saying. And that's what I'm saying. That's been the theme throughout this whole thing. And anything that could be used against me was used against me. If you would look back, there was nothing good said about me during his reign, nothing.

I was not even recognized for 25 years of service. Most people are. I was not recognized for winning contracts. That's the common practice. EICs on contracts or program managers, you win a contract, you get a little reward or something like that. I didn't get any of that. I never, to my knowledge, received any constructive

we didn't need to send you anything else to get the records.

MR. DRYWA: No. I'm going to give them to you. But unless I get them, I can't give them to you.

BY MS. NORDSTROM:

Q: So other than the anxiety and the stress, were there any other psychological —

A: I wasn't sleeping.

Q: Have those symptoms remained the same, gotten worse, gotten better over the course of time?

A: They have gotten better. The medication has been reduced. They have gotten better. But as I told you, there has not been any closure. And there's always the suspicion that I am being watched more so than anyone else.

Q: You mean on the job?

A: Yes.

Q: Who is your current manager?

A: My current manager now is Gary Hessler.

Q: Do you believe that Mr. Hessler is acting at the direction of Carl Supancic when managing you?

A: Everyone acts at the direction of a Carl Supancic, so I don't quite understand that question.

Q: I guess before you believed that there was some



ill intent that was coming from Carl through Jim Higson, I'm wondering if you're believing that you're still being treated disparately by Gary Hessler at the request of Carl?

A: Well, what I have done is I haven't given them anything, absolutely nothing they can use against me. I go out of my way. It's to the point where it's almost ridiculous. I take no vacation. I go to work sick. I still work my uncompensated overtime if necessary, but I don't benefit from that whatsoever.

Anything that I felt that can be used against me, I just don't do now. My quality of work life now is the worst it's ever been with this company, even though I'm in the same position.

Q: What would you like to happen with regard to your position at Lockheed Martin?

A: Well, the way we got into this, the harassment had to stop, had to.

Q: Has it stopped?

A: The harassment stopped after Mike sent a letter asking for my personnel file. Prior to that anybody — prior to that, as it — Carl was obsessed with me and what I was doing, above and



beyond his call of duty.

So you asked me a question what would I like to happen. First, like I said, the harassment had to stop. Unfortunately, we had to get to this point before the harassment stopped, because going through Lockheed Martin it did not stop.

Q: What do you mean by going through Lockheed Martin?

A: When I called Sean, and I asked him to get this guy off my back, one way or the other, I said, "This has to stop. This is ridiculous," it didn't happen.

Q: Did you tell Sean this was harassment or discrimination, or do you remember how you characterized what you believed —

A: I don't remember exactly what I said, but I'll tell you — maybe you want to ask some of the other people that were there because they felt that they understood what I was saying.

Why would someone, when I'm reporting to another manager, take it upon himself to change an agreement that manager had given me under any conditions? It was reasonable. I was not a problem employee. I was putting in my time. I made a request. And to change it for the sake of



changing it, that was not necessary.

Q: What are you referencing right now?

A: That's going back to August again, when I had to scramble to get someone to pick up my great aunt. That's when I asked him, "Why? Why are you doing this?" And, you know, I'm not going to slander the individual. Some people get off on that. Maybe that's his mode of operation, but.

Q: You say you asked Carl why he was doing that?

A: At that time, no, I didn't ask Carl. I didn't ask Carl directly. I'm sure — well, I won't say I'm sure. I was asking — I may have asked Jim, now that I think about it, what was his problem. I did ask Jim that.

Q: And Jim said what?

A: Jim was very apologetic. He was sympathetic, I should say. He thought I was finally going to take some time off. I needed some time off. And under the conditions that I was going to take them, it was very favorable. I hadn't seen family. My family do not travel here. I was hosting a family reunion, and I was very happy to see them or very excited about the fact they were coming out here.

So anyway, I guess you asked me what would

Page 201

I like. I had always expected to retire from Lockheed Martin. I made that decision a long time ago, back when I could have made decisions to leave and go to another company. And I'll tell you why.

Up until Carl, I always had a very good relationship with Lockheed Martin. And people who knew me would tell you that. I felt fortunate to have the kind of career that I did with them. I had responsibility. I had job satisfaction. I had flexibility. I had rapport with my management. I didn't have any of that with Carl. And it just started downhill.

So I wanted the harassment to stop, and I needed it to stop. I mean, I don't know if this put him on notice or whatever. I would like to finish my career with Lockheed Martin. That was always my intention. I would like to be restored to some position that I can progress in, of a position that takes advantage of my technical abilities.

I've already indicated that I had an interest in continuing in a supervisory or management, technical management positions. And I didn't think I was asking for a lot because I

Page 202

don't know if you've looked at the number of years that I have in Lockheed. I probably don't have that many more years before I could actually retire. So starting over, that was never my intention, starting up with somebody else. And being forced out of the company, that was never my intention. I just felt that I couldn't allow that.

If I was leaving, I wanted to leave because I felt that I was making a better deal with better life for myself and my family somewhere else and not because somebody didn't want me to be here.

**Q:** Okay. So that's still your position today, you want to finish your career and retire at Lockheed Martin and be put in a position where you can take more —

**A:** Progressive. I can feel like I'm working toward something.

When I come to work, and you sit down and you work a 40, 50, 60-hour work week, those extra hours you're looking at as an investment in yourself for recognition for future potential position. In other words, you're banking that. I don't feel that now. All I'm doing is chasing

Page 203

charge numbers now.

And I feel that — I feel that Carl enjoys that. That's just my own feeling. And I feel he enjoys that. Didn't like the way I dressed, didn't like the way I talked, didn't like what I drove, didn't like me having clean hands. There's a lot of things he didn't like about me.

So now he can say, well, I'm crawling around doing cables or whatever, you know, in just these less than challenging positions. Or as he put it once before, "Are you too good for it?" I never said I was. I've taken everything they have given me and thrown at me, and I've done it.

**Q:** Would you be willing to work or to consider working at another facility other than the Newport facility?

**A:** It would be difficult. It would be an extreme strain on my family at this point in time. The answer to your question is if it was a different point in time, yeah. This is a critical point in time right now. And I know this really has nothing to do with the job. But my wife has very elderly parents who rely on her for a hundred percent of everything. If I left the area, I would have to leave her here because their whole

Page 204

existence right now relies on her and their whole independence.

In other words, we're not going to put them in a home, in a rest home, because they can still do for themselves on a daily basis. Therefore, my wife goes there — this is up in Boston — at least once a month. She pays all the bills. She does all the shopping and anything that comes up in between. So it would be a hardship for me to leave this area.

If this would have been ten years ago, or maybe — and I'm not hoping anything bad on them, but they are elderly. Maybe at some point it will be easier to transition out of here because we wouldn't have those responsibilities.

**Q:** You say they're in Boston?

**A:** Yes, in Boston. It's a 60-minute ride.

**MS. NORDSTROM:** Before I lose track, can you mark this?

(Defendants' Exhibit 17 for I.D.: Letter dated December 2, 2005, to Human Resources, Lockheed Martin Tactical Systems, from Michael F. Drywa, Jr., with attached Employee Authorization for Employment Information)

**Q:** I just want to show you what's been marked as Defendants' Exhibit 17. This is a letter from your counsel, Michael Drywa, to Lockheed Martin

Page 205

Human Resources Department.
Is that the letter that you were referencing earlier when you said that harassment stopped after your lawyer sent the letter?
A: Pretty much.
Q: Okay. So after December of 2005, you believe the harassment stopped?
A: The — I said I believe the harassment stopped. As far as I know, there was no direct intervention of anything negative on my behalf by Carl.
Q: Let me ask you this, too. Early in your reporting relationship to Carl he gave you some good performance reviews, did he not?
A: No.
Q: He never gave you good performance reviews?
A: No. The only one I can remember — and I looked for those — by the way, have you seen my performance reviews? Because I can't get them.
If I remember, the first performance review was a partial from Carl. The majority of it was from my previous manager, was Phil Smiley.
Q: Okay.
A: That's the only positive one that I can remember. If I'm wrong, well, you can show me. But I don't remember it.

Page 206

Q: Let me see I have them.
MS. NORDSTROM: I'm sorry. Just give me a minute here.
(Whereupon, a brief recess was taken at 2:59 p.m., and the proceedings resumed at 3:01 p.m.)
MS. NORDSTROM: Let's mark these.
(Defendants' Exhibit 18 for I.D.: Document entitled, "Performance Assessment and Development Review from 06/02 to 06/03, dated 5/21/03)
(Defendants' Exhibit 19 for I.D.: Document entitled, "Performance Assessment and Development Review" from 6/2/03 to 12/31/03, dated 4/8/04)
(Defendant's Exhibit 20 for I.D.: Document entitled, "Employee Salary Notification")

BY MS. NORDSTROM:

Q: I'm going to show you what's been marked as Defendants' Exhibit 18. And it's a Performance Assessment and Development Review from June of 2002 to June of 2003, where you're rated a high contributor by Carl Supancic.
A: When did I start reporting to Carl?
Q: 2000.
MR. DRYWA: Do you have a question? Is there a question pending?
MS. NORDSTROM: No, I was just letting him

Page 207

take a look at it.
Q: Are you done reviewing it?
MR. DRYWA: Probably not. I just wanted to know if there was a question.
MS. NORDSTROM: No.
A: Can I ask a question? Did I have a performance review prior to this by Carl?
Q: I don't know.
A: In 2000 —
Q: Actually, I take that back. There is some record of performance review prior to 2002.
MS. NORDSTROM: Could you mark that?
(Defendants' Exhibit 21 for I.D.: Printout of annual ratings of Azell Malone, Jr.)
Q: I'm going to show you what's been marked as Defendants' Exhibit 21. This is a printout, actually. You can take a look. It shows from the year 2000 through 2005 your performance ratings, your pay increases. And I do believe — you correct me if I am wrong — that all of those were done under the management of Carl Supancic?
A: Do we have those reviews? I'm not sure if they were.
Q: You're not sure if that's accurate?
A: No. I'm not sure — I don't recall seeing a

Page 208

performance review prior to this.
Q: Is your signature on —
A: It's on this, yes, it's on this one. Is there one before this?
Q: I don't know. Are you saying that you don't recall having a written one prior to?
A: By Carl I'm saying.
Q: By Carl?
A: Yes, by Carl. See, there was one year where Carl's input into my rating was actually partial.
See, I'm thinking this is — I'm not sure if Carl — wait a minute. But you're saying — I couldn't look back on this.
Q: You're saying you could or couldn't?
A: I could not. Records say that I started working for Carl in the year 2000 you say?
Q: That's my understanding, yes.
A: Hmm. I'm not sure how to answer this because — I mean, I understand this evaluation. But prior to this evaluation I don't know if that was Carl's evaluation or someone else's evaluation.
Q: Okay. Let's just ask the question about the evaluation you're looking at that's Exhibit 18.
It was given to you by Carl Supancic, correct?