UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| AZELL MALONE | : | |
| | : | |
| v. | : | C.A. No. 07-65T |
| | : | |
| LOCKHEED MARTIN CORPORATION | : | |
| and CARL SUPANCIC | : | |

**REPORT AND RECOMMENDATION**

Lincoln D. Almond, United States Magistrate Judge

**Background**

Before this Court is Defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56. Azell Malone ("Plaintiff") alleges three statutory counts of employment discrimination based on race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; the Rhode Island Fair Employment Practices Act ("RIFEPA"), R.I. Gen. Laws § 28-5-1 et seq.; and the Rhode Island Civil Rights Act of 1990 ("RICRA"), R.I. Gen. Laws § 42-112-1 et seq. Plaintiff also alleges a violation of the Rhode Island Whistleblowers' Protection Act ("RIWPA"), R.I. Gen. Laws § 28-50-1 et seq.

Defendants filed their Motion for Summary Judgment (Document No. 17) on January 7, 2008. Plaintiff filed his Objection to Defendants' Motion for Summary Judgment (Document No. 20) on January 24, 2008. Defendants replied on February 7, 2008. (Document No. 25). This matter has been referred to me for preliminary review, findings and recommended disposition. 28 U.S.C. § 636(b)(1)(B); LR Cv 72. A hearing was held on March 26, 2008. After reviewing the Memoranda submitted, listening to the arguments of counsel and conducting independent research, I recommend

that Defendants' Motion for Summary Judgment be GRANTED in limited part as set forth herein and otherwise DENIED.

**Statement of Facts**

The following undisputed facts are culled from the parties' Local Rule Cv 56(a) statements: See Document Nos. 18 and 20-2.

Plaintiff began his employment with Sperry Corporation (a predecessor to Lockheed Martin Corp. ("Lockheed")) on or about March 7, 1977. He was hired as a Field Engineer ("FE") and progressed to Engineer-In-Charge ("EIC") in March 1983. In August 1997, he was promoted to Field Engineering Manager ("FEM").

Sometime in 2000, Plaintiff and his subordinate team of approximately six other FEs began working on the Combat Control Systems Laboratory ("CCSL") contract, in which Purvis Systems was the prime contractor, and the Government was the customer. Purvis had approximately forty employees working on the CCSL contract, and the Government had approximately six employees jointly working with the two contractors. Plaintiff was the only Manager that Lockheed had representing its daily interests on the CCSL contract at that time. Plaintiff began reporting directly to Defendant Carl Supancic in November 2000, when Supancic became Site Manager for Lockheed's Newport operations. Supancic had no performance or attendance issues with Plaintiff early in the reporting relationship and continued to give him good performance reviews and raises. Despite Plaintiff's managerial position on the CCSL contract and reporting requirements to Purvis, Supancic was ultimately responsible for Lockheed's performance, as a whole, on the CCSL contract.

On January 24, 2002, after Plaintiff requested two unscheduled vacation days in the same week, Supancic sent him an email regarding his use of vacation time and absenteeism.

Despite this reprimand, in June 2003, Plaintiff again requested vacation time twice in the same week on the day he planned to take vacation, i.e., without advance notice. As a result, Supancic sent another email to Plaintiff dated June 11, 2003 regarding this issue. This occurred again in December 2003, prompting Supancic to notify Lynda Thomson, a Lockheed Human Resources Manager, of the issues he was having with Plaintiff's attendance. As a result of these issues, Plaintiff's performance review for the latter half of 2003 stated, in part: "Performance was spotty. Disruptive staff behavior is problematic. Status is not regularly provided on a timely and complete basis. PRS process is also lacking, as is example-setting behavior for vacation planning and authorization, as well as absences....[C]ustomer criticism of team performance, employee whereabouts and level of cooperation was disappointing. Getting to the root of it and rectify negative perceptions is a priority."

Despite Supancic's admonitions and performance review comments, Plaintiff called in requesting to take vacation days on the same day of his request again in June and August 2004. As a result, Supancic noted these performance concerns to Thomson in August 2004, stating in part: "[M]y concerns over Al's performance have deepened....[H]is behavior, accountability and performance is falling well short of what it needs to be. Al is certainly not setting the example that is required of management." Further, Plaintiff took unscheduled vacation from October 4-7, 2004 to deal with a personal problem. On October 13, 2004, Plaintiff was given a formal written warning, which required that he speak with Supancic directly at least twenty-four hours prior to any request for vacation time. Plaintiff's performance review for 2004 likewise reflected that: "Al did not adequately address some of the weaknesses that had been called out in his assessment from the prior year, with problems in attendance and accountability being most significant. These problems set him

very much apart from his management peers for the period, and set a very poor and visible example." These issues led to a formal performance improvement plan given to Plaintiff on January 7, 2005, requiring him to speak directly with Supancic and Keith Cobb (his EIC) regarding absences.

In March 2005, Jim Higson took over as Manager of Plaintiff's group, removing him from Supancic's direct supervision. Higson sent Plaintiff an updated copy of the performance improvement plan requirements in place while Plaintiff was under his supervision. Even after Higson became Plaintiff's Manager, unplanned absences continued, allegedly in direct violation of his performance improvement plan requirements. Lockheed's Absence From Work policy states that "regular and reliable attendance on scheduled work days" is an essential function of all positions. When Plaintiff was asked during his deposition what he understood he was required to do under Lockheed's attendance policy, Plaintiff stated "I'm required to show up for work."

Beginning in April 2004, Lockheed's Newport Operations went through a period of reorganization of its management level employees. The concerns that led to this reorganization were the decreasing number of employees reporting to what seemed to be an overabundance of Managers. All Lockheed employees are given "Level" ratings and there were both Level 4 and Level 5 Managers prior to April 2004. Lockheed's goal was to reclassify all Level 4 Managers as non-management employees and leave only Level 5 Managers with that particular title. Plaintiff was a Level 4 Manager. In April 2004, during the initial stages of this reorganization, Cobb and Don Rhodes, two Caucasian Level 4 Managers, were reclassified as non-management employees and given the title of EIC. In October 2004, as a result of the continual shifting of management and staff, Cobb was placed under the management of Plaintiff who had previously been a peer level Manager. In accordance with the stated reorganization goals of eliminating Level 4 Managers and

in light of Plaintiff's ongoing performance and attendance issues, Plaintiff was reassigned as an EIC on November 15, 2004. Plaintiff's job duties, pay and benefits remained the same, and he was still responsible for front line management of Lockheed's CCSL team. Plaintiff testified that "[t]here was no change with respect to responsibilities between Manager and EIC."

Plaintiff took unscheduled vacation the first two days after being informed of his reclassification to EIC status. On November 18, 2004, Supancic recommended and Lockheed's Director of Lifetime Support, Janet Christopherson, approved removal of Plaintiff as EIC of the CCSL team and transitioned him to another contract with the Trident DPS team as an FE. Cobb had been repositioned as the EIC on the Trident DPS team, so therefore, Plaintiff was now reporting to Cobb. Despite the change in title, Plaintiff remained a Level 4 employee and had no change in his pay or benefits. Plaintiff admitted that, during his tenure with Lockheed, his job titles and duties would change depending on the contract and/or program he was assigned to work. The Trident DPS team was in a different building from the CCSL team, minimizing the contact between himself and his former subordinates, whom Plaintiff believed to be "harassing" him. Plaintiff worked onsite with the Trident DPS team for approximately one year (2005-2006) and then began working in a systems engineering position on another contract, with a four-hour, round trip drive to the location site. It is common for FEs to travel to customer worksites. Plaintiff admitted that he has had to travel and work in the field at various points in his career with Lockheed. Plaintiff perceived this position to provide career progression opportunities. As Site Manager, Supancic approved Plaintiff's request to work in this capacity. Plaintiff worked in this position until the customer funding was depleted in May or June 2007.

After the systems engineering position ended in 2007, Plaintiff agreed to work under a contract for a customer based in Wisconsin where the client funding was sufficient. Plaintiff's Manager was Gary Hessler. Plaintiff continued working in this position as of early 2008. Plaintiff received a pay raise in 2007.

On September 23, 2004, while Plaintiff was still an FEM working the CCSL program, Richard Goulart, one of Plaintiff's subordinates, reported to Plaintiff that two of his other subordinates had been accepting tools as gifts. Plaintiff, in accordance with his managerial duties, relayed Goulart's report to Supancic, who likewise forwarded it to his supervisor, Christopherson, and Lockheed's Human Resources Department. Plaintiff admitted that he was unaware of his subordinates' misconduct and that he later learned that such conduct had been going on for at least a year without his knowledge. Ultimately, an investigation was conducted by Lockheed's Ethics Department that resulted in a finding that the tools were being improperly gifted to Plaintiff's subordinates and reprimands were given as appropriate. Plaintiff also received a written warning which indicated "lack of effective and/or active management practices," "lack of a clearly communicated tool process," "overall poor supervisory practices, and [his] own personal attendance."

Plaintiff alleges Supancic made the following comments to him early in his reporting relationship: (a) Plaintiff made too much money and had to "earn his keep"; (b) told him not to worry because he could "probably find a job anywhere"; (c) said that Plaintiff did not like to get his hands dirty; and (d) said that Plaintiff talked down to people. Plaintiff further alleges that in 2003 or 2004, that he believed Supancic "attacked" his family by recommending that Plaintiff's wife "do more" in the household so Plaintiff would not have to leave work for such things as picking up his

daughter after her car broke down or staying home to wait for the furnace repairman. While Supancic denies these allegations, Plaintiff admitted that Supancic has not made any of these types of alleged comments since approximately 2004 or 2005.

There is only one specific allegation Plaintiff asserts against other Lockheed employees relating to his claims of race discrimination. Plaintiff alleged that Joe Pires, one of his subordinate employees on the CCSL program, disagreed with Lockheed's travel reimbursement policy and refused to drive his own vehicle to travel to an after-hours work site. Given Pires' refusal, Supancic asked Plaintiff to drive him to the worksite and return to pick him up after Pires completed his work. Plaintiff alleges that the following day, Pires and others were laughing and joking saying Plaintiff was "Driving Miss Daisy." This is the only incident or statement that Plaintiff proactively states that he believed to be race-based. However, Plaintiff admitted that he believed Supancic's only reason for asking him to perform the task was because Pires reported to Plaintiff and he needed to get the work done. Plaintiff alleged that he reported the "Driving Miss Daisy" incident to Supancic and Lockheed's Human Resources Department. Supancic recalls Plaintiff alleging that "someone" had used the term "Driving Miss Daisy" in relation to his transporting Pires, but that Plaintiff had heard about the incident second- or third-hand and that he could not directly identify the party who made the statement. In any event, Supancic stated that, in response, he gave an admonition to the entire team to refrain from using any type of derogatory comments in the workplace and that such conduct would not be tolerated. Supancic also notified Human Resources of the allegations and his response.

Plaintiff understood that Lockheed had policies prohibiting discrimination and harassment and understood that he had a duty to report any such claims. Plaintiff asserted that he would only make such a claim or report if the discrimination or harassment was "obvious." Plaintiff never

reported claims of race discrimination to Lockheed prior to hiring a lawyer. Plaintiff admits that he made only one report of alleged "harassment" by Supancic to Lockheed's Human Resources Department in August 2005. Plaintiff did not report any of the alleged conduct stated above regarding his perceived discriminatory treatment, but simply told them that Supancic was "harassing" him and to "get him off my back. Get him off now. This has got to end." Plaintiff never reported any specific allegations of race discrimination or retaliation to Lockheed's Human Resources Department with regard to Supancic. Plaintiff admitted that he has not had any complaints of discrimination or retaliation against anyone since he began working offsite in the systems engineering position in 2005 through early 2008.

**Summary Judgment Standard**

A party shall be entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When deciding a motion for summary judgment, the Court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997).

Summary judgment involves shifting burdens between the moving and the nonmoving parties. Initially, the burden requires the moving party to aver "an absence of evidence to support the nonmoving party's case." Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986)). Once the moving party meets this burden, the burden falls upon the nonmoving party, who must oppose the motion by presenting facts that show a genuine "trialworthy issue remains." Cadle, 116 F.3d

at 960 (citing Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)). An issue of fact is "genuine" if it "may reasonably be resolved in favor of either party." Id. (citing Maldonado-Denis, 23 F.3d at 581).

To oppose the motion successfully, the nonmoving party must present affirmative evidence to rebut the motion. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-257, 106 S. Ct. 2505, 2514-2515, 91 L. Ed. 2d 202 (1986). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, [or] unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Moreover, the "evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." Id. (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)). Therefore, to defeat a properly supported motion for summary judgment, the nonmoving party must establish a trialworthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (citing Anderson, 477 U.S. at 249).

**Analysis**

**A. Exhaustion of Administrative Remedies**

Defendants move for summary judgment in favor of Carl Supancic on Count I (Title VII) and Count II (RIFEPA). Defendants argue that Plaintiff failed to exhaust his administrative remedies and, alternatively, that Supancic, as a supervisor, is not subject to personal liability under Title VII. Title VII provides relief to individuals subjected to racially motivated employment

discrimination but "[j]udicial recourse under Title VII...is not a remedy of first resort." Morales-Vallellanes v. Potter, 339 F.3d 9, 18 (1st Cir. 2003). Before filing suit under Title VII in Federal Court, the aggrieved party must first exhaust his administrative remedies, and failure to do so "bars the courthouse door." Bonilla v. Muebles J.J. Alvarez, Inc., 194 F.3d 275, 278 (1st Cir. 1999). Counts I and II of Plaintiff's Complaint must be dismissed as to Defendant Supancic because of Plaintiff's failure to exhaust administrative remedies as to a discrimination claim against Supancic in his individual capacity.[1]

The purpose of the exhaustion of administrative remedies requirement is to provide notice and the opportunity to engage in voluntary conciliation to the individual or entity charged with discrimination. In order to effectuate this purpose, the EEOC regulations administering Title VII state that the administrative charge should contain "[t]he full name and address of the person against whom the charge is made..." 29 C.F.R. § 1601.12(a)(2); see also 94-040-002 R.I. Code R.§ 4.04(B)). "[A] party that was not named in the administrative filing may be named as a defendant in a subsequent civil action only where the charge put the unnamed party on notice, its conduct at issue, and gave the party an opportunity to participate in conciliation." Russell v. Enter. Rent-A-Car Co. of R.I., 160 F. Supp. 2d 239, 253 (D.R.I. 2001) (dismissing claim against a corporate entity which was "not named as a respondent at the administrative stage and was not afforded notice or an opportunity to conciliate prior to th[e] lawsuit"); see also Chatman v. Gentle Dental Ctr., 973 F. Supp. 228, 232-236 (D. Mass. 1997) (dismissing Massachusetts state law employment discrimination claims against individual defendants not specifically named as respondents for failure

[1] RIFEPA also requires exhaustion. See Horn v. Southern Union, 927 A.2d 292, 294 n.7 (R.I. 2007) ("FEPA provides for administrative agency involvement before actual in-court litigation commences."). Since Plaintiff co-filed his charge alleging violations of Title VII and RIFEPA with both the EEOC and the Rhode Island Commission for Human Rights ("RICHR"), the same analysis as to exhaustion applies to both Count I and Count II.

to allege in the complaint that the defendants had notice and an opportunity to conciliate at the administrative level).

Plaintiff failed to include the information required in the regulations in order to name Defendant Supancic as a Respondent at the administrative level. Plaintiff's EEOC charge specifically named "Lockheed Martin Tactical" as the employer who Plaintiff "believe[d] discriminated against me or others." Document No. 20-4 at p. 15. Plaintiff failed to name "Carl Supancic" in this portion of the charge. Id. In detailing the particulars, Plaintiff filed an Affidavit which states the basis for his belief that he has been a victim of racial discrimination. Id. at pp. 16-17. In this Affidavit, Plaintiff mentions Supancic's name fourteen times and indicates he believes "I was being targeted by Supanic [sic] because of my race." Id. at p. 17. Yet, Plaintiff, represented by counsel at the time, failed to take the additional step of naming Supancic as a Respondent.

For purposes of this Motion, the Court assumes that Supancic knew Lockheed was being charged with race discrimination that related to his alleged conduct as Plaintiff's supervisor. However, notice to Defendant Supancic that his conduct is at issue in a charge brought against and served on Lockheed does not provide Supancic with any notice of his potential individual liability.

Defendant Supancic's lack of notice as to the charge against him personally would have prevented him from initiating or participating in any voluntary conciliation measures independent of Lockheed. Lockheed's corporate position regarding conciliation may have been different from Supancic's personal position, and Supancic may have retained personal counsel at that time if he knew he was charged personally. As an employee of Lockheed, Supancic was subject to Lockheed's litigation decisions since only Lockheed, and not Supancic, was charged before the EEOC. Whether or not Supancic would have participated in conciliation or engaged his own attorney does not matter;

he was never afforded notice and the opportunity to participate in conciliation in order to potentially avoid a lawsuit against him. Plaintiff had the opportunity to name Supancic, in his individual capacity, as an additional Respondent in the EEOC/RICHR charge but did not do so.

The Supreme Court has cautioned against being overly technical in the specifics of the charging requirements in statutory schemes such as employment discrimination cases. This is particularly so when considering a statutory structure frequently used by pro se litigants. Love v. Pullman Co., 404 U.S. 522, 526 (1972) ("To require a second 'filing' by the aggrieved party after termination of state proceedings would serve no purpose other than the creation of an additional procedural technicality. Such technicalities are particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process."); Shehadeh v. Chesapeake & Potomac Tel. Co. of Maryland, 595 F.2d 711, 727-729 (D.C. Cir. 1978). However, the inclusion of an individual without providing him with notice that he is being charged in his personal capacity does not represent the kind of technicality the Supreme Court was concerned about.

An exception to the rule that the defendant must be named in the charge, the "identity of interest exception," has previously been recognized in this District. Ashley v. Paramount Hotel Group, Inc., 451 F. Supp. 2d 319, 327 (D.R.I. 2006) (holding that misnaming a defendant due to a confusing corporate structure does not bar a subsequent civil action); see also Russell, 160 F. Supp. 2d at 254. The exception allows a plaintiff to "proceed against a defendant who was not originally named in the administrative filing if there is a clear identity of interest between the named and unnamed defendants." Russell, 160 F. Supp. 2d at 254. In applying the exception, the Court in Russell looked for guidance to the Second Circuit's decision in Johnson v. Palma, 931 F.2d 203 (2nd

Cir. 1991), which identifies four factors to be examined in order to determine whether an "identity of interest" exists:

> (1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; (2) whether, under the circumstances, the interests of a named [party] are so similar as unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; (3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; (4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

Johnson, 931 F.2d at 209-210 (quoting Glus v. G.C. Murphy Co., 562 F.2d 880, 888 (3rd Cir. 1977)).

First, Plaintiff included Supancic's name in the narrative Affidavit, making it clear that Plaintiff knew of Supancic's involvement and could have included him as a named Respondent. Second, as mentioned above, the interests of Supancic and Lockheed are not so similar that it is unnecessary to name Supancic in his individual capacity. This is not a case where a plaintiff has misidentified the actual legal entity employing him in a complex corporate structure. There is no identity of interest between Supancic as an individual and his corporate employer. While Supancic was likely involved in the administrative proceedings as the site manager for Lockheed, that capacity is different and distinct from being charged, i.e., sued, in his personal capacity. Third, Supancic did not have a chance to be involved in the conciliation process as a Respondent and, as such, had no opportunity to avoid being named as a Title VII/RIFEPA defendant in this lawsuit. The identity of interest exception simply does not apply to Supancic.

Plaintiff's administrative discrimination charge failed to provide Supancic with sufficient notice or an opportunity to respond in the administrative proceedings in his personal capacity. As

such, Plaintiff failed to exhaust his clearly available administrative remedies as to Supancic. Thus, I recommend that Counts I and II be dismissed as to Defendant Supancic. In view of this recommendation, it is unnecessary to address Defendant's alternate supervisory liability argument.

**B. Statute of Limitations**

Defendants argue that Plaintiff's discrimination claims under Title VII (Count I), RIFEPA (Count II) and RICRA (Count III) are time barred. Because Rhode Island is a deferral state, the applicable Title VII statute of limitations is 300 days. Kassaye v. Bryant College, 999 F.2d 603, 605 n.3 (1st Cir. 1993). The applicable RIFEPA and RICRA statutes of limitations are one year. See Horn, 927 A.2d at 295.

It is undisputed that Plaintiff filed his administrative charge of discrimination on August 16, 2006. Thus, only those events that occurred after October 20, 2005 are actionable under Title VII, or after August 15, 2005 are actionable under RIFEPA and RICRA. Any events occurring prior to those dates are time-barred absent application of an equitable exception, such as the continuing violation theory. See, e.g., Mercado v. Ritz-Carlton San Juan Hotel, Spa & Casino, 410 F.3d 41, 46 (1st Cir. 2005); Crowley v. L.L. Bean, Inc., 303 F.3d 387, 405 (1st Cir. 2002).[2]

Defendants' statute of limitations argument is specific and narrow. In their initial brief, Defendants contend that Plaintiff admits that "there were no acts of discrimination or retaliation occurring after December 2, 2005, when his attorney sent a letter to Lockheed requesting his personnel file." Document No. 17-2 at pp. 5 and 15. Thus, they argue, Plaintiff's discrimination

---

[2] Case law developed under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq. is "routinely applied" to claims brought pursuant to FEPA and RICRA. See Kriegel v. State of R.I., 266 F. Supp. 2d 288, 296 (D.R.I. 2003) (applying federal analysis to claims under FEPA AND RICRA); and Russell, 160 F. Supp. 2d at 265 ("FEPA is Rhode Island's analog to Title VII and the Rhode Island Supreme Court has applied the analytical framework of federal Title VII cases to those brought under FEPA.") (citations omitted). Thus, in its analysis, this Court will cite to cases interpreting Title VII.

claims are time-barred since he fails to identify any allegations of discrimination between August 15, 2005 and December 2, 2005. Id. Defendants rely on Plaintiff's deposition testimony in which he stated that the harassment "stopped" after his attorney sent a letter asking for his personnel file and that prior to that Supancic was "obsessed" with him and what he was doing "above and beyond his call of duty." Document No. 25-2 at p. 10. However, when Plaintiff was actually shown the letter at a subsequent point in his deposition, he clarified that it had "pretty much" stopped and that he believed "the harassment stopped. As far as I know, there was no direct intervention of anything negative on my behalf by [Supancic]." Id. at p. 12. Since Plaintiff's testimony presents an issue of fact as to whether or not he admits the absence of any harassment or other discrimination after December 2, 2005, the premise for Defendants' narrow statute of limitations argument evaporates.

In their reply, Defendants expand their statute of limitations argument to address Plaintiff's December 15, 2005 performance review. Defendants contend that this "performance review from a subsequent manager [Higson], who is not alleged to have participated in any of the allegedly discriminatory conduct..., in which he gives Plaintiff an average rating[3] is insufficient discriminatory conduct to relate back to allegations of retaliation and discrimination Plaintiff now alleges." Document No. 25 at p. 3. In particular, Defendants assert that it is undisputed that Higson took over as Manager of Plaintiff's group in March 2005 and Supancic was removed as Plaintiff's supervisor. Plaintiff's allegations of discrimination, harassment and retaliation are directed almost exclusively at the actions of Supancic.

[3] Defendants misstate the record. The 2005 performance review was not an "average rating" as described by Defendants. The review form contains five overall ratings ranging from exceptional to unsatisfactory. Document No. 20-4 at p. 18. The middle or average rating is "successful contributor." Id. Plaintiff received the overall rating of "basic contributor" in 2005 which falls between successful and unsatisfactory, i.e., a 4 rating on a 1-5 scale. Id.

In response, Plaintiff argues that his claims constitute a continuing violation, i.e., "a pattern of discrimination that continued up to at least January, 2006 and continues through to the present." Document No. 24 at p. 8. (emphasis omitted). Plaintiff contends that he has sufficiently identified factual issues as to both "serial" violations and "systemic" violations to avert summary judgment. Id. at p. 9. In support, Plaintiff cites to the First Circuit's decision in Megwinoff v. Banco Bilbao Vizcaya, 233 F.3d 73, 74 (1st Cir. 2000).

Plaintiff, however, fails to recognize that the serial/systemic distinction applied in Megwinoff is no longer applicable. See Brissette v. Franklin County Sheriff's Office, 235 F. Supp. 2d 63, 86 (D. Mass. 2003) (citing Crowley, 303 F.3d at 406). This shift away from the serial/systemic analysis was triggered by the Supreme Court's decision in Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002).

"The continuing violation doctrine is an equitable exception that allows an employee to seek damages for otherwise time-barred allegations if they are deemed part of an ongoing series of discriminatory acts...." O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001). In Morgan, the Supreme Court distinguished between hostile environment claims and discrimination or retaliation claims arising out of "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire." 536 U.S. at 114. It held that the continuing violation doctrine only applied to the former because a "[h]ostile work environment claim is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice....'" Id. at p. 117 (quoting 42 U.S.C. § 2000e-5(e)(1)). Thus, "a plaintiff's untimely allegations may be considered for the purposes of determining liability only if an act contributing to the hostile environment claim occurs within the filing period." Paquin v. MBNA Mktg. Sys., Inc., 233 F. Supp. 2d 58, 63 (D. Me.

2002) (emphasis in original). The Supreme Court stated that the "court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." Morgan, 536 U.S. at 103. (emphasis added). Further, when an employee seeks redress for "discrete acts" of discrimination or retaliation, then the continuing violation doctrine may not be invoked to allow for recovery for acts that occurred outside the filing period. Id. at p. 113; see also Miller v. New Hampshire Dep't of Corr., 296 F.3d 18, 22 (1st Cir. 2002). In this case, this task must be performed in the context of a motion for summary judgment requiring that all evidence be viewed in the light most favorable to Plaintiff and all reasonable inferences drawn in his favor. See O'Rourke, 235 F.3d at 732 ("while...these issues may be resolved as a matter of law, they are often better resolved by juries....").

Although it is undisputed that Supancic was no longer Plaintiff's direct supervisor as of March 2005, Supancic remained Plaintiff's Site Manager, and there are factual issues regarding the extent of Supancic's direct involvement with Plaintiff after March 2005. Plaintiff began reporting to Supancic in 2000. Document No. 24-2 at ¶ 3. Prior to that, Plaintiff asserts that he "received excellent performance reviews and was regularly promoted and given greater amounts of authority." Id. Plaintiff contends that Supancic subjected him to "an extraordinary degree of scrutiny..., specifically regarding my attendance." Id. at ¶ 4. Starting in 2002, Supancic began to reprimand Plaintiff for attendance issues. Plaintiff was formally warned by Supancic in 2004 and placed on final warning by Supancic in early 2005. These attendance concerns were identified in Plaintiff's 2003 and 2004 performance reviews, and Plaintiff's overall rating dropped from "successful contributor" to "basic contributor." Plaintiff was rated at that time by Supancic.

As noted above, the relevant period for Plaintiff's Title VII claims began on October 21, 2005, and Plaintiff's RIFEPA/RICRA claims began on August 16, 2005. Thus, the issue is whether Plaintiff has shown the existence of a genuine issue of material fact as to a continuing violation or the presence of actionable discrimination in the relevant period. Viewing all of the evidence, and drawing all reasonable inferences therefrom, in Plaintiff's favor, Plaintiff has done so.

Although Higson took over as Plaintiff's direct supervisor before the relevant period, Supancic was still in the picture as Plaintiff's Site Manager with overall supervisory responsibility. Supancic also remained directly involved with Plaintiff's disciplinary situation in several respects. See Morgan, 533 U.S. at 413 (allowing prior untimely acts as background evidence of a timely claim). First, on August 15, 2005, Higson issued an "updated" final warning to Plaintiff regarding his attendance. The performance requirements were identical to those contained in Supancic's January 7, 2005 final warning other than to replace Supancic's contact information with Higson's. The Higson warning does not identify any "new" attendance issues but notes that it "serves as an updated supervisory reporting relationship of [the] final written warning given to you [by Supancic] regarding your continued absenteeism." Document No. 17-12. In other words, Higson adopted the specific call-out procedures implemented by Supancic. Compare Document No. 17-11 and 17-12. Second, on April 11, 2005, Supancic sent a detailed email to Human Resources outlining his current, direct involvement in issues involving Plaintiff's attendance. Document No. 17-13. Supancic was critical of Plaintiff's behavior and described the events as "most troubling." Id. Supancic signed the email in his capacity as Site Manager and identified Cobb as the EIC of Plaintiff's Group and Higson as Plaintiff's "LM People Manager." Id. Supancic ended the email by indicating that he did not feel Plaintiff was in compliance with the conditions of his final warning and asked Human

Resources to give "full attention to th[e] matter." Id. Third, on July 18, 2005, Supancic authored another detailed email to Human Resources about Plaintiff's attendance and again identified potential violations of Plaintiff's final warning. Document No. 17-14. Fourth, on July 29, 2005, Supancic authored another email to Human Resources expressing concern about Human Resources' observation that "[a]ll of [Plaintiff's] absences were approved by his manager and were not contested at the time of his request." Document No. 24-2 at p. 14. Drawing all reasonable inferences in Plaintiff's favor, the email suggests that Supancic wanted to plead his case to Human Resources before any discussion with Plaintiff took place. Id.

Finally, there is a factual issue as to the level of Supancic's involvement in Plaintiff's 2005 performance review issued by Higson on December 15, 2005. Id. at p. 18. The review was for the entire 2005 calendar year, and Supancic was Plaintiff's direct supervisor for part of that year. Further, Supancic remained directly involved in Plaintiff's supervision as a Site Manager well into 2005. Plaintiff again received a lower-end evaluation of "basic contributor" and was denied a salary increase as a result. See Document No. 20-3 at p. 10. Plaintiff testified that he was "told" that Supancic was "very instrumental" in the 2005 review and that Supancic told him in late 2005 that "you're really not going to like being rated as a four," i.e., basic contributor. Document No. 25-2 at p. 9. Plaintiff also testified, when asked if Higson was influenced by anyone in his rating, that Higson "had to go along with the program." Id. There is a factual issue as to Supancic's involvement in the 2005 review and/or the degree to which Higson's assessment was based on Supancic's challenged discipline of Plaintiff.

### C. The Discrimination Claim

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer...to discharge any individual, or otherwise to discriminate against any individual with respect to his...employment, because of such individual's race...." 42 U.S.C. § 2000e-2(a)(1).[4] Thus, a violation of Title VII occurs whenever race is a motivating factor for an adverse employment action. In this case, Plaintiff does not rely on direct evidence of discrimination or a so-called "smoking gun." Thus, Plaintiff's proof of a Title VII violation is evaluated pursuant to the familiar three-step, burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); and Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). The First Circuit has thoroughly outlined this framework as follows:

> [STEP ONE] [T]he plaintiff shoulders the initial burden of adducing a prima facie case of unlawful discrimination. This includes a showing that: (1) plaintiff is a member of a protected class; (2) plaintiff's employer took an adverse employment action against him; (3) plaintiff was qualified for the employment he held; and (4) plaintiff's position remained open or was filled by a person whose qualifications were similar to his. Establishment of a prima facie case creates a presumption of unlawful discrimination.
>
> [STEP TWO] Once a plaintiff establishes a prima facie case, the burden [of production, not persuasion,] shifts to the employer to rebut this presumption by articulating a legitimate, non-discriminatory reason for its adverse employment action.

---

[4] The same analysis applies to all three discrimination counts contained in Plaintiff's Complaint. See Kriegel, 266 F. Supp. 2d at 296 (applying federal analysis to claims under FEPA and RICRA); and Russell, 160 F. Supp. 2d at 265 (D.R.I. 2001) ("FEPA is Rhode Island's analog to Title VII and the Rhode Island Supreme Court has applied the analytical framework of federal Title VII cases to those brought under FEPA.") (citations omitted). Therefore, this Court will generally refer to Title VII in its analysis, but the analysis will also apply to Plaintiff's claims under FEPA and RICRA.

> [STEP THREE] In the third and final stage, the burden devolves upon the plaintiff to prove that the reasons advanced by the defendant-employer constitute mere pretext for unlawful discrimination. To meet this burden, the plaintiff must prove not only that the reason articulated by the employer was a sham, but also that its true reason was plaintiff's race....

Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 19 (1st Cir. 1999) (citations and footnote omitted).

Defendants contend that Plaintiff cannot establish a prima facie case of discrimination because he was not performing his job satisfactorily and did not suffer any adverse employment action. The First Circuit has instructed that "[t]he burden of making out a prima facie case is 'not onerous.'" Mesnick v. Gen. Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991). Defendants have not shown that Plaintiff cannot, as a matter of law, establish a prima facie case of race discrimination.

Defendants contend that Plaintiff was not meeting Lockheed's legitimate attendance expectations. However, Defendants have not established what those legitimate expectations were at the time. With the exception of the "updated" warning adopted by Higson and the 2005 performance review issued by Higson, the criticism of Plaintiff's attendance comes from Supancic. It is undisputed that Plaintiff did not have any performance/attendance issues prior to being supervised by Supancic. Document No. 24-2 at pp. 1-2, ¶¶ 3 and 8. It is also undisputed that Plaintiff did not take more leave days than he had earned under Lockheed's compensation policy. Id. at p. 2, ¶ 9. The conflict is relatively simple. Supancic took issue with Plaintiff taking unplanned vacation days with little notice or on short notice and found it to be unprofessional and unacceptable behavior for a manager. Plaintiff, a long-term Lockheed employee, responds that it was "common practice to allow all employees to request a vacation day on the same day they sought to take one, so long as the work was being performed." Id. at p. 1, ¶ 5. Plaintiff also avers that "[t]he discipline

[he] received for attendance problems alleged by Mr. Supancic was not given to any other white employee, despite that fact that all employees used the same method for taking vacation and sick time." Id. at p. 3, ¶ 18.

Defendants clarify in their Reply Memorandum that Plaintiff "was not being disciplined for the amount of time he was absent or taking more vacation than he had earned, the issue was the manner in which he continually took vacation the day of his request in violation of Lockheed policies and the clear direction of Lockheed management." Document No. 25 at p. 4, n.4. The only policy identified by Defendants is the portion of Lockheed's Absence from Work policy which states that "regular and reliable attendance on scheduled work days" is an "essential function of all positions." Document No. 17-2 at p. 11. This is a reasonable and obvious statement of workplace policy. However, Defendants fail to offer anything to rebut Plaintiff's statements that "[f]or all the years [he] had worked at Lockheed, and prior to Mr. Supancic becoming [his] supervisor, it was common practice to allow all employees to request a vacation day on the same day they sought to take one, so long as the work was being performed" and that "[t]his was especially true of management personnel...who would often work many hours without compensation." Document No. 20-4 at pp. 1-2, ¶¶ 5 and 10.[5] In addition, the management direction on this issue came almost exclusively from Supancic who Plaintiff alleges harbored discriminatory animus and subjected him to an extraordinary degree of scrutiny. Id. at p. 3, ¶¶ 16,18, 19. The record also suggests some conflict between Supancic and Human Resources regarding Plaintiff's attendance issues. For instance, there is a handwritten note on an email from Supancic to Human Resources responding that he "can't continue to approve v[acation] and then hold it against [Plaintiff]." Id. at p. 9. Supancic

[5] In an email to Plaintiff, Supancic recognized that "things sometimes come up that we simply can't anticipate and don't allow for any advance notice...." Document No. 17-4.

also sent an email to a Human Resources representative asking for an explanation of "the significance and intent" of his writing "[a]ll of [Plaintiff's] absences were approved by his manager and were not contested at the time of his request." Id. at p. 14. While the evidence adduced at trial may ultimately establish that Plaintiff violated Lockheed policy or failed to meet the legitimate performance expectations of a manager, Defendants have not established the absence of a genuine issue as to any material fact on this element of the prima facie case.

Similarly, Defendants have failed to adequately support their claim that Plaintiff cannot, as a matter of law, establish that he suffered an adverse employment action. As discussed below in connection with Plaintiff's RIWPA claim, Plaintiff was the subject of disciplinary warnings decreasing performance evaluations which resulted in denial of a salary increase and a two-level "demotion" from FEM to FE which was due, at least in part, to claimed performance issues.

"[A]t the summary judgment stage, Plaintiff 'must produce evidence to create a genuine issue of fact with respect to two points: whether the employer's articulated reason for its adverse action [attendance] was a pretext and whether the real reason' was race discrimination." Ashley, 451 F. Supp. 2d at 333 (quoting Quinones v. Buick, 436 F.3d 284, 290 (1st Cir. 2006)). However, Plaintiff's burden of production under Fed. R. Civ. P. 56(e) is only triggered if Defendants' motion is "properly made and supported." In other words, Defendants must "put the ball in play" by showing the absence of evidence to support Plaintiff's case. Garside, 895 F.2d at 48. Defendants have not done so.

After thoroughly reviewing the pleadings and supporting exhibits, there remains factual disputes as to whether Plaintiff actually had an attendance problem, what Lockheed's absence policy/practice was at the time and whether Plaintiff violated that policy/practice. Plaintiff should

not view this recommendation to deny Defendants' Summary Judgment Motion as an affirmation that his discrimination claims have merit. This recommendation stems from Defendants' failure to sufficiently "put the ball in play" under Rule 56 and the requirement at this stage that all evidence be viewed in the light most favorable to Plaintiff and all reasonable inferences therefrom be drawn in Plaintiff's favor. Plaintiff is advised, however, that the decision to recommend denial of Defendants' Motion as to the discrimination counts was a close call, and the evidence supporting an inference of race discrimination and resulting damages appear to be thin.[6]

**D. The Whistleblower Claim**

Count IV of Plaintiff's Complaint alleges retaliation in violation of the RIWPA. Plaintiff alleges that he learned, in 2004, that "some of the engineers who reported to him had received special favors in the form of gifts from an employee of Purvis" and that the Purvis employee was "taking scrap metal from the facility (which belonged to the United States government), possibly selling it to a scrap company, and keeping the proceeds for himself." Compl., ¶¶ 16, 17. Plaintiff contends that an investigation conducted after he reported these activities "revealed that [the Purvis employee] had in fact given gifts to...Plaintiff's [subordinates] and had also improperly taken scrap metal from the facility." Id. at ¶ 19. Plaintiff asserts that he became the "target of retaliation" after making his report to his employer/supervisor in violation of the RIWPA. Id. at ¶¶ 20, 49.

The RIWPA prohibits retaliation against an employee:

> Because the employee reports verbally or in writing to the employer or to the employee's supervisor a violation, which the employee knows or reasonably believes has occurred or is about to occur, of a law or regulation or rule promulgated under the laws of this state, a political subdivision of this state, or the United States, unless the

---

[6] Defendants are likewise advised that the decision to recommend denial of Defendants' Motion as to the RIWPA claim was not a close call.

> employee knows or has reason to know that the report is false. Provided, that if the report is verbally made, the employee must establish by clear and convincing evidence that the report was made.

R.I. Gen. Laws § 28-50-3(4).

Defendants devote less than two pages (Document No. 17-2 at pp. 16-17) of their brief to this claim. Defendants contend that Plaintiff has not alleged a violation of the RIWPA because he did not report any illegal conduct. They assert that "while accepting tools from a customer is a violation of Lockheed policies, there is no evidence that such conduct violated any laws." Document No. 17-2 at p. 17. Defendants conveniently ignore that Plaintiff's RIWPA claim also alleges a report of illegal theft and sale of scrap metal. Plaintiff points this out in his brief (Document No. 20-3 at pp. 19-20) and Defendants fail to address it in their reply. Document No. 25.

In support, Plaintiff avers in his Affidavit that he reported "wrongful and illegal conduct." Document No. 24-2 at ¶ 20. Plaintiff also offers an email dated October 1, 2004 which he sent to Mary Markov and copied to Supancic. Id. at p. 10. In the email, Plaintiff reports that the Purvis employee in question had admitted "that he had sold scrap metal and used the money to buy tools." Id. Given Defendants' limited briefing of the issue and the arguments and evidence proffered by Plaintiff, the Court finds that there is a genuine issue of material fact as to whether the report made by Plaintiff was of a "violation" covered by the RIWPA.

Defendants alternatively argue that Plaintiff cannot establish an adverse employment action, or a causal connection between his report and any alleged adverse employment action. Again, Defendants' briefing on this issue is thin. See Document No. 17-2 at p. 17. Plaintiff identified sufficient evidence to establish a genuine issue of material fact as to both adverse action and

retaliatory motive. First, Plaintiff points to his October 18, 2004 written warning for negligent supervision. In an October 20, 2004 response, Plaintiff questioned why he was disciplined for the actions of "insubordinate individuals" and his observation that the consequences of his report "were to shoot the messenger." Document No. 24-2 at p. 13. Second, Plaintiff received an attendance warning on October 13, 2004. Document No. 17-9. In anticipation of any perception of retaliation, Supancic was coached by Human Resources in an email to "explain to [Plaintiff] that you planned on doing that irregardless of the outcome of the investigation [regarding the tool/gift report] due to his personal attendance and previous conversations you had with him (it was just held up by Legal for review) and it was separate from the investigation." Document No. 24-2 at p. 12.

Third, Defendants contend that Plaintiff's reclassification from FEM to EIC in November 2004 was part of a legitimate reorganization to correct a "top heavy" management structure. However, in their statement of Undisputed Facts, Defendants indicate that Plaintiff's claimed performance issues contributed to the November 15, 2004 EIC reassignment and that three days later, on November 18, 2004, Plaintiff was removed from the CCSL team for performance reasons, at Supancic's recommendation, and reassigned to a non-managerial FE position. Document No. 18 at ¶¶ 35 and 39; Document No. 17-17. Within a relatively short period, Plaintiff went from supervising Cobb, a Caucasian manager, on the CCSL team to reporting to Cobb as an FE on the Trident DPS team. Document No. 18 at ¶¶ 33, 34 and 40. Although Plaintiff's pay was not reduced, he was stripped of his supervisory/managerial duties and placed in a position which he viewed as having no "opportunity for progression." Document No. 22 at p. 2. There is at least a genuine issue of material fact as to whether these job reclassifications were demotions and thus adverse employment actions.

As to retaliation, Defendants argue that summary judgment should enter because the "sole basis" for Plaintiff's RIWPA claim is the temporal proximity between his report to Supancic and his removal from the CCLS conduct due to a "well-documented reorganization." Document No. 25 at p. 1. However, as noted above, Defendants concede that Plaintiff's two-level "demotion" was due, at least in part, to performance issues and not solely a reorganization. Also, Plaintiff has identified adverse employment actions in addition to the job reclassifications which came on the heels of his report. See Russell, 160 F. Supp. 2d at 264 ("An inference of retaliation arises when the plaintiff establishes an adverse action soon after the plaintiff engages in the protected activity."). Finally, Lockheed itself recognized that one could draw an inference of retaliation when it coached Supancic at the time to "explain" the separateness of the investigation and the discipline issued to Plaintiff. Document No. 20-4 at p. 12. Defendants have simply not met their burden under Rule 56 of establishing the absence of any "trialworthy" issue on Plaintiff's RIWPA claim.

**Conclusion**

For the reasons stated, I recommend that Defendants' Motion for Summary Judgment (Document No. 17) be GRANTED in limited part on Counts I and II solely as to Defendant Supancic and otherwise DENIED.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within ten (10) days of its receipt. See Fed. R. Civ. P. 72(b); LR Cv 72. Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the District Court and the right to appeal the District Court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
July 22, 2008