UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

AZELL MALONE,
        Plaintiff

v.                               C.A. No.  07-065ML

LOCKHEED MARTIN CORPORATION
and CARL SUPANCIC,
        Defendants.

**MEMORANDUM AND ORDER**

Mary M. Lisi, Chief United States District Judge.

This matter is before the Court on the defendants' motion for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure, or, in the alternative, for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure or remittitur.  The defendants, Lockheed Martin Corporation ("Lockheed Martin") and Carl Supancic ("Supancic"), assert that the plaintiff, Azell Malone ("Malone"), failed to sustain at trial his burden of proving the claims of racial discrimination and violation of the state whistleblowers' act he raised against the defendants.  In the alternative, the defendants petition this Court for a new trial based on, inter alia, certain statements made by plaintiff's counsel during closing argument and alleged juror confusion about the verdict form which necessitated post-trial adjustment of the jury award.  After considering the parties' arguments and the entire record herein, the Court grants the defendants' motion for judgment as a matter of law.  The Court conditionally grants the

defendants' motion for a new trial and denies as moot the defendants' motion for remittitur.

## I. Factual Background

Malone was hired by Lockheed Martin (formerly Sperry Corporation) as Field Engineer in 1977. He was promoted to Engineer-In-Charge ("EIC") in 1983 and to Field Engineering Manager in 1997. By all accounts, Malone was an excellent employee, receiving positive performance reviews and regular promotions. By 2000, Malone was in charge of a team of approximately six other field engineers assigned to work on the Combat Control Systems Laboratory ("CCSL") contract. The primary contractor on the CCSL contract, Purvis Systems ("Purvis"), had approximately 40 employees working on the project and the government, as the customer, had six employees working with Purvis and Lockheed Martin. Malone, in his role as manager, oversaw Lockheed Martin's daily interests and, in addition to supervising approximately 14 Lockheed Martin employees, Malone also supervised some of the Purvis employees.

In November 2000, Carl Supancic became Site Manager for Lockheed Martin's Newport operation and assumed ultimate responsibility for Lockheed Martin's performance on the CCSL contract. Malone began to report directly to Supancic. Initially, Malone continued to receive favorable performance reviews and raises from Supancic.

On January 24, 2002 at 6:41 a.m., Malone sent an e-mail to Supancic, informing him that, with Supancic's approval, he would

take the day as a vacation day. Def.'s Ex. B. In response, Supancic sent an e-mail to Malone in which he pointed out that Malone's request was the second such request in the same week, and he expressed the need for advanced notice in order to discuss items that would have to be dealt with in Malone's absence. Id. Notwithstanding Supancic's admonition, Malone sent a 5:04 a.m. e-mail to Supancic on June 18, 2002, this time making a request to extend his vacation by one day. Def.'s Ex. C.

In March 2003, Malone began treating with psychotherapist Brian Riley ("Riley") for panic attacks, insomnia, depression and episodic alcohol abuse. On June 9 and 11, 2003, Malone again requested vacation without advanced notice. In response, Supancic e-mailed Malone and reprimanded him for leaving an early morning e-mail or voice mail instead of contacting Supancic directly, and for failing to answer any of the calls or pages made to Malone by Supancic regarding the requested time off. Supancic also pointed out that Malone's conduct was "categorically unacceptable," particularly in "what is supposed to be [an] example-setting management position." Def.'s Ex. E.

On December 9, 2003, Supancic informed Lynda Thomson ("L. Thomson"), a Lockheed Human Resources Manager, that Malone had again taken two consecutive days of vacation during the week of December 8, 2003, without prior approval. Def.'s Ex. G. Supancic voiced his concern that, in the absence of Trident Engineer Keith Cobb ("Cobb"), Malone was the only manager in Navy Undersea

Warfare Center ("NUWC") buildings 1258 and 1259 and that Malone's absence  occurred during a "significant tug-of-war" with Purvis about staffing.  Id.  According to Richard McCauley ("McCauley"), program manager for Purvis, while there were no complaints regarding the quality of Malone's work, the government raised some concerns that Malone could not be found and that he spent too much time on management responsibilities instead of working in the labs. McCauley also conveyed his own concerns to Malone and to Supancic that, on occasion, he had been unable to locate Malone when he needed him.

Malone's Performance review for the second half of 2003 showed a decline from "High Contributor" to "Successful Contributor."  It also noted that Malone's management and administrative performance was "spotty;" that "[d]isruptive staff behavior [was] problematic;" and that he was lacking "example-setting behavior for vacation planning and authorization, as well as absences."  Pl.'s Ex. 3.

Beginning in April 2004, Lockheed Martin's Newport operations went through a period of reorganization of its management level employees.  To address what was perceived as an overabundance of managers, Lockheed Martin decided to retain only managers designated as Level 5 in that position and to reclassify all Level 4 managers as non-management employees.  Two Level 4 Managers, Cobb and Dan Rhoads ("Rhoads"), both Caucasian, were reclassified as non-management EICs at that time.

In August 2004, Malone again left voice mails to ask for vacation on the same day as his request.  Supancic sent another e-

-4-

mail to L. Thomson, in which he expressed his frustration over Malone's absences and suggested, for the second time, that Malone "sounded a bit odd" on the voice mail. Def.'s Ex. I. Supancic also stated that Malone failed to complete time sheets for himself and his subordinate Joe Pires ("Pires") and that he had not approved any of his staff's time sheets. Id.

On September 23, 2004, Malone informed Supancic that he had received a complaint by Richard Goulart ("Goulart"), one of his subordinates, about alleged harassment by Pires. Def.'s Ex. J. Goulart also reported that Pires and their mutual co-worker John Lastowski ("Lastowski") had been accepting gifts of tools from a government employee. Id. Supancic passed this information to his own supervisor. Shortly thereafter, Human Resources Manager Sean Thompson ("S. Thompson") and Lockheed Martin's ethics officer paid a visit to the Newport facility to investigate the incident. They eventually concluded that the acceptance of tools by members of Malone's team was improper.

On October 6, 2004, after another unscheduled two-day absence by Malone, Supancic contacted S. Thompson and L. Thomson to discuss Malone's most recent absence. In response, L. Thomson provided certain "talking points" to Supancic for a "Disciplinary discussion", together with a note drafted by S. Thompson and Human Resources Director Darlene Weiss ("Weiss"). Def.'s Ex. O. The note, addressed to Malone, stated: "We have been unsuccessful in reaching you" and directed Malone to report to Supancic's office the following day. Def.'s Ex. P. The note was signed by Supancic

-5-

and delivered to Malone by courier on October 6, 2004.  Malone did
not appear at work, as the note directed, on October 7, 2004.
Instead, Malone left Supancic a voice mail shortly after midnight,
stating that he had a family problem.  L. Thomson then e-mailed a
second letter to Supancic to be delivered to Malone.  That letter
warned Malone that failure to report to Supancic's office the
following day would "result in disciplinary action up to an [sic]
including termination of employment." Def.'s Ex. R.  L. Thomson
also advised Supancic that she would draft a disciplinary letter
for Malone and she provided additional talking points to Supancic
for his anticipated discussion with Malone.  Def.'s Ex. Q.

On October 7, 2004, L. Thomson drafted a warning letter
addressing Malone's absences.  The letter was reviewed by S.
Thompson and forwarded to Supancic on October 12, 2004. Def.'s Ex.
S.  The draft letter, originally dated October 8, 2004,  addressed
Malone's "Attendance Issues" and stated that "the requirements of
your job are not met due to your absenteeism and there is a direct
impact to our customer program performance," and that, because
Malone had ignored proper notification procedure in the past, he
was now required to obtain approval from Supancic at least 24 hours
prior to taking a vacation day.  The letter also warned that "[a]ny
further absences not approved by [Supancic] in advance will lead to
further disciplinary action up to and including termination of
employment."  Id.  Malone received the formal warning (now dated
October 13, 2004) and, although he  disagreed with the content of
the letter, Malone signed the letter in acknowledgment on October

-6-

13, 2004.  Def.'s Ex. T.

On October 17, 2004, L. Thomson forwarded two letters to Supancic with instructions to deliver the letters to Malone the following day.  Def.'s Ex. U.  The first letter was the letter already signed by Malone on October 13, 2004.  The second letter, dated October 18, 2004, constituted a written warning for "Negligent Supervisory Responsibilities" in regards to the tool gifting incident.  Def.'s Ex. V.  The letter stated that Malone's "lack of effective and/or active management practices contributed to the issues plaguing [his] employees," and it concluded that Malone's actions as a supervisor were "unacceptable" and "negatively impacted the overall performance of [his] work group." Id.  L. Thomson's cover e-mail directed Supancic to explain to Malone that the warning about his attendance was unrelated to the outcome of the tool gifting investigation which resulted in a separate reprimand.  Def.'s Ex. U.

Malone's 2004 performance review acknowledged that Malone's team met its primary objective under his direction but it also stated that Malone failed to address the significant problems with his attendance and accountability and that "[t]hese problems set [Malone] very much apart from his management peers for the period, and set a very poor and visible example."  Pl.'s Ex. 4.  The review assessed Malone as a "Basic Contributor", a designation which precluded him from receiving a raise.

On November 15, 2004, like Cobb and Rhoads before him, Malone was reassigned as an EIC.  Under this re-assignment, Malone

remained a Level 4 employee; he continued to be responsible for front line management of Lockheed's CCSL team; and his pay and benefits were unchanged.   Following this reassignment, Malone immediately took two unscheduled vacation days.   On November 18, 2004, upon Supancic's recommendation and approval by Lockheed's Director of Lifetime Support, Janet Christopherson, Malone was removed as EIC of the CCSL team and assigned to the Trident DPS team as a Field Engineer.   Because Cobb had previously been named EIC of the Trident DPS team, Malone now reported to Cobb, who was once his subordinate.  Pl.'s Ex. 16 at LM 153.

On January 7, 2005, Malone was issued a "Final Warning" drafted by S. Thompson, Weiss, and Lockheed Martin's legal counsel, pursuant to which Malone was required to seek approval from Supancic or Cobb before taking vacation leave and to provide documentation from his physician to verify Malone's need for sick leave. Pl.'s Ex. 26.  Malone was also warned that failure to meet the requirements of this letter would "likely result in termination of [his] employment with Lockheed Martin."    <u>Id.</u>

Malone applied for the position of EIC in February, 2005, but was not granted an interview.   Around that time, Riley noted that Malone showed increased anxiety and depression, which Riley attributed to job stressors.

In March 2005, James Higson ("Higson") took over as manager of Malone's group.   At S. Thompson's instruction, Supancic informed Higson of Malone's prior attendance problems.   On April 11, 2005, Supancic sent a detailed e-mail to Human Resources and Higson, in

which he reported that, in the course of the previous week, Malone had been repeatedly late, left early, or called in sick because of a back problem. Pl.'s Ex. 22.  Malone eventually produced a note from his physician that confirmed his visit on April 8, 2005 and recommended he stay home from work until the following Monday. Instead of returning to work on that day, Malone placed an early morning call to Supancic and informed him that he intended to ask his physician for an extension to his sick leave. Pl.'s Ex. 23. Although he was no longer Malone's direct manager/supervisor, on July 18, 2005, Supancic sent a second detailed e-mail to Human Resources regarding Malone's absences.  Id.  Neither of the last two e-mails from Supancic to Human Resources resulted in any disciplinary action against Malone.

On July 6, 2005, Malone wrote a letter to Human Resources Manager Mr. Wronsky,  in which Malone complained that, after the tool gifting incident was disclosed, both he and Goulart were removed, "in retribution." Pl.'s Ex. 18.  Malone explained that Goulart was removed for "making the complaint" and Malone was removed for "forwarding it to LM Management."  Id.  Malone also related that, after he had been instructed by management to drive Pires to Raytheon in Portsmouth, he felt ridiculed by subordinates and government technicians who made "Driving Miss Daisy" remarks.[1] According to Malone, he reported the incident to Supancic, but no

---

[1]

"Driving Miss Daisy" is a 1989 film set in the American South about the relationship between an elderly Jewish woman and her African-American chauffeur.

action was taken.

On August 16, 2005, Higson issued an "Updated Final Warning" to Malone, which placed the same requirements on Malone as the letter previously issued by Supancic on January 7, 2005. Pl.'s Ex. 27. The letter was signed by S. Thompson and Higson and, although Supancic was aware of the letter, he was apparently not involved in the decision to issue it to Malone. According to Malone, Higson (since deceased) had no attendance issues with Malone, but believed that Malone had a problem with Supancic. Malone's performance review by Higson for 2005 rated him as a "Basic Contributor" and he did not receive a raise. Pl.'s Ex. 5.

Following his reassignment to the Trident DPS team, Malone continued in that position for about a year. Around that time, Malone discontinued treatment with Riley. Malone then worked for Lockheed Martin in Groton, Connecticut, pursuant to an arrangement made by Higson, after which he continued working for Lockheed Martin in Wisconsin. Subsequent performance reviews for 2006 and 2007 rated Malone as a "Successful Contributor" and the 2008 performance review rated Malone as a "High Contributor." Pl.'s Ex. 6-8.

## II.  Procedural Background

On August 16, 2006, Malone filed an administrative charge of discrimination against the defendants. He filed a complaint in Rhode Island state court on January 16, 2007, which was timely removed to this Court. Malone asserted three statutory counts of race-based employment discrimination in violation of Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e <u>et seq.</u>; the Rhode Island Fair Employment Practices Act ("RIFEPA"), R.I. Gen. Laws § 28-5-1 <u>et seq.</u>; and the Rhode Island Civil Rights Act of 1990 ("RICRA"), R.I. Gen. Laws § 42-112-1 <u>et seq.</u>; as well as a claim under the Rhode Island Whistleblowers' Protection Act ("RIWPA"), R.I. Gen Laws § 28-50-1 <u>et seq.</u>.  Malone sought compensatory damages for emotional distress and punitive damages.

On February 6, 2009, this Court accepted the report and recommendation by Magistrate Judge Almond (1) to grant the defendants' motion for summary judgment with respect to the Title VII and RIFEPA claims directed against Supancic, based on Malone's failure to exhaust his administrative remedies; and (2) to deny the motion with respect to all other claims, on the ground that the defendants failed to establish the absence of trialworthy issues in Malone's discrimination and whistleblower claims.  <u>Malone v. Lockheed Martin Corp.</u>, 2009 WL 304275 (D.R.I. Feb. 6, 2009).

On April 7, 2009, just prior to commencing the jury trial in this case, the defendants filed two motions in limine to exclude (1) evidence of events that occurred outside of the applicable statutes of limitations; and (2) statements made by Malone's former supervisor Jim Higson, who is deceased. Specifically, the defendants argued that, because Malone's administrative claim of discrimination was not filed until August 16, 2006, any events that occurred before October 20, 2005 were time barred under Title VII and any events that occurred before August 15, 2005 were time barred under RIFEPA and RICRA.  Malone objected to the motions and

the Court advised the parties that it would hold the motions pending development of supportive evidence during the trial proceedings.

At the close of Malone's presentation of his case, defendants' counsel made a motion for judgment as a matter of law pursuant to Federal Rule 50, on the grounds that (1) Malone had not sustained his burden of proof to support claims of race-based discrimination or violation of the RIWPA; and (2) Malone had failed to provide any evidence of (a) race-based discrimination within the statutory time frame or (b) a continuing violation of the anti-discrimination statutes. The Court took the motion under advisement and asked the defendants to proceed with their case.

After a four-day jury trial, the jury found for Malone on all counts and awarded him $125,000 each in compensatory and punitive damages on the Title VII claim; $125,000 each in compensatory and punitive damages on the RIFEPA claim; $500,000 each in compensatory and punitive damages on the RICRA claim; and $500,000 in compensatory damages on the RIWPA claim, for a total award of $2 million. Subsequently, this Court adjusted the jury verdict in order to avoid double recovery for Malone's injuries and it aggregated the compensatory and punitive damages for the discrimination claims under the RICRA claim, reducing the total award to $1.5 million. Malone v. Lockheed Martin Corp., 2009 WL 1360875 (D.R.I. May 14, 2009).

Following the Court's adjustment of the jury verdict, the defendants filed a motion for permission to conduct post-verdict

-12-

interviews of the jury[2] and Malone filed a motion for attorney
fees.  On May 29, 2009, the defendants filed a motion for judgment
as a matter of law or, in the alternative, for a new trial or
remittitur.  Malone filed an objection to the defendants' motion
and the defendants have filed a reply thereto.

### III. Standard of Review

A.  Motion for Judgment as a Matter of Law

A court is authorized to grant judgment as a matter of law
"[i]f a party has been fully heard on an issue during a jury trial
and the court finds that a reasonable jury would not have a legally
sufficient evidentiary basis to find for the party on that issue."
Fed. R. Civ. P. 50(a)(1).  The motion may be raised "at any time
before the case is submitted to the jury" and it must "specify the
judgment sought and the law and facts that entitle the movant to
the judgment."  Fed. R. Civ. P. 50(a)(2).  "If the court does not
grant the motion for judgment as a matter of law under Rule 50(a),"
it is "considered to have submitted the action to the jury subject
to the court's later deciding the legal questions raised by the
motion."  Fed. R. Civ. P.50(b).  The movant may then file a renewed
motion for judgment as a matter of law and "may include an
alternative or joint request for a new trial under Rule 59."  Id.

When considering a motion for judgment as a matter of law, the
court must "evaluate the evidence in the light most favorable to

---

[2]

During a chambers conference with the parties' attorneys, the
Court indicated that it was not inclined to permit the defendants
to interview the jury.

the non-moving party . . . and draw all reasonable inferences" in
that party's favor. Peguero-Moronta v. Santiago, 464 F.3d 29, 48-
49 (1st Cir. 2006); Zimmerman v. Direct Fed. Credit Union, 262 F.3d
70, 75 (1st Cir. 2001)(court may grant motion for judgment as a
matter of law only "when, after examining the evidence of record
and drawing all reasonable inferences in favor of the nonmoving
party, the record reveals no sufficient evidentiary basis for the
verdict"). The court may not "take into account the credibility of
witnesses, resolve evidentiary conflicts, nor ponder the weight of
the evidence introduced at trial.'" Peguero-Moronta v. Santiago,
464 F.3d at 48 (quoting Figueroa-Torres v. Toledo-Davila, 232 F.3d
270, 273 (1st Cir. 2000)).

   B. Motion for New Trial

   Pursuant to Rule 59, "[t]he court may, on motion, grant a new
trial on all or some of the issues . . . after a jury trial, for
any reasons for which a new trial has heretofore been granted in an
action at law in federal court . . . Fed. R. Civ. P. 59(a)(1). The
First Circuit has cautioned that "[n]ew trials should be ordered
sparingly," United States v. Conley, 249 F.3d 38, 45 (1st Cir.
2001), and that a court should grant a motion for a new trial only
where it is "convinced that the jury verdict was a 'seriously
erroneous result.'" Huber v. JLG Indust., Inc., 344 F. Supp.2d
769, 772 (D. Mass. 2003)(quoting Coffran v. Hitchcock Clinic, Inc.,
683 F.2d 5, 6 (1st Cir. 1982)). When deciding a motion for a new
trial, "' a trial judge is free to weigh the evidence [herself],
and need not view it in the light most favorable to the verdict

-14-

winner.'" <u>DLC Mgmt. Corp v. Town of Hyde Park</u>, 163 F.3d 124, 134 (2d Cir. 1998); <u>Ahern v. Scholz</u>, 85 F.3d 774, 780 (1st Cir. 1996)("district court has broad legal discretion to determine whether or not a jury's verdict is against the 'clear weight of the evidence'")(citation omitted).

## IV. Discussion

A. Preliminary considerations

Before proceeding to the substance of the defendants' motions, the Court will briefly address the objections Malone raised on procedural grounds, <u>i.e.</u>, that the defendants "failed to make a proper Rule 50(a)(2) motion at the close of <u>all</u> evidence," Pl.'s Obj. to Mot. 2 (emphasis added), and that the motion itself "was insufficient to preserve the issue." <u>Id.</u> at 3.

With respect to the first objection, Rule 50(a) clearly provides that a motion for judgment as a matter of law "may be made <u>at any time</u> before the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2)(emphasis added). As defendants point out in their reply to Malone's objection, the 2006 amendment to Rule 50 deleted "the requirement that a motion be made at the close of all the evidence." <u>See</u> Fed. R. Civ. P. 50(a) Advisory Committee Notes to 2006 Amendment. Because there is no dispute that the defendants raised the motion at the close of Malone's case, the defendants were entitled to renew their motion after the trial under Rule 50(b).

With respect to Malone's second objection, defendants' counsel, in making the motion for judgment as a matter of law,

argued that (1) Malone failed to meet his burden of substantiating the claims of race-based discrimination or retaliation under the whistleblower statute; and (2) Malone failed to provide any evidence that race-based discrimination against him took place within the applicable statute of limitations time periods, or that the alleged discrimination was part of a continuing violation.

Rule 50 requires that a motion for judgment as a matter of law "specify the judgment sought and the law and facts that entitle the movant to the judgment."   Fed. R. Civ. P. 50(a)(2).   The requirement for such articulation is intended to "prevent unfair surprise and provide the responding party with an opportunity to correct any deficiencies in her proof."   Lynch v. City of Boston, 180 F.3d 1, 13 n. 9 (1st Cir. 1999)(citing Fed. R. Civ. P. 50(a) Advisory Committee Notes to 1991 Amendment).   However, Rule 50 "'does not require technical precision in stating the grounds of the motion.   It does require that they be stated with sufficient certainty to apprise the court and opposing counsel of the movant's position with respect to the motion.'"   Id. (citing 9A C. Wright & A. Miller, Federal Practice and Procedure, § 2533, at 310-11 (1995)).

As set forth in detail in the report and recommendation accepted by this Court on February 6, 2009, defendants first asserted in their motion for summary judgment that all of Malone's race-based discrimination claims were time barred; that he failed to establish a prima facie case for the discrimination claims; and that he was unable to establish a claim under the state

-16-

whistleblower act.  See  Malone v. Lockheed Martin Corp., 2009 WL
304275 at *8 - 12, *14 - 15.   These are the same issues the
defendants relied on in their motion for judgment as a matter of
law.   Consequently, the statement by defendants' counsel at the
close of the plaintiff's case, although it was brief, was
sufficient to support the defendants' motion and to articulate the
legal arguments to which the defendants are now bound in their
renewed motion.  See Casillas-Diaz v. Palau, 463 F.3d 77, 81 (1st
Cir. 2006)(renewed motion for judgment as a matter of law under
Rule 50(b) is "'bounded by the movant's earlier Rule 50(a)
motion'")(quoting Correa v. Hosp. San Francisco, 69 F.3d 1184, 1196
(1st Cir. 1995)).  Having established that the defendants' motion
was both timely and sufficient, the Court will proceed to the
merits of the motion.

     B.   Statute of Limitations

     A Title VII claim must be filed within 300 days of an alleged
act of discrimination.   42 U.S.C. § 2000e-5(e); 29 C.F.R. §§
1601.70(a), 1601.74(a).  Claims brought under the RIFEPA and RICRA
must be filed within one year.  R.I.Gen. Laws § 28-5-17(a)(1956);
Rathbun v. Autozone, Inc., 253 F.Supp.2d 226 (D.R.I. 2003).  Malone
filed his administrative discrimination claim on August 16, 2006,
and, unless his claim qualifies for a recognized exception to the
applicable time limitations, Malone was precluded from seeking
relief under Title VII for events that occurred prior to October
20, 2005 and from asserting any claims under RIFEPA and RICRA for
events that occurred prior to August 15, 2005.

Generally, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113, 122 S.Ct. 2061, 2972, 153 L.Ed.2d 106 (2002). As noted by the Supreme Court, "termination, failure to promote, denial of transfer, or refusal to hire" are discrete acts, which must be challenged within the applicable statute of limitations period. Morgan, 563 U.S. at 114, 122 S. Ct. at 2073. See Tobin v. Liberty Mut. Ins. Co., 552 F.3d 121, 130-131 (1st Cir. 2009)

However, under the "continuing violation" doctrine, a plaintiff may recover for "discriminatory acts that otherwise would be time-barred as long as a related act fell within the limitations period." Tobin v. Liberty Mut. Ins. Co., 553 F.3d at 130 (continuing violation doctrine "does not apply to 'discrete acts' of alleged discrimination that occur on a 'particular day,' but only to discriminatory conduct that takes place 'over a series of days or perhaps years.'" Id. (quoting Morgan, 563 U.S. at 115, 122 S.Ct. at 2073). If the conduct of which a plaintiff complains does not establish discrete acts of discrimination or retaliation, but contributes, in the aggregate, to a "hostile work environment," he or she may be able to recover for such "component acts," even if they would be otherwise time-barred. Tobin, 553 F.3d at 130; Morgan, 536 U.S. at 117, 122 S.Ct. at 2074 (stating that, where the alleged discrimination "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice,'", a plaintiff may recover for discrimination outside of the statutory

-18-

time limit, provided that at least one "act contributing to the claim" occurred within the filing period). In addition, a plaintiff may "use prior acts as background evidence of a timely claim." Id. at 113, 122 S.Ct. at 2072 (noting that discrete acts outside the actionable time period "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue").

A hostile work environment claim is indicated when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78, 118 S. Ct. 998, 1001, 140 L.Ed.2d 201 (1998)(cited in Crowley v. L.L. Bean, Inc., 303 F.3d 387, 395 (1st Cir. 2002)). In order to establish a hostile work environment claim that would permit the consideration of allegedly discriminatory acts outside the statute of limitations period, Malone had to establish that he was subjected to severe or pervasive harassment that materially altered the conditions of his employment and that such harassment was "objectively and subjectively offensive." In other words, it is not sufficient that Malone perceived the complained of conduct as offensive, but it had to be offensive to a "reasonable person" as well. Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005)(discriminatory conduct "must rise to some level of substantiality before it can be actionable").

To assess Malone's claim of a hostile work environment, this

Court must look to "'all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" <u>Morgan</u>, 536 U.S. at 116, 122 S.Ct. at 2074.

Based on the evidence submitted at trial, there were only two events that arguably fell into the actionable time period for Malone's discrimination claims: (1) on August 16, 2005, Higson issued an "Updated Final Warning" regarding Malone's attendance issues that was based on the prior warning memorandum given to Malone by Supancic, Pl.'s Ex. 27; and (2) on December 15, 2005, Higson, who succeeded Supancic as Malone's supervisor in March 2005, issued Malone's performance review for the entire 2005 year in which he rated Malone as a "Basic Contributor."[3]  Pl.'s Ex. 5. According to Malone, both events were the result of Supancic's continuing involvement in Malone's supervision.

While Supancic may have continued to monitor Malone's attendance, there is nothing to indicate that either of those two occurrences were the result of racial discrimination.  Supancic had been asked by S. Thompson to inform Higson, as Malone's new direct supervisor, about Malone's prior attendance issues; however,

---

[3]

Malone also refers to an occasion where he was granted leave by Higson which was subsequently rescinded by Supancic; however, there is nothing in Malone's testimony or the submitted evidence that establishes the date of this alleged event.

Supancic had no role in issuing the updated warning memorandum to Malone.   With respect to Malone's 2005 performance assessment, Malone offered no evidence that would suggest Supancic exerted any influence on Higson in rating Malone a "Basic Contributor." Malone's detailed and assertive rebuttal to the assessment report makes no mention of Supancic, whereas he acknowledges that the "[c]oncerns about attendance are being addressed and hopefully will no longer be an issue." Pl.'s Ex.5.   Since neither of the discrete incidents cited by Malone constitute discriminatory treatment, any events outside of the statute of limitations period should have been barred unless Malone could demonstrate that they contributed to a pattern of "unlawful employment practice" to which he was subjected on account of his race.

However, nothing in the testimony or evidence offered at trial supports a finding that, at any time, Malone was subjected to severe intimidation, ridicule, or insult.   Supancic's conduct, which Malone perceived as harassment, consisted primarily of reprimanding Malone each time Malone failed to give advance notice before taking a vacation day, as he had been repeatedly asked to do.   As Malone continued his habit of unscheduled absences, Supancic began to involve Lockheed Martin's Human Resource Department and he included a reference to Malone's absenteeism in his performance review. Malone's habit of taking unscheduled vacation days over a period of several years is undisputed and well documented. Supancic's directives to Malone explained the need for advance notice and requested Malone's cooperation, which was not

forthcoming.   Malone conceded that initially he received very good performance reviews from Supancic, which resulted in significant salary increases, and the evidence showed that his performance ratings deteriorated only after his absenteeism became an issue.

Although Malone concluded, for himself, that some of his difficulties with Supancic were based on Malone's race, he could not provide any examples of race-based discrimination against him, nor could he articulate how Supancic treated other, Caucasian managers.[4]   Moreover, Malone never complained about racial discrimination to L. Thomson, S. Thompson (who also happens to be African-American), Mr. Wronsky, or Higson, although Malone took numerous opportunities to complain about other aspects of his work, including the reprimand he received after the tool incident.   The closest any of Malone's allegations come to a race-based incident is the "Driving Miss Daisy" remark directed at him by some of his co-workers.   However, Malone conceded that he was not asked to transport his co-worker because of Malone's race and he did not assert that the comment itself was race-based.

In sum, although Malone asserted in his complaint that he was subjected to a "pattern of retaliation, harassment, and discrimination," Compl. ¶ 13, no evidence was offered at trial to

---

[4]
Malone claimed that he was aware of at least one Caucasian employee, Keith Cobb, who may have requested a day off on the same day as the request.  Cobb later testified that he had taken an occasional day off on the same day he called in, but stated that it was uncommon in his group.  However, neither Malone nor Cobb stated whether Cobb's requests were made to Supancic.

establish such a pattern.

As stated before, the defendants filed a motion _in limine_ to exclude all evidence of events that occurred prior to August 15, 2005.  The defendants also suggested that Malone conceded that no acts of discrimination or retaliation occurred after December 2, 2005.  At the time the motion was asserted, the Court determined that a decision on the motion would be improvident because it was unknown then whether Malone could establish facts during the trial that might exempt his claims from the statute of limitations bar, _i.e_, whether the facts could support a "continuing violation" theory.  The motion was held to afford Malone an opportunity to make such a showing.

After evaluating the facts presented at trial, this Court is of the opinion that, even when those facts are reviewed in the light most favorable to Malone, the evidence was insufficient to support Malone's claim of a "continuing violation" on the ground that the defendants' acts contributed to a "hostile work environment."  Therefore, Malone's discrete discrimination claims were limited to the events alleged to have occurred within the applicable statutory limitations periods.  However, because those events are insufficient to assert, independently, a claim of race-based discrimination, the defendants are entitled to judgment as a matter of law with respect to the Title VII, RIFEPA, and RICRA discrimination claims.

C.  Rhode Island Whistleblowers' Protection Act Claim

The Rhode Island Whistleblowers' Protection Act was enacted to

provide "relief for an employee discharged for reporting a known violation of federal or state laws by an employer." <u>See, e.g.</u>, <u>Picard v. State of Rhode Island</u>, 694 A.2d 754 (R.I. 1997). The RIWPA was amended in 2002 to provide broader protection for employees who report a violation to the employer or the employee's supervisor. <u>Maturi v. McLaughlin Research Group</u>, 326 F.Supp.2d 313, 321 (D.R.I. 2004). Section 3 of the current Whistleblowers' Act provides in pertinent part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, location, or privileges of employment . . . (4) because the employee reports verbally or in writing to the employer or to the employee's supervisor a violation, which the employee knows or reasonably believes has occurred or is about to occur, of a law or regulation or rule promulgated under the laws of this state, a political subdivision of this state, or the United States, unless the employee knows or has reason to know that the report is false . . . R.I. Gen. Laws § 28-50-3(4)(2002).

Generally, "where the terms of a statute are clear, a court must give the words their plain and obvious meaning." <u>Marques v. Fitzgerald</u>, 99 F.3d 1, 4 (1st Cir. 1996)(citing <u>Ellis v. Rhode Island Pub. Transit Auth.</u>, 586 A.2d 1055, 1057 (R.I. 1991)). However, "[a] statute may not be construed in a manner that results in absurdities or defeats its underlying purpose." <u>Id.</u> (citing <u>In re Falstaff Brewing Corp.</u>, 637 A.2d 1047, 1050 (R.I. 1994)).

There are only a handful of Rhode Island cases addressing the RIWPA, one of which has explained that the RIWPA is "designed to foster compliance (and enforcement) with the laws of our state by providing much needed protection to those who come forward and

report violations of the law on the state's behalf; the thrust of
the act is to encourage, where appropriate, more "'whistleblowing'
in the hopes that this will benefit society as a whole." <u>Faraone</u>
<u>v. Pezza</u>, 1987 WL 859857 (R.I. Super. July 14, 1987); <u>see also</u>
<u>Belanger v. A&F Plating Co.</u>, 2002 WL 1288782 at *4 (R.I. Super.
June 7, 2002)(to qualify for protection under RIWPA, "employee
himself or herself or someone acting in his or her name must blow
the whistle on his or her employer"). Similarly, the First Circuit
has stated that the public policy behind whistleblowers' statutes
like the RIWPA is "to encourage the prompt reporting and early,
amicable resolution of potentially dangerous workplace situations,
and to protect those employees who do report such violations from
retaliatory action by employers." <u>Marques v. Fitzgerald</u>, 99 F.3d
at 6.

The defendants suggest that Malone is not entitled to
protection under the RIWPA because "in accordance with his duties,"
Malone merely passed Goulart's report up the "supervisory chain"
and, therefore, Malone's "report" does not constitute protected
activity. Def.'s Mot. 18. Specifically, the defendants argue that
(1) whistleblower acts are "intended for individuals who risk their
own job security for the advancement of the public good by
disclosing violations of law," <u>id.</u> at 20; and (2) if Malone's
memorandum relating Goulart's report is considered a "report" under
the RIWPA, then "everyone else who subsequently receives the
report" would qualify as a whistleblower. Def.'s Reply 8.

Malone, on the other hand, argues that there is no requirement

in the RIWPA's language that the purported whistleblower must
"discover" the illegal activity described in the report, Pl.'s
Mem. 29, and that Malone is not precluded from protection under the
RIWPA because he may have been obligated to report such activities
as part of his "managerial responsibilities." Id. at 31.

In order to prove his allegations under the RIWPA, Malone was
required to prove, by a preponderance of the evidence, that (1) he
reported, verbally or in writing to Lockheed Martin or to his
supervisor a violation of a federal, state, or local law or
regulation which Malone knew or reasonably believed had occurred or
was about to occur; (2) he was discharged, threatened or otherwise
discriminated against by Lockheed Martin; and (3) there was a
causal connection between the report and the discharge, threat or
discrimination. See Marques v. Fitzgerald, 99 F.3d at 4 (holding
that "an employee must demonstrate that there was a causal
connection between the report and the termination"). The jury was
instructed accordingly and no objections to the instructions were
raised by either party.

1. The Report

At trial, Malone recounted that on September 24, 2004, he
received a report from his subordinate Richard Goulart ("Goulart")
that two of Goulart's co-workers, Pires and Lastowski, had accepted
gifts of tools from Olimpio Pavao ("Pavao"), a government employee.
Malone sent a memorandum detailing Goulart's report to Supancic,
who in turn forwarded it to Human Resources and the Lockheed Martin
ethics officer. Although Malone testified that Pavao was also

stealing scrap metal and selling it for personal profit, his memorandum to Supancic made no mention of such theft. Pl.'s Ex. 17.

At trial, Malone acknowledged that, prior to receiving Goulart's report, he was unaware that his subordinates were receiving gifts of tools, possibly in exchange for overlooking the theft of scrap materials. The initial report was made by Goulart, who feared that he would be ostracized at work and who had already been threatened by the same co-worker whom he accused of being involved in the incident. Malone, on the other hand, never asserted that he expected retaliation of any kind when he forwarded Goulart's report to Supancic. In fact, it apparently never occurred to Malone how the conduct of his subordinates might reflect on his managerial abilities. As S. Thompson recounted at trial, he had to explain to Malone on numerous occasions why Malone received a reprimand. Malone did not discover the inappropriate conduct of his subordinates, nor did he require encouragement to "come forward" and relate the report of another subordinate to his own supervisor. Consequently, this Court finds that Malone's report to his supervisor is not the type of conduct the whistleblower statute seeks to protect.

To indulge Malone's interpretation of the act, Supancic, S. Thompson, and anyone else involved in the reporting of the incident up the chain of command would automatically be protected from retaliation. Nothing in the RIWPA requires such a result, nor would that outcome serve RIWPA's purpose.

-27-

2.  The Re-assignment

Even assuming that Malone's interpretation of the RIWPA affords him protection for passing Goulart's report to Supancic, his whistleblower claim falls short with respect to the other two elements.   While Malone's assertions may initially have been sufficient to withstand the defendants' motion for summary judgment, the evidence revealed during the course of the trial does not support Malone's claim of a retaliatory demotion nor does it demonstrate a causal connection between Malone's forwarding Goulart's report of the tool incident and Malone's eventual demotion to Field Engineer and transfer to the Trident DPS project.

Instead, the evidence submitted to the jury established that Malone was reprimanded and eventually re-assigned because he continued to take unscheduled leave on numerous occasions in clear disregard of the detailed communications from his immediate supervisor, who had repeatedly requested that Malone provide timely notice.

Malone's re-assigment as EIC occurred on November 15, 2004, several months after two other (Caucasian) Level 4 Managers had already been re-assigned to EIC positions in connection with Lockheed Martin's restructuring.[5]   Malone's first re-assignment did not result in a loss of benefits and/or pay and Malone provided no evidence that this event constituted more than the title change

---

[5]

One additional Level 4 Manager, T. Maurer, was on disability and eventually died. The other managers who retained their status were all Level 5 Managers.  Pl.'s 16 at LM 151.

previously imposed on Cobb and Rhoads.  Moreover, Malone's second re-assignment as Field Engineer on the Trident DPS project, which, notwithstanding the unchanged pay and benefits, clearly amounted to a demotion, occurred only after Malone again failed to appear for work on November 16 and 17, 2004.  In other words, Malone offered no evidence to establish that his initial title change differed from that given to the two other Level 4 employees, nor did he establish that his eventual re-assignment was a means to retaliate against him for passing along Goulart's report of misconduct.

3. Causation

Malone testified that, once he passed on Goulart's report, he suddenly began receiving warnings like the one given to him by Supancic on October 18, 2004, which stated that "the requirements of your job are not being met."  Pl.'s Ex. 21.  The evidence offered at trial showed that, following the ethics investigation initiated by Lockheed Martin, S. Thompson advised Malone that Malone was partially responsible for the incident because he should have known about the conduct by his subordinates and should have taken a more active role in preventing it.  Subsequently, Malone received a written warning which concluded that Malone's "lack of effective and/or active management practices contributed to" the tool incident.  Def.'s Ex. U.  S. Thompson maintained, however, that Supancic had no role in issuing the October 18, 2004 disciplinary letter; that Malone's title change was not a consequence of the ethics investigation; and that Malone did not lose any pay or benefits as a result.

-29-

Malone's assertion that he suddenly received warnings regarding his attendance after the tool incident are simply not supported by the evidence offered at trial. Instead, it was clearly established that, as far back as January 24, 2002, Malone was repeatedly directed to provide advance notice prior to taking vacation. Def.'s Ex. B. Following a detailed e-mail by Supancic explaining the need for such notice, Malone nevertheless requested same day leave on at least six separate occasions prior to the tool incident. (June 18, 2002, Def.'s Ex. C; October 7, 2002, Def.'s Ex. D; June 11, 2003, Def.'s Ex. E; December 8 and 9, 2003, Def.'s Ex. G; January 28, 2004, Def.'s Ex. H; August 27, 2004, Def.'s Ex. I). Supancic began informing L. Thomson in late 2003 of Malone's unplanned absences and requested a discussion about placing a warning in Malone's personnel folder. Def.'s Ex. G. Supancic contacted L. Thomson again on August 29, 2004, indicating his increasing concern about the impact of Malone's absences on his performance. Def.'s Ex. I. In other words, there was considerable evidence demonstrating that the warnings and reprimands issued to Malone did not suddenly begin after he apprised Supancic of Goulart's allegations, but that Malone had previously been advised on numerous occasions over a two and a half year period that his habit of taking unscheduled vacation days was unacceptable.

Moreover, after Malone informed Supancic of Goulart's report on September 24, 2004, he was again absent without prior authorization between October 4-7, 2004 and could not be reached by Supancic. Although Malone was sent a notice by courier requiring

-30-

him to report to Supancic's office on October 7, 2004, he failed to do so, and only appeared on October 8, 2004, after a second message by courier was sent.

In sum, no evidence was submitted to the jury which supported a causal connection between Malone's forwarding of Goulart's report and Malone's eventual demotion to Field Engineer on the Trident DPS Project. As testified by Lockheed Martin's Human Resources Manager S. Thompson, Malone received a reprimand because he should have been aware that his subordinates improperly accepted gifts of tools and because he failed to take a more active role in preventing such conduct. Whatever Malone's perception may have been with respect to the connection between the tool incident and his eventual demotion, it is undisputed that on at least two more occasions between those two events, Malone again failed to appear for work or to communicate with his superior about his absence. Against the background of Malone's unscheduled absences over a period of more than two years, a causal link between the forwarding of Goulart's report and Malone's reassignment to Field Engineer on the Trident DPS project amounts to nothing more than speculation, based solely on the fact that the re-assignment happened at some point after the report was forwarded. After carefully considering all of the evidence presented at trial in the light most favorable to Malone, and drawing all reasonable inferences in Malone's favor, this Court concludes that the evidence presented to the jury was simply insufficient, as a matter of law, to support Malone's claim under the RIWPA. Therefore, the defendants' motion for judgment as a

-31-

matter of law is granted with respect to the RIWPA claim.

D.  Motion for New Trial

This Court is required to rule conditionally on the defendants' motion for new trial, even when the motion for judgment as a matter of law is granted. Fed. R. Civ. P. 50(c); <u>Jennings v. Jones</u>, 499 F.3d 2, 21 (1st Cir. 2007)("Federal Rule of Civil Procedure 50(c)(1)requires the district court to rule conditionally on such motions in the event that the grant of judgment as a matter of law is overruled on appeal").  In determining a motion for new trial, the Court "has a duty to set aside the verdict and grant a new trial if [it] is of the opinion that the verdict is against the clear weight of the evidence . . . or will result in a clear miscarriage of justice."  <u>Coffran v. Hitchcock Clinic, Inc.</u>, 683 F.2d 5, 6 (1st Cir. 1982).  This is a lesser standard than the one employed in determining a motion for judgment as a matter of law, because the Court is free to weigh the evidence and "need not view it in the light most favorable to the verdict winner." <u>DLC Mgmt. Corp. v. Town of Hyde Park</u>, 163 F.3d 124, 134 (2d Cir. 1998)(cited in <u>Jennings v. Pare</u>, 2008 WL 2202429 at *2 (D.R.I. May 27, 2008)). Even if the jury's verdict is supported by substantial evidence, a new trial may be granted.  <u>DLC Mgmt. Corp. v. Town of Hyde Park</u>, 163 F.3d at 134.

For the reasons already asserted in this Court's analysis of the defendants' motion for judgment as a matter of law, and because this Court concludes that the jury's verdict was against the clear weight of the evidence, the defendant's motion for new trial is

conditionally granted. Now that the Court has determined, after hearing all of the evidence, that any evidence related to events outside of the applicable statutes of limitation should not have been submitted to the jury and, because such evidence was highly prejudicial to the defendants, a new trial must be based on only that evidence that was properly admitted.

In addition, the Court notes that the defendants' objections to several remarks Malone's counsel made during his closing argument were well taken. On at least four different occasions, the Court cautioned Malone's counsel to stick to the facts of the case and not to invite the jury to speculate. Inter alia, Malone's counsel cast doubt on who had actually written Malone's December 2003 performance report, (Trial Tr. vol. 4, 22 April 30, 2009); he suggested that Human Resources disagreed with Supancic's request to place a written warning in Malone's file, id. at 27; and he introduced the idea that Malone's position was changed to flex time after it had been taken over by a Caucasian employee, id. at 43. None of these assertions, which relate directly to Malone's claims of deliberate persecution by Supancic and race-based discrimination, were supported by facts introduced at trial. The Court is of the opinion that, in the aggregate, such assertions were sufficiently prejudicial to the defendants to warrant the grant of defendants' motion for a new trial. See e.g. S.E.C. v. Happ, 392 F.3d 12, 26-27 (1st Cir. 2004)(setting forth test to assess improper argument or conduct of counsel).

## Conclusion

For the reasons set forth above, the defendants' motion for judgment as a matter of law is GRANTED; and, in the event an appeal is taken from this decision and the grant of the motion for judgment as a matter of law is overturned, the defendant's motion for a new trial is conditionally GRANTED. The defendants' motion for remittitur is denied as moot, without prejudice to refile if the grant of the motion for judgment as a matter of law is reversed. In light of the Court's grant of the defendants' motion for judgment as a matter of law, the plaintiff's motion for attorney fees is denied.

SO ORDERED.

Mary M. Lisi
Chief United States District Judge

July 16 ,2009